In re: **PHENYLPROPANOLAMINE (PPA) PRODUCTS LIABILITY LITIGATION**

**Park**

v.

**Chattem, Inc., et al.,**

**No. MDL 1407.**

United States District Court, W.D. Washington.

Nov. 12, 2004.

Arthur Sherman, Sherman Salkow & Petoyan, Los Angeles, CA, Christina A Lopez–Fountain, Lopez Hodes Restaino, Milman & Skikos, Newport Beach, CA, Christopher A Seeger, Seeger Weiss (N.Y.), New York, NY, James F Green, Ashcraft & Gerel, Washington, DC, Lance Eugene Palmer, Levinson Friedman, Seattle, Michael W Heaviside, Ashcraft & Gerel (DC), Washington, DC, Ramon Rossi Lopez, Lopez Hodes Restaino, Milman Skikos & Polos, Newport Beach, CA, Richard S Lewis, Cohen Milstein Hausfeld & Toll, Washington, DC, Ron Michael Meneo, Early Ludwick & Sweeney, New Haven, CT, Stephen A Weiss, Seegwe Weiss LLP, New York, NY, for John Park, Danza Honeyblue, Plaintiffs.

Peter Simshauser, Skadden Arps Slate Meagher & Flom, Los Angeles, CA, Chester Crews Townsend, Miller & Martin, Chattanooga, TN, John J Petrullo, Buchalter Nemer Fields & Younger, Mary G Whitaker, Lewis D'Amato Brisbois & Bisgaard, Los Angeles, CA, Rodney L Umberger, Jr, Williams Kastner & Gibbs, Jan Catherine Kirkwood, Williams Kastner & Gibbs (SEA), Seattle, for Thompson Medical Company Inc, Delaco Company, Chattem Inc, John 1–10 Does, Defendants.

## MEMORANDUM AND ORDER

ROTHSTEIN, District Judge.

### I. Introduction

This matter comes before the court on the joint motion of plaintiffs and defendant Chattem, Inc. ("Chattem"), for approval of a proposed Class Action Settlement Agreement (the "Settlement" or "Settlement Agreement") and for certification of the Settlement class (the "Class") pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure ("the Joint Motion"). For the reasons discussed below, the court concludes that the requirements of Fed.R.Civ.P. 23 have been satisfied, and that the Settlement is fair, reasonable and adequate. Therefore, the court grants the Joint Motion, certifies the Class, and approves the Settlement pursuant to Fed. R.Civ.P. 23(e).

### A. Background and Procedural History

The Settlement involves Dexatrim® products containing phenylpropanolamine ("PPA") alleged to have been ingested on or after December 21, 1998 ("Dexatrim® Products"). Chattem marketed Dexatrim® Products from December 21, 1998,[1] until Chattem withdrew the product from the market in November 2000. The withdrawal of PPA-containing products from the market was

---

**1.** On December 21, 1998, Chattem purchased the Dexatrim® product line from Thompson Medical Company, Inc. ("Thompson"). Thompson subsequently merged with The Delaco Company ("Delaco"), which assumed Thompson's liabilities. On February 12, 2004, Delaco filed a Petition for Bankruptcy in United States Bankruptcy Court for the Southern District of New York. Although Delaco is not party to this Settlement, it has reached a Memorandum of Understanding with the plaintiffs that is very similar to the plaintiffs' agreement with Chattem.

precipitated by Food & Drug Administration ("FDA") concern about the results of a case-control study, the Hemorrhagic Stroke Project ("HSP"), which suggested that the ingestion of PPA might be associated with an increased risk of hemorrhagic stroke. Following publication of the HSP, plaintiffs throughout the United States filed suit against Chattem and the other manufacturers of PPA-containing products, alleging a variety of injuries stemming from the ingestion of PPA. Many of these cases have been removed to federal court on the basis of diversity jurisdiction.

In August 2001, the Judicial Panel on Multidistrict Litigation consolidated and transferred all pending federal PPA litigation to this court as Multidistrict Litigation ("MDL") No. 1407. Since the creation of MDL 1407, extensive fact discovery has been completed as to many MDL defendants, including Chattem. Federal proceedings have been complemented by extensive activity in state courts, including coordinated proceedings in California, New Jersey, Pennsylvania and Texas. In addition to overseeing the discovery process, this court has decided issues concerning the admissibility of scientific evidence regarding PPA.[2] With the court now in the process of remanding MDL 1407 cases to transferor courts for trial, the PPA claims against Chattem are mature and ripe for settlement.

## B. Settlement Negotiations

Beginning in December 2002, Chattem and a subcommittee of the MDL Plaintiffs' Steering Committee (now "Class Counsel") began initial settlement negotiations. During these preliminary discussions, Chattem and Class Counsel developed the concept of the uniform Dexatrim® Case Scoring System and Matrix ("Matrix") to value each case. Over the next nine months, counsel refined the Matrix and

debated values, often engaging in heated negotiations. Eventually, the parties reached an impasse, and agreed to hire John E. Keefe, a former New Jersey judge, to assist them in reaching settlement. The considerable efforts of Judge Keefe, Chattem, and Class Counsel finally resulted in the parties presenting the court with an executed Memorandum of Understanding on December 18, 2003, and in public announcement of the Settlement by Chattem the following day. Over the next few months, the parties hammered out the remaining details of the Settlement[3] and the Settlement Agreement. On April 13, 2004, the parties filed a Motion for Preliminary Approval of the Settlement. In an order dated April 23, 2004, the court preliminarily approved the Settlement pending a fairness hearing, temporarily certified the Class pursuant to Rule 23(b)(3), and authorized notice to be given to the Class.

## C. The Settlement

### 1. The Class

Pursuant to the Settlement Agreement, the

'Settlement Class' shall mean all Dexatrim® Product Users who sustained bodily injury on or after December 21, 1998 allegedly as a result of his or her ingestion of a Dexatrim® Product, and their associated Derivative Claimants and Representative Claimants. The Settlement Class specifically includes Dexatrim® Product Users who have or may have claims with respect to injuries not yet manifested, as well as those persons who seek medical monitoring for potential future injuries that have not yet manifested. The Settlement Class shall expressly exclude any person or entity that entered into a settlement with Chattem (which included a release) related to claims arising out of the use of a Dexa-

---

2. In early 2003, the court held a hearing regarding the admissibility of plaintiffs' expert opinions as to general causation pursuant to Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The court heard several days of live testimony and argument, and found that generic opinions that PPA can cause hemorrhagic and ischemic stroke are admissible, but that opinions that PPA can cause cardiac, or certain other injuries, are not.

3. During this period of time, Sidmak Laboratories, Inc. ("Sidmak") agreed to become part of the Settlement. Sidmak executed an Amended Memorandum of Understanding on February 18, 2004, and is a Released Party pursuant to Section 1.1(xx)(iii) of the Settlement Agreement. Sidmak has been acquired by Pliva, a Croatian company.

trim® Product. The Settlement Class shall also expressly exclude any individual (and their associated Derivative Claimants and Representative Claimants) against whom any court has entered judgment or dismissal with prejudice in an action related to a Dexatrim® Product on or before the Preliminary Approval Date, regardless of whether such judgment or dismissal is the subject of a motion for reconsideration, motion to alter, amend or set aside the judgment or similar motion; or an appeal. Settlement Agreement, § 1.1(bbb).

## 2. Notice of Settlement

Chattem and Class Counsel designed a notice procedure with the goal of providing actual notice to all potential members of the class ("Class Members") whose addresses were known or reasonably could be located, and to provide publication notice to reach potential Class Members whose whereabouts were unknown. To disseminate individual notice where feasible, Chattem's counsel mailed 504 individual notice packets to known potential claimants. Chattem published advertisements to notify unknown potential Class Members of the existence of the Settlement (the "Summary Notice"). The Summary Notice appeared seven times in *USA Today,* and once in *Parade* magazine. In addition, notice was published in 31 regional newspapers between May 24, 2004 and June 22, 2004. The combined national and regional newspaper advertisements reached a readership of roughly 150 million people, and cost over $500,000. In addition to the 504 notice packets initially mailed, the Claims Administrator mailed 496 notice packets to persons who requested them by telephone, mail, or via a website created by the Claims Administrator to facilitate the administration of the Settlement.

## 3. Main Provisions of the Settlement Agreement

In accordance with the Settlement Agreement, eligible Class Members receive payment from the Class Benefit Fund and may also be eligible to receive payment from an Extraordinary Damages Fund. The Class Benefit Fund provides compensation to each eligible Class Member ranging between $100 and $5,000,000, depending on the type and severity of the injury claimed, the Class Member's age and other liability and damages factors. Under the Matrix, claims of stroke and non-stroke injuries are treated somewhat differently.

Hemorrhagic and ischemic stroke claims are subject to a comprehensive evaluation consisting of four components: (1) product identification; (2) temporal relationship of ingestion to injury; (3) liability and causation; and (4) damages. The "Final Case Score" is the sum of these separate elements, and determines the Class Member's "Matrix Level." A Class Member's base "Settlement Compensation" (before adjustment) is determined based on the Matrix Level and the Class Member's age at the time of the stroke.

In contrast, claims for non-stroke injuries are subjected to two threshold inquiries: product identification and temporal relationship. If a cardiac injury claim, or other type of injury claim satisfies both these inquiries, the claim is eligible for a base Settlement Compensation (before adjustment) of between $100 and $2,000, depending on the Class Member's age at the time of injury. These diminished settlement values reflect this court's ruling that evidence regarding cardiac, and several other types of injuries is not admissible. *See* Section I(A), fn. 2, above.

Base Settlement Compensation may be reduced in three circumstances: (1) where the Class Member's injury is an ischemic (as opposed to a hemorrhagic) stroke;[4] (2) where there is a defense related to statute of limitations; and (3) where co-defendants are potentially liable for the plaintiff's injuries.

In addition to receiving payment from the Benefit Fund, certain Class Members are eligible to receive payment from the Extraordinary Damages Fund. This Fund exists to compensate Class Members who have in-

---

**4.** The Settlement Compensation for a Class Member suffering from an ischemic stroke is reduced by 15% as the result of a compromise based on this court's *Daubert* ruling that proof of purport-ed PPA-ischemic stroke association poses more difficult questions under *Daubert* than are presented by proving a link between PPA and hemorrhagic stroke.

curred more than $250,000 in non-reimbursed economic damages.

### 4. Claims Administration

A "Class Counsel Claims Coordinator," a "Chattem Claims Coordinator" and a third party "Claims Administrator" will coordinate and administer the Settlement under the supervision of a Special Master. To receive benefits, a Class Member must complete a Benefit Claim Form and, in certain circumstances, a Supplemental Claim Form. Once a Class Member submits the required forms, the Class Member (or their counsel) and the Chattem Claims Coordinator meet and confer to determine the benefits the Class Member is entitled to receive under the Matrix. If, after meeting and conferring, the Class Member and the Chattem Claims Coordinator are unable to agree on fair compensation, the Class Member may either accept the Chattem Claims' Coordinator's benefit determination, or challenge it within 30 days. If challenged, the matter will be decided in a binding arbitration by the Special Master appointed by the court.[5]

Pursuant to Section 2.4 of the Settlement Agreement, Chattem was required to create the Initial Chattem Settlement Trust (the "Trust"), and to fund any shortfall that might arise if its insurers failed to provide their respective shares of the funding. By order dated April 13, 2004, this court directed Chattem to fulfill its obligations, and Chattem complied by depositing $60,885,000 into the Trust. Subsequently, on April 23, 2004, the court issued a Writ of Attachment and took possession of the Trust for the benefit of the Class.

### 5. Opt–Outs

The Settlement has an impressively high participation rate. According to Chattem and Class Counsel, Chattem has received 387 claims, and only 16 Class Members have elected to opt out of the Settlement. Three objections to the Settlement were filed, one by nonsettling defendants, and two by small groups of purported Class Members. *See* Sections I(A)-(F), below.

---

**5.** Pursuant to Section 4.2(i) of the Settlement Agreement, the losing party is required to pay a penalty of at least $10,000 of the cost of the arbitration to the Settlement Trust. However,

### 6. Effect of the Settlement on Contingency Fee Agreements

The Settlement does not alter contingency fee agreements entered into before December 21, 2003. However, attorneys who entered into contingency fee agreements after December 21, 2003, are entitled only to reasonable fees for completing claim forms and for consulting with their clients, such fees not to exceed 10% of the Plaintiff's total Settlement Compensation, or $10,000, whichever is less.

### 7. Contribution and Indemnity for Nonsettling Defendants

The Settlement Agreement contains a release and dismissal of contribution and indemnity claims by nonsettling defendants, and a bar order:

> Consistent with the provisions of Article 8 of this Settlement Agreement, the releases herein shall extinguish any claims for contribution and/or indemnification against Chattem or the other Released Parties.

Section 6.2 of the Settlement Agreement.

> The parties hereby agree to request that the Court enter an order finding this Settlement Agreement to be a good faith settlement and barring and enjoining, to the extent permitted by applicable law, the commencement and prosecution of any contribution and/or indemnification claim or action by or on behalf of any ... entity against Chattem or any other Released Party for reimbursement for payments made or to be made to or on behalf of any ... Class Member for Dexatrim® Products Related claims, actions or injuries[.]

Section 6.3 of the Settlement Agreement.

### 8. Attorneys' Fees

Case Management Order ("CMO") 8 was entered on July 9, 2002, and established the Plaintiffs' Litigation Expense Fund to compensate and reimburse the Plaintiffs' Steering Committee ("PSC") and other authorized attorneys for services performed and expenses incurred for the common benefit of

---

Chattem and Class Counsel since have consented to allow Judge Keefe the discretion to set the penalty on a case by case basis, without regard to a minimum amount. *See* Section II(C)(4), below.

MDL plaintiffs. Pursuant to CMO 8, 4% of any amount paid in connection with the settlement of a federal action associated with MDL 1407 must be paid into the MDL Fee and Cost Account ("MDL Account"). Class Counsel filed a motion asking the court to modify CMO 8 to increase the percentage paid into the MDL Account from 4% to 8% on amounts that are paid in this Settlement. Class Counsel seek this modification in consideration of the effort put forth by the PSC subcommittee to conceive of, and implement, the global settlement of Dexatrim claims in MDL 1407. The court's ruling on this motion will be contained in a forthcoming order.

### 9. Fairness Hearing

On August 26, 2004, the court conducted a fairness hearing to determine whether the proposed class should be certified, and whether the settlement was fair, adequate and reasonable. All interested parties were afforded an opportunity to be heard.

## II. Discussion

### A. Objectors

Three groups filed objections to the Settlement and appeared at the fairness hearing. First, a group calling themselves the "non-settling defendants" submitted a limited objection to the Settlement based on certain language in the bar order. The court overruled this objection in an order dated October 26, 2004. This objection and the court's ruling are reviewed in Section II(C)(3), below.

In addition, two small groups of purported Class Members filed objections to the Settlement. First, Mose Wiley, Arla Grathwohl, Judy Broadway and Joyce Waterman–Reynolds ("the Wiley Objectors"), represented by Lewis Saul & Associates, filed an objection seeking discovery from Class Counsel. These objectors contend that notice was inadequate, that the Class does not satisfy the requirements of Rule 23, and that the terms of the Settlement are not fair, adequate and reasonable. The court is satisfied that the Wiley Objectors are Class Members, and that their objection was timely filed. These objections are addressed in relevant sections below.

The "Daunt Objectors" are a group of five persons: Sharon Daunt; Etrenda Davis; Phyllis Clark; Victoria Collins; and Ophelia Hill. The Daunt Objectors were represented at the fairness hearing by Jamie B. Mathey and Robert W. Bishop of Bishop & Associates, P.S.C. Chattem and Class Counsel assert that the Daunt Objectors' objection is untimely. The court's April 23, 2004 order stated that any objections to the Settlement "must be filed in this Court and served on all parties by July 7, 2004." The Daunt Objectors did not file an objection until July 12, 2004, when the court received, via U.S. mail, a Notice of Intention to Appear at Fairness Hearing, and the Objections of Sharon Daunt, Etrenda Davis, Phyllis Clark, Victoria Collins and Ophelia Hill to the Proposed Class Action Settlement. Included in this mailing was an opt-out letter from Sharon Daunt. More untimely filings trickled in from the Daunt Objectors over the coming weeks. On July 30, 2004, the court received, via U.S. mail, the Objectors' Motion for an Order Allowing them to File Their Letters of Signs and Symptoms Out of Time (which inexplicably offered no explanation for the failure to submit these letters in a timely fashion), and Objectors' Notice of Filing opt-out letters of the remaining four objectors.[6] Finally, on August 11, 2004, the court received by electronic filing the Supplemental Objections of Sharon Daunt, Etrenda Davis, Phyllis Clark, Victoria Collins and Ophelia Hill to the Proposed Class Action Settlement ("Supplemental Daunt Objection").

At the fairness hearing, the court questioned Mr. Mathey and Mr. Bishop regarding the lateness of their filings. Mr. Bishop

---

**6.** It is worth noting that the Daunt Objectors' opt-out letters are remarkable for their failure to assert any injury compensable under the Matrix. For example, Sharon Daunt claims that taking Dexatrim with PPA caused her "to become very dizzy, [her] heart to race, and also caused [her] to become very sick to [her] stomach. These symptoms scared [her] and caused [her] to have a panic attack, fearing [she] was having a heart attack." Victoria Collins claims that taking Dexatrim with PPA "caused [her] heart to flutter and race, and also made [her] feel very scared and nervous." Phyllis Clark, Etrenda Davis and Ophelia Hill's letters recount substantially similar experiences.

explained that he had understood the notice to require only that objections be postmarked, not filed, by July 7, 2004. Counsel for Chattem confirmed that the notice did indicate that objections could be postmarked by July 7, 2004, but stressed that this was an unintentional inconsistency, and that it had not been Chattem and Class Counsel's intention to override the court's order. Mr. Bishop argued that objectors "look at a notice and they believe that notice is what they're supposed to do." Mr. Bishop, presumably, was referring only to the documents received by the court on July 12, 2004, and did not hazard an explanation as to the untimeliness of the filings received in the ensuing weeks. Addressing Mr. Bishop, the court deemed the Daunt objections untimely, concluding that "there is a distinction between you and the people who come to you to object[,]" and that counsel are "required to really understand ... the rules of the court[.]" The court noted that it would deal with the objections made by the Daunt Objectors to the extent that they overlapped with the objections timely filed by the Wiley Objectors.

### B. Class Certification

■ In general, parties seeking certification of a class must satisfy two sets of requirements, those set forth in Fed.R.Civ.P. 23(a) and Fed.R.Civ.P. 23(b). First, Rule 23(a) requires that (1) the proposed class be sufficiently numerous; (2) there be at least one common question of fact or law; (3) the named plaintiff's claims be typical of the class as a whole; and (4) the named plaintiff adequately represent the class. Second, a class action may be maintained only if it meets one of the three criteria set forth in Rule 23(b). Chattem and Class Counsel seek certification pursuant to Rule 23(b)(3), which allows a class action where

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest in the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of

any litigation concerning the controversy already commenced by or against any members of the class; (C) the desirability or undesirability of concentrating the litigation in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

These general standards for class certification are applicable to certifying a class action for settlement, with one exception. A district judge faced with a request to certify a settlement class "need not inquire whether the case, if tried, would present intractable management problems[.]" *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The *Amchem* court added, however, that the settlement context demands "undiluted, even heightened, attention" to "unwarranted or overbroad class definitions." *Id. See also Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir.1998) (calling for "a higher standard of fairness" in reviewing a settlement negotiated before class certification).

### 1. Requirements of Rule 23(a)

For the reasons set forth below, the court finds that the Class satisfies all requirements of Rule 23(a).

#### a. Numerosity

■ The court is convinced that the Class is sufficiently numerous. Rule 23(a)(1) permits class action treatment only if "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). The Wiley Objectors argue that joinder is practicable in this situation, because all Class Members can be identified. This contention is unpersuasive. It is certainly the case that if all the members of the class could not be identified, that factor would militate in favor of class certification. *See, e.g., Moeller v. Taco Bell Corporation,* 220 F.R.D. 604, 608 (N.D.Cal.2004) (fact that class is difficult to identify supports class certification). However, it does not follow that where all class members have been identified, class certification should be denied. Rather, the key issue is whether joinder is practicable, and in this case, in which the Class includes claimants with pending actions in state, as well as federal, courts, both the size and geographic

diversity of the Class render joinder impracticable. *See Council of and for the Blind of Delaware County Valley, Inc. v. Regan,* 709 F.2d 1521, 1544 (D.C.Cir.1983) ("courts have considered, in addition to the size of the class, the geographical diversity of the class members" that could render joinder of class members impracticable).

### b. Commonality

 Rule 23(a)(2) requires that questions of law or fact be common to the class. This requirement can be satisfied, where class members' claims have divergent facts, by the existence of a shared legal issue, or it can be satisfied where there are disparate legal remedies available to the claimants, but where there is a common core of salient facts. *Hanlon,* 150 F.3d at 1019. The mere existence of individual questions does not defeat satisfaction of the commonality requirement. *Id.*

The court finds that the commonality requirement is easily met in this case. All members of the Class allege injuries resulting from the ingestion of a Dexatrim® product containing PPA. This commonality raises many common questions including: whether Dexatrim® caused hemorrhagic strokes, ischemic strokes, or other injuries; whether Dexatrim® Products were defective and/or unreasonably dangerous; at what point Chattem learned of the alleged defect in its Dexatrim® Products; and whether Chattem took action in a timely fashion upon learning of the alleged defect.

### c. Typicality

 Rule 23(a)(3) requires the claims of the representative plaintiffs to be typical of the claims of the class. Typicality hinges on the similarity between the representative plaintiffs' claims and those of class members. *Hanlon,* 150 F.3d at 1020. This Class has two proposed representatives, who, according to Chattem and Class Counsel, "exemplify various characteristics of other Class Members." One proposed representative plaintiff, Danza Honeyblue, is a 56 year-old female who alleges that she sustained a hemorrhagic stroke as a result of ingesting Dexatrim®.

The other is Jon Park, a 45 year-old male who alleges that he sustained an ischemic stroke after using Dexatrim®. Chattem and Class Counsel assert that the proposed representatives are not subject to any unique defenses which would eliminate the typicality of their claims.

The Wiley Objectors argue that the Class representatives' claims are not typical of those of the Class because the representatives are both holders of claims made or lawsuits filed prior to November 6, 2003,[7] rather than claims made or lawsuits filed after that date. Under the Matrix, plaintiffs who made claims or filed lawsuits after November 6, 2003, and after the statute of limitations had run in either the forum state or the plaintiffs' state of residence at the time of injury, are subject to severe limitations on their recovery. The Wiley Objectors also contend that the representative parties, as stroke victims, are not representative of those claimants who suffered other types of injuries.

The objectors would have to do more than simply point to these, or other, differences to defeat typicality. Typicality does not require that the claims of the class representatives be identical to those of the other class members. *Staton v. Boeing Co.,* 327 F.3d 938, 957 (9th Cir.2003). In fact, representative claims are "typical if they are reasonably coextensive" with those of other class members. *Hanlon,* 150 F.3d at 1020. The court is of the opinion that the claims of the Class representatives, although not identical, are indeed typical of the claims of the Class as a whole.

### d. Adequacy

 Rule 23(a)(4) requires that a class representative fairly and adequately protect the interests of the class. Whether there is adequate representation is determined by the answers to two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon,* 150 F.3d at 1020 (cita-

---

7. November 6, 2003, is three years from the date the FDA requested that the manufacturers of PPA-containing products voluntarily withdraw such products from the market.

tion omitted). Rule 23(a)(4)'s second requirement is easily satisfied because it is uncontested that the proposed representatives are represented by competent attorneys with extensive experience in mass tort litigation.

Regarding the first requirement, the parties assert that the proposed Class representatives' interests are neither antagonistic to, nor in conflict with, the interests of other Class Members. Chattem and Class Counsel contend that so long as all Class Members are united in asserting a common right, such as achieving the maximum possible recovery, Class interests are not antagonistic. In so arguing, the parties seek to distinguish the Settlement from the one at issue in *Amchem,* in which the Supreme Court affirmed the Third Circuit's ruling vacating district court certification of a class, in part because the interests of present (asbestos) claimants conflicted with those of potential future claimants. *Amchem,* 521 U.S. at 625–28, 117 S.Ct. 2231. In this case, because there is no scientific evidence of latent injuries from the ingestion of PPA, there is no class of potential future claimants, as in *Amchem,* in whose interests it would be to preserve Chattem's resources for the future. Here, there is no reason to believe that the named plaintiffs and their counsel have any conflicts of interest with other Class Members.

The Wiley Objectors nonetheless urge the court to take note of several purported conflicts in the Settlement, including, for example, the difference in treatment between various types of claims under the Matrix, and the parties' decision to file the Matrix under seal, which the objectors contend concealed from Class Members the disadvantage of having failed to make a claim or file suit by November 6, 2003. The Wiley Objectors seek the opportunity to conduct discovery regarding these alleged conflicts.

First, disparate treatment of claims is obviously necessary if claims are to be valued and a settlement is to occur. Placing a lower value on claims that would have been barred by a defense of statute of limitations is hardly evidence of a conflict. The court is of the opinion that such disparate treatment under the Matrix is the product of intense, arms-length negotiations. Second, these objectors have offered no evidence that the Matrix was filed under seal for the purpose of concealing the potential disadvantages of the Settlement, rather than simply to allow the parties time to work out its finer points prior to making it public. In the absence of evidence of collusion, the court overrules these objections, and denies the Wiley Objectors' request for discovery. *See White v. National Football League,* 822 F.Supp. 1389, 1429 (D.Minn.1993), *aff'd,* 41 F.3d 402 (8th Cir. 1994), *cert. denied sub nom. Jones v. National Football League,* 515 U.S. 1137, 115 S.Ct. 2569, 132 L.Ed.2d 821 (1995) ("if there is no evidence of collusion in the negotiation process, objectors have no right to seek discovery concerning the negotiations of a class action settlement") (citations omitted). Finally, it is beyond dispute that the named plaintiffs and their counsel have prosecuted these actions vigorously on behalf of the Class. The court finds that class representatives Ms. Honeyblue and Mr. Park fairly and adequately protect the interests of the Class as a whole.

### 2. Rule 23(b)(3)

As explained above, Rule 23(b) permits the maintenance of a class action only if the action satisfies the prerequisites of Rule 23(a), and if it meets one of three alternative criteria set forth in Rule 23(b). The subsection of Rule 23(b) on which the Settlement is grounded is Rule 23(b)(3), which permits a class action if "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." For the following reasons, the court finds that the Class satisfies the requirements of Rule 23(b)(3).

### a. Predominance

■ The Rule 23(b)(3) predominance inquiry tests whether the Class is sufficiently cohesive to warrant adjudication by representation. *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231. Chattem and Class Counsel argue that the Class involves a common injury type, a common body of science, and allegations involving a common course of conduct

by the defendant. They point out that any individual differences among the claims of Class Members stemming from, for example, different state laws, would have more import in the context of litigation than settlement. Finally, Chattem and Class Counsel argue that because the Matrix specifically addresses issues of product identification, causation, injury and damages, it effectively nullifies those issues which otherwise would be considered individual, allowing common issues to predominate.

The Wiley Objectors argue that the Settlement does not do enough to address material differences between different categories of injury, and that the structure of the Settlement has bred antagonism between Class Members by drawing arbitrary distinctions between different types of claims. But these distinctions are hardly arbitrary. They are the result of hard-fought negotiations between Chattem and Class Counsel, and of compromises reached with the intervention of a skilled and respected mediator. The court finds this objection to be frivolous, and that the Class is sufficiently cohesive to warrant adjudication by representation.

### b. Superiority

■ Rule 23(b)(3) requires that a class action must be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). In making a finding under this rule, the court may consider the interest of members of the class in individually controlling the prosecution or defense of separate actions, the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, and the desirability or undesirability of concentrating the litigation of the claims in the particular forum. *Id.* Chattem and Class Counsel argue that a class action is the superior method of effectuating the Settlement because the alternative would be the individual trial or settlement of hundreds of cases. In addition, the parties argue that certification of the Class will serve judicial economy, and that the Judicial Panel on Multidistrict Litigation has already addressed the third factor by concentrating the litigation of the claims in this particular forum.

The Wiley Objectors contend that Class Counsel represent most of the identified Class Members, and that this was an incentive for Class Counsel to reach an agreement advantageous to their clients at the expense of unidentified Class Members. This objection is frivolous and it is overruled. There is no evidence that Class Counsel shirked their duty to any members of the Class. On the contrary, the parties have presented the court with persuasive evidence that the Settlement Agreement was reached as a result of fair negotiations by competent, experienced counsel. It is absolutely clear that a class action is superior to other available methods for the fair and efficient adjudication of this controversy, and therefore, the court finds that the superiority requirement is satisfied. The court hereby certifies the Class pursuant to Rule 23(b)(3).

### C. Fairness and Adequacy of the Settlement

### 1. General Considerations

■ Rule 23(e) requires the Court to determine whether a settlement is "fundamentally fair, adequate and reasonable." *Hanlon*, 150 F.3d at 1026. In exercising its discretion to approve the settlement of a class action, the Ninth Circuit has held that a district court should balance the following factors:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Id.* (Citation omitted.) It is this court's opinion that a balance of these factors weighs in favor of approving the Settlement.

■ First, in the months following the negotiation of Matrix values, several defense verdicts were reached in state court PPA cases. The Settlement, therefore, was negotiated at an opportune time for plaintiffs, and

it is likely that this fact added value to their claims. Second, settlement of these claims is far more efficient for claimants, Chattem and the judicial system, than the prosecution of separate actions. It is well understood that mass tort litigation places an unusual strain on court dockets, and each of these claims, absent the Settlement, could result in costly, time-consuming proceedings.

Third, because this court has already declined to certify litigation classes in MDL 1407, the Class could not be maintained for trial. If the Settlement is not approved, each of these actions would have to be adjudicated on an individual basis. Fourth, the amount offered in settlement is substantial. Chattem has deposited over $60 million into a settlement trust, and it has arranged for continual funding should the need arise. Fifth, litigation against Chattem is sufficiently mature, and settlement is appropriate at this stage. Sixth, Class Counsel, as well as counsel for Chattem, many of whom are extremely experienced in the area of mass tort litigation, are supportive of the Settlement. Further, it is obvious that the Settlement is the result of protracted, and sometimes difficult, negotiations; there is no evidence of collusion. Finally, the Class Members themselves have effectively voted heavily in favor of the Settlement, by not opting out. In fact, 95% of Class Members have chosen to take part in the Settlement. The court finds that a balance of these factors weighs heavily in favor of approving the Settlement.

### 2. Wiley Objectors

The Wiley Objectors claim that the Settlement is unfair, inadequate, and unreasonable. First, they reprise their objection to the disparate treatment of claims made or lawsuits filed after November 6, 2003, because, they claim this date "has no material relevance to ... settlement value." But as explained above, November 6, 2003, is not an arbitrary date; it was the third anniversary of the November 6, 2000, withdrawal of PPA-containing products from the market. Given that personal injury statutes of limitations are typically no longer than three years, and that the withdrawal of a product would commence the running of a statute under a liberal injury discovery rule, it was reasonable for the parties to compromise that claims not

filed by November 6, 2003, faced serious obstacles. This is particularly true because there is no scientific evidence suggesting latent effects from the ingestion of PPA. The court finds that the disparate treatment of claims on this basis is not arbitrary.

In a related objection, these objectors argue that discounts based on statutes of limitations in what are referred to as No Conflict/False Conflict cases are unfair. This category includes cases in which (1) the forum state and the state of the plaintiff's residence at the time of injury have the same discovery rule for statute of limitations purposes, (2) the plaintiff filed suit prior to the expiration of the statute, assuming that such a statute began to run on November 6, 2000, pursuant to a discovery rule, but (3) where the action would have been time-barred but for the discovery rule. Under the Matrix, claims that fall into this category are discounted by 13%. The Wiley Objectors insist that this discount will result in an arbitrary allocation of funds. The court must point out again that the Settlement was the result of over a year of negotiations, and that it is simply not tenable to argue that this sort of negotiated compromise renders the Settlement unfair because it allocates amounts among Class Members. This objection is overruled.

The Wiley Objectors also take issue with the Matrix's release of derivative claims without compensation, where, as in this case, derivative claims may be significant. Payments made under the Matrix, however, are intended to encompass all damages stemming from one injury, direct or derivative. The court overrules this objection, which verges on the frivolous.

These objectors also claim that the Extraordinary Damages Fund is inadequate because it only covers non-reimbursed and non-reimbursable expenses and therefore discriminates against insured claimants. Chattem and Class Counsel note that "the U.S. Congress did the same thing when it created the September 11th Compensation Fund. The Fund required the Special Master in charge of distributing the money to deduct all 'collateral source compensation' (e.g., benefits from other government programs, in-

surance benefits, etc.) from the award." The court is of the opinion that the distinction between insured and uninsured claimants is an appropriate one, and is a reasonable method of allocating funds. This objection is overruled.

The Wiley Objectors take issue with the limitations placed on certain contingency fee agreements under the Settlement. The Settlement Agreement provides that attorneys entering into contingency agreements after December 21, 2003, are entitled only to reasonable fees for filling out claim forms and consulting with their clients, with a cap of 10% of the total compensation, or $10,000, whichever is less. These objectors contend that nullification of these contingency fee contracts is unfair, because it may have discouraged attorneys from advertising for claimants. Chattem and Class Counsel announced the Settlement on Friday, December 19, 2003. Once Chattem and Class Counsel publicly announced the terms of the Settlement, there was no longer any real risk associated with taking on a Dexatrim® case against Chattem. Since it is this court's opinion that it is not only reasonable, but sensible, to limit contingency fees where, as here, the risk to plaintiffs' counsel was essentially nullified by the Settlement, this objection is overruled.

Finally, the Wiley Objectors objected to both the content and the dissemination of notice of the Settlement. Rule 23(c)(2)(B) provides that in any class action maintained under Rule 23(b)(3), "the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." In addition, the notice should describe, fairly and accurately and in a neutral manner, the claims and parties in the litigation, and the terms of the settlement. Due process requires that the notice make clear the options available to potential class members, including the right to opt out. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), *cert. denied,* 487 U.S. 1223, 108 S.Ct. 2883, 101 L.Ed.2d 918 (1988). Chattem's extensive notice campaign was preliminarily approved by the court in an order dated April 23, 2004. At that time, the court approved the manner of disseminating notice, and found that pursuant to Rule 23(c)(2)(B),

the notice concisely and clearly states in plain easy to understand language the nature of the action, the definition of the class certified, the class claims, issues or defenses, that a class member may enter an appearance through counsel if the member so desires, that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded, and the binding effect of a class judgment on class members under Rule 23(c)(3).

The Wiley Objectors contend that the extent of the notice was inadequate. Here, although the notice given to unidentified class members was published in 30 local newspapers, *USA Today* and *Parade* magazine, the Wiley Objectors point out that some notice programs have employed public relations campaigns "involving media releases and communications to government agencies and medical organizations, facilities and personnel, and more recently on-line facilities." The Wiley Objectors also claim that the content of the notice was inadequate, since the terms of the proposed settlement are less favorable to claimants whose lawsuits or claims were filed after November 6, 2003, but (they assert) that the notice failed to make that distinction sufficiently clear.

Chattem and Class Counsel argue that "[t]he Wiley Objectors simply prove the point that no matter how extensive a notice campaign is, more can always be done." The court agrees. The applicable standard is not the best conceivable notice, but the best notice practicable under the circumstances. The Supreme Court has held that Rule 23(c)(2)(B) requires notice to be " 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 173, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), *quoting Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The Wiley Objectors have done nothing more than draw the court's attention to a few tactics that Chattem did not happen to

employ in this notice campaign; in so doing, they have not shown that the notice provided was inadequate in any way, or that it was not reasonably calculated to inform interested parties of the Settlement. This objection is therefore overruled.

### 3. Nonsettling Defendants' Objection

The majority of the cases against Chattem include allegations against other defendants. The nonsettling defendants objected to the language in Sections 6.2 and 6.3 of the Settlement Agreement, set forth in Section I(C)(7), above, on the basis that the provisions could have the effect of cutting off a co-defendant's contribution rights where (1) Chattem is determined to have paid less than its proportional share, and (2) the relevant jurisdiction employs a *pro tanto* rule. After reviewing the briefing on this objection and hearing oral argument, the court ordered the nonsettling defendants to meet with Chattem and Class Counsel to reach agreement on this issue. The nonsettling defendants, Chattem and Class Counsel failed in this regard, and filed separate briefs proposing clarifying language for this court's Final Order and Judgment.

The nonsettling defendants insisted on language explicitly stating that the bar order does not circumvent the application of state law allowing contribution. Chattem and Class Counsel in turn expressed concern that the nonsettling defendants were attempting to "provide for the unfettered right to maintain claims for indemnification and contribution against Chattem and the other Released Parties[,]" a goal incompatible with the finality sought by the parties to the Settlement. Chattem and Class Counsel pointed out that only three of the 387 claims in the Settlement involve a co-ingestion case in a *pro tanto* jurisdiction, but in an effort at compromise, Chattem and Class Counsel proposed additional language giving the nonsettling defendants the right to apply to this court for relief:

> Despite the bar set forth herein, this Court retains jurisdiction to enforce and interpret the terms of this Final Order and Judgment. If in a particular case, no

judgment reduction, set off or other credit is available to the nonsettling defendant under applicable state law and the settlement extinguishes otherwise applicable state law rights of indemnity and/or contribution, the non-settling defendant may file a motion with the Court, and if found warranted, the Court may fashion an appropriate remedy that is consistent with the settlement agreement and the finality sought by that agreement and by this Final Order and Judgment.

The court ruled, in an order dated October 26, 2004, that the additional language proposed by Chattem and Class Counsel substantially protects the rights of the nonsettling defendants, particularly where the likelihood of the nonsettling defendants being prejudiced is so low. This ruling is reflected in the Final Order and Judgment that follows.

### 4. Penalty to Losing Party in the Event of Arbitration

At the fairness hearing, the court expressed some concern to Chattem and Class Counsel about a provision in the Settlement Agreement relating to a claimant's right to challenge a benefit determination. Pursuant to the Settlement Agreement, if such a challenge is lodged, the matter will be decided in a binding arbitration by a Special Master. Section 4.2(i) of the Settlement Agreement provides that the losing party is required to pay a penalty of at least $10,000 of the cost of the arbitration to the Trust. The court questioned the parties regarding how they reached agreement on the amount of the penalty. After a short colloquy, the parties indicated their agreement to leave the amount of any penalty to the sole discretion of the Special Master, without regard to a minimum amount.[8] The court, having overruled all objections lodged, and having found that the Settlement is fair, adequate and reasonable, hereby approves the Settlement.

### D. Anti–Injunction Act

In the instant case, because certain Class Members have pending cases in state courts,

---

8. Although this issue was among those that the Daunt Objectors attempted to raise, the court

had been prepared to raise this issue *sua sponte*.

and because the Settlement is conditioned on all Class Members being enjoined from pursuing their claims outside the settlement context, an injunction is necessary to implement this court's ruling certifying the Class and approving the Settlement. Upon the court's entry of its Final Order and Judgment, therefore, Class Members, including those with pending actions in state court, will be enjoined from pursuing their claims further.

Although the Anti–Injunction Act, 28 U.S.C. § 2283 (the "Act") generally prohibits federal courts from enjoining state court actions, there are three circumstances where such an injunction is appropriate: where "expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. This court's injunction is permissible pursuant to the third exception to the Act, referred to as the relitigation exception, which applies upon entry of final judgment, and "was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988).

### FINAL ORDER AND JUDGMENT

Accordingly, it is hereby ORDERED, ADJUDGED and DECREED as follows:

1. The following Class is CERTIFIED, for settlement purposes only, under Fed. R.Civ.P. 23(a), 23(b)(3), and 23(e) in *Park v. Chattem, Inc., et al.*, Case No. 02–755 (the "Action") and is defined as follows:

All Dexatrim® Product Users who sustained bodily injury on or after December 21, 1998 allegedly as a result of his or her ingestion of a Dexatrim® Product, and their associated Derivative Claimants and Representative Claimants. The Settlement Class shall expressly exclude any person or entity that entered into a settlement with Chattem (which included a release) related to claims arising out of the use of a Dexatrim® Product. The Settlement Class shall also expressly exclude any individual (and their associated Derivative Claimants and Representative Claimants) against whom any court has entered judgment or dismissal with prejudice in an action related to a Dexatrim® Product on or before the Preliminary Approval Date, regardless of whether such judgment or dismissal is the subject of a motion for reconsideration, motion to alter, amend or set aside the judgment or similar motion; or an appeal.

Dexatrim® Product Users are all persons who ingested one or more Dexatrim® Products on or after December 21, 1998 and who were citizens or residents of the United States at the time of their alleged injury.

Dexatrim® Product means all appetite suppressant products bearing the trademark Dexatrim® marketed, distributed and/or manufactured by Chattem, Inc. and/or The Delaco Company, as successor by merger to Thompson Medical Company, Inc. that contained Phenylpropanolamine.

2. As used herein, "Settled Claims" shall include any and all claims, including assigned claims, whether known or unknown, asserted or unasserted, regardless of the legal theory, existing now or arising in the future by any or all members of the Settlement Class arising out of or relating to any of the Dexatrim® Products or their development, manufacture, formulation, testing, distribution, marketing, labeling, regulatory submissions, advertising, sale, or ingestion.

3. Danza Honeyblue and John Park are appointed representatives of the Class. Seeger Weiss LLP is appointed as lead Class Counsel. Ashcraft & Gerel; Herman, Mathis, Casey, Kitchens & Gerel; Early, Ludwick & Sweeney, LLC; and Lopez, Hodes, Restaino, Milman & Skikos are appointed as Class Counsel.

4. The Settlement is hereby APPROVED and shall be consummated in accordance with the terms and provisions of the Settlement Agreement. The Settlement Agreement has been entered into in good faith, following arms-length and non-collusive negotiations. The Settlement is fair, reasonable, adequate, and in the best interests of the Class. A true and correct copy of the Class Action Settlement Agreement is attached hereto and incorporated herein by reference as Exhibit A. All terms used in this Final Order and Judgment shall be interpreted in accordance with

the definitions set forth in the Class Action Settlement Agreement.

5. The Court finds that the manner of publication of the Summary Notice along with the direct mailing of notice to all known class members is the best notice practicable under the circumstances. Accordingly, the Court hereby APPROVES both the form and procedure of the publication of the Summary Notice of the Settlement and the direct mailing of notice to all known members of the Class.

6. Except for the cases specifically identified in Exhibit D to this Final Order and Judgment, all cases that were transferred to this court for coordinated pretrial proceedings under MDL No. 1407 ("MDL 1407"), or that are pending in any U.S. District Court against Chattem involving Dexatrim® Products are hereby DISMISSED as to Chattem and all other Released Parties, with prejudice. A list of all cases where such dismissals will occur is attached hereto and incorporated herein by reference as Exhibit B.

7. All Class Members who did not expressly opt out of the settlement are hereby permanently BARRED and ENJOINED from initiating, continuing, asserting or otherwise prosecuting any actions against Chattem or the Released Parties arising from or related to any Settled Claims.

8. All Class Members who did not expressly opt-out of the Settlement and who are plaintiffs in any action pending in any state court against Chattem or any other Released Party relating to, concerning or arising from a Released Claim, are hereby ORDERED to take such actions as may be necessary to effect a dismissal with prejudice of each such case within 60 days of the entry of this Final Order and Judgment.

9. A list of all Class Members who have filed claims in accordance with this court's April 23, 2004 Order Granting Conditional Certification of Settlement Class and who may seek benefits in accordance with the terms and provisions of the Settlement is attached hereto and incorporated herein by reference as Exhibit C.

10. A list of all Class Members who have timely and properly opted out of the settlement and therefore may pursue or continue to pursue actions against Chattem and the Released Parties, is attached hereto and incorporated herein by reference as Exhibit D.

11. The nonsettling defendants in MDL 1407 and all other persons or entities are permanently barred and enjoined from initiating, asserting or prosecuting any claims or actions, including claims for contribution, non-contractual indemnity, or subrogation, against Chattem and any other Released Party for reimbursement of payments made to or on behalf of any Class Member for any Settled Claims. This Final Order and Judgment shall not be construed to bar claims by nonsettling defendants based on a contract between a nonsettling defendant and a Released Party. Furthermore, the approval for this Settlement and this bar order shall not be construed as precluding a nonsettling defendant from enforcing any judgment reduction, credit or setoff right otherwise available to them under applicable state law. Despite the bar set forth herein, this court retains jurisdiction to enforce and interpret the terms of this Final Order and Judgment. If in a particular case no judgment reduction, set off or other credit is available to the nonsettling defendant under applicable state law and the settlement extinguishes otherwise applicable state law rights of indemnity and/or contribution, the nonsettling defendant may file a motion with the court, and if found warranted, the court may fashion an appropriate remedy that is consistent with the Settlement Agreement and the finality sought by that agreement and by this Final Order and Judgment.

12. Despite the language in Section 4.2(i) of the Settlement Agreement providing that the losing party in an arbitration challenging a Chattem Claims Coordinator's benefit determination will be required to pay a penalty of at least $10,000 of the cost of the arbitration, the parties have consented to give the Special Master the discretion to set the penalty, on a case by case basis, without regard to a minimum amount.

13. The Settlement, this Final Order and Judgment, and all papers related to the Settlement are not, and shall not in any event be, an admission by Chattem, the Released Parties, or any other person, of any liability or wrongdoing whatsoever, and shall not be offered as evidence of any claimed liability or

wrongdoing whatsoever in this or any future proceeding. Conversely, the Settlement, this Final Order and Judgment, and all papers related to the Settlement are not, and shall not in any event, be deemed or construed as an admission or concession by plaintiffs or any Class Member regarding the merits of their claims or the defenses asserted by Chattem or any of the Released Parties.

14. The parties are directed to carry out their obligations under the Settlement forthwith.

15. This court retains continuing and exclusive jurisdiction over the parties to the Settlement, including Chattem and the other Released Parties, and all Class Members, to administer, supervise, construe, and enforce the Settlement and this Final Order and Judgment in accordance with their terms for the mutual benefit of the parties and the Settlement Class. The Court retains continuing and exclusive jurisdiction for purposes of, among other things, approval of the Condition Definitions and Compensation Schedule, supervision and administration of the Compensation Program, the payment of attorney fees and expenses and awards to Class Members, and matters concerning claims administration and the distribution of settlement funds and payment of related fees and expenses until the effectuation of the Settlement in accordance with the Settlement Agreement has been accomplished.

16. The Honorable John F. Keefe is hereby appointed as Special Master to effectuate and implement the terms of the Settlement.

17. Within 30 days of the entry of this Final Order and Judgment, the parties shall present the court with a Final Settlement Trust Agreement for approval. The Final Settlement Trust Agreement shall specifically set forth the terms on which a Class Member may make a payment draw against the trust and the terms that trigger the trustee's obligation to make payment. Until the court approves the Final Settlement Trust Agreement, the attachment the court has placed on the Initial Settlement Trust shall remain in place.

18. This Final Order and Judgment is binding on all Class Members.

19. The clerk of the court is directed to enter forthwith this Final Order and Judgment as a final judgment under Fed.R.Civ.P. 54(b).

## EXHIBIT A—CLASS ACTION SETTLEMENT AGREEMENT
### *CLASS ACTION SETTLEMENT AGREEMENT*

Between

CHATTEM, INC.,

and

CLASS COUNSEL ON BEHALF OF CLASS REPRESENTATIVES
IN RE PHENYLPROPANOLAMINE (PPA) PRODUCTS LIABILITY LITIGATION

Case No. 2:01–and–1407 (MDL No. 1407)

dated as of
April 13, 2004
TABLE OF CONTENTS

RECITALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 571

ARTICLE 1—DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 571

**570**

Section 1.1 Definitions .............................................571

**ARTICLE 2—CHATTEM SETTLEMENT TRUST AND FUNDS ...................576**
Section 2.1 Establishment Of Chattem Settlement Trust ......................576
Section 2.2 Funding .............................................576
Section 2.3 Establishment Of Benefit Funds ................................577
Section 2.4 Funding Extentions ...............................................577
Section 2.5 Other Provisions .........................................577

**ARTICLE 3—CLASS MEMBER RIGHTS AND BENEFITS..................578**
Section 3.1 Benefit Payments To Class Members ...........................578
Section 3.2 Payment Of Benefits .............................................578
Section 3.3 Extraordinary Damages Benefits .................................578
Section 3.4 Opt–Out Rights.............................................579

**ARTICLE 4—CLAIMS ADMINISTRATION .....................................579**
Section 4.1 Benefit Claim Forms .............................................579
Section 4.2 Benefit Determination .............................................580
Section 4.3 Extraordinary Damage Benefit Claim Form .....................582
Section 4.4 Extraordinary Damages Benefit Determination ....................582
Section 4.5 Liens .............................................582
Section 4.6 Claims Administration Procedures ..............................583
Section 4.7 General Claims Administration Matters ..........................583
Section 4.8 Fraudulent Claims .............................................584

**ARTICLE 5—ATTORNEYS' FEES .............................................584**
Section 5.1 Existing Contingency Fee Agreements ...........................584
Section 5.2 Plaintiff's Litigation Expense Fund .............................584
Section 5.3 Any Other Attorneys Fees or Costs .............................584

**ARTICLE 6—GENERAL TERMINATION AND RELEASE ........................584**
Section 6.1 Good Faith Settlement .............................................585
Section 6.2 Release.............................................585
Section 6.3 Requests to the Trial Court ......................................585
Section 6.4 No Recovery from Released Parties Outside This Agreement ..........585
Section 6.5 Claim Forms .............................................585

**ARTICLE 7—CONTINUING JURISDICTION ...................................586**
Section 7.1 Trial Court Retains Jurisdiction ..................................586

**ARTICLE 8—TERMINATION .................................................586**
Section 8.1 Termination By Chattem .........................................586

**ARTICLE 9—SETTLEMENT IMPLEMENTATION .............................587**
Section 9.1 General.............................................587
Section 9.2 Approval Process Provisions ....................................587
Section 9.3 Conditions .............................................587

**ARTICLE 10—ASSIGNMENT OF CLAIMS ....................................588**
Section 10.1 Class Members' Claims Against Alps .............................588
Section 10.2 Recovery From Alps .............................................588
Section 10.3 Duty To Cooperate With Assigned Claims ........................588

**ARTICLE 11—MISCELLANEOUS..............................................588**
Section 11.1 Confidential Information.............................................588
Section 11.2 Successors and Assigns .........................................589
Section 11.3 Use of Settlement and Negotiations in Other Proceedings ...........589
Section 11.4 No Admission of Liability or Lack of Merit.........................589
Section 11.5 Titles and Headings .............................................589
Section 11.6 Distribution of Remaining Funds .................................589
Section 11.7 Notice to Parties .............................................589
Section 11.8 Receipt of Documentation.........................................590
Section 11.9 No Third Party Beneficiaries ....................................590
Section 11.10 Entire Agreement .............................................590

Section 11.11 Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 591
Section 11.13 Original Signatures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 591
Section 11.14 Severance of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 591

## CLASS ACTION SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT, dated as of April 13, 2004 (this *"Settlement Agreement"* or *"Class Action Settlement"* or *"Settlement"*) is entered into by and between Chattem, Inc., a Tennessee corporation (*"Chattem"*) on behalf of itself and the other Released Parties hereunder, and the undersigned Class Counsel on behalf of the Class Representatives. The Class Representatives, together with Chattem, are sometimes referred to herein as the *"Parties."*

## RECITALS

WHEREAS, Chattem and the Class Representatives hereby agree to a class action settlement subject to the approval of the Trial Court, with respect to Class Members in the United States which would resolve, on the terms set forth in this Settlement Agreement, Settled Claims against Chattem and other Released Parties arising from Dexatrim® Products, pending in various courts, including but not limited to claims which have been made in the actions that have been or will be transferred for coordinated or consolidated pretrial proceedings to the United States District Court for the Western District of Washington at Seattle (*In Re Phenylpropanolamine (PPA) Products Liability Litigation* (MDL No. 1407)), and in numerous other federal and state courts.

WHEREAS, this Settlement Agreement shall not be construed as evidence of or as an admission by any of the Released Parties of any liability or wrongdoing whatsoever or as an admission by the Class Representatives or Class Members of any lack of merit in their claims.

NOW, THEREFORE, Chattem and the Class Representatives hereby agree, subject to Final Judicial Approval, compliance with applicable legal requirements, and other conditions, all as set forth below, that the Settled Claims against Chattem and other Released Parties, as defined herein, will be settled, compromised and released, in accordance with the following terms.

## ARTICLE 1—DEFINITIONS

Section 1.1 Definitions

For purposes of this Settlement Agreement the following terms shall have the meanings set forth in this Article I. Terms used in the singular shall be deemed to include the plural and vice verse.

(a.) *"$"* shall denote United States dollars.

(b.) *"Aggregate Opt–Out Matrix Value"* shall have the meaning set forth in Section 8.1(b).

(c.) *"Business Day"* shall mean any day other than Saturday, Sunday or any U.S. federal holiday or any other day that the Trustee is closed.

(d.) *"Benefit Claim Form"* shall have the meaning set forth in Section 4.1(a).

(e.) *"Benefit Claim Form Deadline"* shall mean the date that the Trial Court sets as the last day for Class Members to submit a Benefit Claim Form.

(f.) *"Benefit Fund"* shall have the meaning set forth in Section 2.3(a).

(g.) *"Case Scoring Component(s)"* shall mean one or more components on the applicable Case Scoring Worksheet.

(h.) *"Case Scoring Worksheet"* shall mean the "Matrix Scoring Worksheet for Hemorrhagic Stroke Cases," attached as Exhibit E to Annex I, the "Matrix Scoring Worksheet

for Ischemic Stroke Cases," attached as Exhibit F to Annex I, or the "Matrix Scoring Worksheet for Other Injuries and Cardiac Injuries," attached as Exhibit G to Annex I.

(i.) *"Chattem Settlement Claim Number"* shall have the meaning set forth in Section 4.2(b).

(j.) *"Chattem"* shall mean Chattem, Inc., a Tennessee corporation.

(k.) *"Chattem Claims Coordinator"* shall mean Miller & Martin PLLC and its agents, and/or any other person(s), or entity(ies) selected by Chattem to coordinate the administration of claims on behalf of Chattem.

(l.) *"Claims Administrator"* shall mean the person(s) or entity(ies) to be appointed by the Court and his/her, or its agents, to administer claims under this Settlement Agreement.

(m.) *"Class Action Settlement"* or *"Settlement"* shall have the meaning set forth in the Preamble.

(n.) *"Class Counsel"* shall mean these attorneys executing this Settlement Agreement on behalf of the Class Representatives, or such other attorneys as shall be approved by the Court as counsel to the Settlement Class.

(o.) *"Class Counsel Claims Coordinator"* shall mean the person, persons, or entity selected by Class Counsel and approved by the Court, to coordinate the administration of claims on behalf of Class Members.

(p.) *"Class Members"* shall mean members of the Settlement Class.

(q.) *"Class Representatives"* shall mean Jon Park and Danza Honeyblue, or different persons as shall be designated by the Court as the Representative(s) of the Settlement Class, in the action in Federal District Court captioned *In Re Phenylpropanolamine (PPA) Products Liability Litigation* (MDL No. 1407).

(r.) *"Continuing Funding Date"* shall have the meaning set forth in Section 2.2(o).

(s.) *"Continuing Funding Amount"* shall have the meaning set forth in Section 2.2(c).

(t.) *"Court"* and/or *"Trial Court"* and/or *"Federal District Court"* means the United States District Court for the Western District of Washington at Seattle.

(u.) *"Derivative Claimant"* shall mean any person asserting the right to sue Chattem independently or derivatively, by reason of their personal or family relationship with a Dexatrim® Product User.

(v.) *"Dexatrim® Case Scoring System and Matrix"* or *"Matrix"* shall mean that document titled "Dexatrim® Case Scoring System and Matrix" attached hereto as Annex I.

(w.) *"Dexatrim® Product Users"* shall mean persons who ingested one or more Dexatrim® Products on or after December 21, 1998 and who were citizens or residents of the United States at the time of their alleged injury.

(x.) *"Dexatrim® Products"* shall mean all appetite suppressant products bearing the trademark Dexatrim® marketed, distributed and/or manufactured by Chattem, Inc., and/or The Delaco Company, as successor by merger to Thompson Medical Company, Inc. that contained Phenylpropanolamine.

(y.) *"Documented Unreimbursed or Unreimbursable Economic Damages"* shall have the meaning set forth in Section 3.3(c).

(z.) *"EDF Distribution Recommendation"* shall have the meaning set forth in Section 4.4(a).

(aa.) *"Extraordinary Damage Fund Benefit Claim Form"* and *"EDF Benefit Claim Form"* shall have the meaning set forth in Section 4.3(a).

(bb.) *"Extraordinary Damages Fund"* and *"EDF"* shall have the meaning set forth in Section 2.3(b). The Extraordinary Damages Fund is sometimes referred to in the Matrix as the "Extraordinary Injury Fund," and those two terms may be used interchangeably. It is expressly understood that, although the Matrix provides that an Extraordinary Injury Fund in the amount of $12.5 million will be established, Class Members under this Settlement Agreement are entitled to only $5.0 million and Chattem is not required to pay more than $5.0 million to the Extraordinary Damages Fund. Any amount greater than $5.0 million that is referenced in the Matrix is referring to an amount paid by another party for the benefit of persons other than Class Members.

(cc.) *"Fairness Hearing Date"* means the date on which the Fairness Hearing takes place.

(dd.) *"Fairness Hearing"* means the hearing conducted by the Court to determine the fairness, adequacy and reasonableness of this Settlement Agreement under Fed. R.Civ.P. 23(e).

(ee.) *"Final Benefit Determination"* shall have the meaning set forth in Section 4.2(d).

(ff.) *"Final Chattem Settlement Trust"* shall mean a trust established to receive funds to be transferred from the Initial Chattem Settlement Trust and paid by or on behalf of Chattem or the other Released Parties, pursuant to the terms of this Settlement Agreement and the Final Settlement Trust Agreement.

(gg.) *"Final EDF Distribution Determination"* shall have the meaning set forth in Section 4.4(c).

(hh.) *"Final Judicial Approval Date"* shall mean the date on which Final Judicial Approval occurs.

(ii.) *"Final Judicial Approval"* refers to the approval of the Settlement Agreement by the Court and such approval becoming final by the exhaustion of all available appeals, including writs of certiorari to the United States Supreme Court. Final Judicial Approval shall be deemed not to have been obtained in the event that Trial Court Approval is denied, and the period for appealing such denial has expired without any such appeal having been taken.

(jj.) *"Final Settlement Trust Agreement"* shall mean the Final Settlement Trust Agreement in the form to be agreed to by the Parties and approved by the Trial Court.

(kk.) *"Initial Chattem Settlement Trust"* shall mean a trust established to receive funds to be paid by or on behalf of Chattem and the other Released Parties as provided in this Settlement Agreement, pursuant to the Initial Settlement Trust Agreement.

(ll.) *"Initial Funding Date"* shall have the meaning set forth in Section 2.2(a).

(mm.) *"Initial Funding Amount"* shall have the meaning set forth in Section 2.2(a).

(nn.) *"Initial Settlement Trust Agreement"* shall mean the document attached hereto as Annex II.

(oo.) *"Matrix Levels"* shall mean the horizontal rows on the "Injury Matrix," attached as Exhibit A to Annex I.

(pp.) *"Notice"* shall have the meaning set forth in Section 9.2(a).

(qq.) *"Opt–Out Deadline"* shall mean the date and time preset by the Trial Court, which is the last day on which Class Members may exercise the Opt–Out Right.

(rr.) *"Opt–Out Right"* shall have the meaning set forth in Section 3.4(a).

(ss.) *"Parties"* shall have the meaning set forth in the preamble.

(tt.) *"Plaintiffs' Counsel"* and *"Class Member's Counsel"* shall mean any attorney who represents one or more individual Class Members.

(uu.) *"Preliminary Approval"* shall mean the conditional certification of the proposed class for settlement purposes and the preliminary approval of this Settlement Agreement by the Trial Court.

(vv.) *"Preliminary Approval Date"* shall mean the date on which the Preliminary Approval occurs.

(ww.) *"Preliminary Benefit Determination"* shall have the meaning set forth in Section 4.2(a).

(xx.) *"Released Parties"* shall mean:

 (i) Chattem, Inc. and each of its past, present and future direct or indirect parent companies, subsidiaries, affiliates, divisions, joint venturers, predecessors, successors, and assigns;

 (ii) The Delaco Company, as successor by merger to Thompson Medical Company, Inc. (*"Delaco"*) and each of its past, present and future direct or indirect parent companies, subsidiaries, affiliates, divisions, joint venturers, predecessors, successors, and assigns;

 (iii) Sidmak Laboratories, Inc. ("Sidmak") and each of its past, present and future direct or indirect parent companies, subsidiaries, affiliates, divisions, joint venturers, predecessors, successors, and assigns;

 (iv) suppliers of the raw material Phenylpropanolamine hydrochloride used in the manufacture of Dexatrim® Products (including, without limitation, Sidmak); however, it is expressly understood that Alps Pharmaceutical Ind. Co., Ltd. (*"Alps"*) is not a Released Party;

 (v) suppliers of materials other than Phenylpropanolamine, machines or equipment used in the manufacture of Dexatrim® Products;

 (vi) Chattem's contact manufacturers of finished Dexatrim® Products (including, without limitation, Sidmak);

 (vii) any and all distributors of Dexatrim® Products, including, without limitation, wholesale distributors, private label distributors, retail distributors, pharmacies and pharmacists;

 (viii) any other person or entity (specifically including the Consumer Healthcare Products Association and its predecessors ("CHPA")) involved in the development, design, manufacture, formulation, testing, distribution, marketing, labeling, regulatory submissions, advertising or sale of Dexatrim® Products (including, without limitation, consultants to Delaco or Chattem); however, nothing in this sub-section shall affect the rights of individuals from pursuing their claims against CHPA to the extent those claims do not relate to a Dexatrim® Product; and

 (ix) for each entity identified above, all of its past, present and future direct or indirect parent companies, subsidiaries, affiliates, divisions, joint venturers, predecessors, successors, and assigns and, collectively, all of their

past, present and future directors, officers, employees, agents, attorneys, shareholders, underwriters and insurers, and for each person identified above, all of his, her, or their respective past, present or future heirs, estates and personal representatives.

(yy.) *"Representative Claimant"* shall mean an estate, administrator or other legal representative, trust or "special needs trust" of a Dexatrim® Product User or Derivative Claimant. For the purpose of clarity, the parties acknowledge that Representative Claimants are entitled to any and all rights and benefits under this Settlement Agreement that the represented Dexatrim® Product Users and/or Derivative Claimant would have received hereunder regardless of any state law to the contrary.

(zz.) *"Settled Claims"* shall mean any and all claims, including assigned claims, whether known or unknown, asserted or unasserted, regardless of the legal theory, existing now or arising in the future by any or all members of the Settlement Class arising out of or relating to any of the Dexatrim® Products or their development, manufacture, formulation, testing, distribution, marketing, labeling, regulatory submissions, advertising, sale, or ingestion. These *"Settled Claims"* include, without limitation and by way of example, all claims for damages or remedies of whatever kind or character, known or unknown, that are now recognized by law or that may be created or recognized in the future by statute, regulation, judicial decision, or in any other manner, for:

 (i) personal injury and/or bodily injury, damage, death, fear of disease or injury, mental or physical pain or suffering, emotional or mental harm, or loss of enjoyment of life;

 (ii) loss of wages, income, earnings, and earning capacity, medical expenses, doctor, hospital, nursing, and drug bills;

 (iii) loss of support, services, consortium, companionship, society or affection, or damage to familial relations, by spouses, parents, children, other relatives or "significant others" of Class Members;

 (iv) wrongful death and survival actions;

 (v) medical screening and monitoring, injunctive and declaratory relief;

 (vi) consumer fraud, refunds, unfair business practices, deceptive trade practices, Unfair and Deceptive Acts and Practices (*"UDAP,"*) unjust enrichment, disgorgement and other similar claims whether arising under statute, regulation, or judicial decision;

 (vii) compensatory damages, punitive, exemplary, statutory and other multiple damages or penalties of any kind including, without limitation, economic or business losses or disgorgement of profits arising out of personal injury;

 (viii) pre-judgment or post-judgment interest; and/or

 (ix) attorneys' fees, costs of court or litigation expenses.

(aaa.) *"Settlement Agreement"* shall mean this document and all attachments, appendices, and annexes thereto.

(bbb.) *"Settlement Class"* shall mean all Dexatrim® Product Users who sustained bodily injury on or after December 21, 1998 allegedly as a result of his or her ingestion of a Dexatrim® Product, and their associated Derivative Claimants and Representative Claimants. The Settlement Class shall expressly exclude any person or entity that entered into a settlement with Chattem (which included a release) related to claims arising out of the use of a Dexatrim® Product. The Settlement Class shall also expressly exclude any individual (and their associated Derivative Claimants and Representative Claimants) against whom any court has entered judgment or dismissal

with prejudice in an action related to a Dexatrim® Product on or before the Preliminary Approval Date, regardless of whether such judgment or dismissal is the subject of a motion for reconsideration, motion to alter, amend, or set aside the judgment or similar motion, or an appeal.

(ccc.) *"Special Master"* shall have the meaning set forth in Section 4.2(c) and, in addition, shall perform the functions assigned to the "Administrator" and the "EIF Administrator" in the Matrix.

(ddd.) *"Supplemental Benefit Claim Form"* shall have the meaning set forth in Section 4.1(c).

(eee.) *"Total Matrix Score"* shall have the meaning set forth in Section VI of Annex I.

(fff.) *"Trial Court Approval Date"* shall mean the date upon which Trial Court Approval occurs.

(ggg.) *"Trial Court Approval"* shall mean the granting, by order entered on the docket thereof, of the approval of the Settlement Agreement by the Trial Court.

(hhh.) *"Trustee"* shall mean that person or entity approved by the Court as Trustee of the Initial Chattem Settlement Trust and/or the Final Chattem Settlement Trust in accordance with the Initial Settlement Trust Agreement and the Final Settlement Trust Agreement, and any successor Trustee and will serve subject to the jurisdiction and supervision of the Court.

## ARTICLE 2—CHATTEM SETTLEMENT TRUST AND FUNDS

### Section 2.1 Establishment Of Chattem Settlement Trust

(a) *Initial Chattem Settlement Trust.* On or before the Preliminary Approval Date, Chattem shall create the Initial Chattem Settlement Trust to receive amounts to be paid by or on behalf of Chattem and the other Released Parties. There shall be a single corporate Trustee of the Initial Chattem Settlement Trust. Such Trustee shall be a bank organized and doing business under the laws of the United States of America, any State thereof or the District of Columbia, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $100,000,000, subject to supervision and examination by federal or state authority and shall be appointed by Chattem (with the consent of Class Counsel, such consent not to be unreasonably withheld), subject to the approval of the Court. The Initial Settlement Trust Agreement, attached hereto as Annex II, sets forth the duties and obligations of the Trustee.

(b) *Final Chattem Settlement Trust.* No later than thirty (30) days after the Trial Court Approval Date, the Final Chattem Settlement Trust will be established on terms that are mutually agreeable to the Parties. The Final Chattem Settlement Trust will receive and administer amounts to be transferred from the Initial Chattem Settlement Trust in accordance with the terms of a Final Settlement Trust Agreement agreed to by the Parties.

(c) In the event that this Settlement Agreement is terminated in accordance with Article 8 hereunder or in the event that all conditions specified in Section 9.3 hereunder are not satisfied or waived by Chattem, Chattem shall have the exclusive right to all funds deposited into or property transferred to the Initial Chattem Settlement Trust.

(d) Chattem shall have the right to the funds deposited into or property transferred to the Initial Chattem Settlement Trust and the Final Chattem Settlement Trust in accordance with Section 11.6 hereunder.

### Section 2.2 Funding

(a) *Funding of Initial Chattem Settlement Trust.* On or before the date that is twenty (20) days after the Preliminary Approval Date (the *"Initial Funding Date"*). Chattem shall deliver to the Initial Chattem Settlement Trust $60,885,000 (the *"Initial Funding Amount"*).

(b) *Funding of Final Chattem Settlement Trust.* Within five (5) days after the later of: (i) the Trial Court Approval Date, and (ii) the date on which the Final Chattem Settlement Trust is created, the Trustee of the Initial *Chattem Settlement Trust shall deliver all assets contained in the Initial Chattem Settlement Trust to the Final Chattem Settlement Trust.*
(c) *Continuing Funding.* The Trustee of the Final Chattem Settlement Trust shall notify Chattem immediately after the balance of the Benefit Fund falls below $5 million. Within fifteen (15) days after the date that the Trustee notifies Chattem that the balance of the Benefit Fund has fallen below $5 million (*"Continuing Funding Date"*), Chattem shall deposit into the Final Chattem Settlement Trust the sum that will cause the balance of the Benefit Fund to be at least the total of (x) $5 million, plus (y) the sum that represents the total dollar amount of all Final Benefit Determinations for which a payment has not been issued as of the Continuing Funding Date (*"Continuing Funding Amount"*).

## Section 2.3 Establishment Of Benefit Funds

(a) *Benefit Fund.* The Trustee of the Final Chattem Settlement Trust shall initially allocate $60,885,000 of the Initial Funding Amount to the Benefit Fund. The Trustee of the Final Chattem Settlement Trust shall allocate all Continuing Funding Amounts to the Benefit Fund. The Trustee of the Final Chattem Settlement Trust also shall allocate to the Benefit Fund that portion, if any, of the Assigned Alps Claims expressly allocated to the Benefit Fund in Section 10.2.

(b) *Extraordinary Damages Fund.* Within fifteen (15) days after a Final Benefit Determination is rendered for all Class Members who submitted a Benefit Claim Form, the Trustee of the Final Chattem Settlement Trust shall allocate $5.0 million from the Benefit Fund to the Extraordinary Damages Fund. The Trustee of the Final Chattem Settlement Trust also shall allocate to the Extraordinary Damages Fund that portion, if any, of the Assigned Alps Claims expressly allocated to the Extraordinary Damages Fund in Section 10.2. The Trustee of the Final Chattem Settlement Trust also shall allocate any interest that accrues on or after the Trial Court Approval Date on funds on deposit in either the Initial Settlement Trust or the Final Chattem Settlement Trust to the Extraordinary Damages Fund.

## Section 2.4 Funding Extensions

(a) If Kemper Insurance Company fails to deliver all or any portion of $37.5 million and/or General Star Indemnity Company fails to deliver all or any portion of $22.5 million to Chattem or the Initial Chattem Settlement Trust on or before the Initial Funding Date, the Initial Funding Amount due on the Initial Funding Date shall be reduced by that portion not delivered by Kemper Insurance Company and/or General Star Indemnity Company; however, within ninety (90) days after the Initial Funding Date, or longer if ordered by the Trial Court, Chattem shall deposit into the Initial Chattem Settlement Trust an amount equal to such reduced portion.

(b) If any action by a third party causes any portion of the amount deposited by Kemper Insurance Company into the Initial Settlement Trust and/or the Final Chattem Settlement Trust to be unavailable to pay claims, the Continuing Funding Date specified in Section 2.2(c) shall be extended by ninety (90) days, or longer if ordered by the Trial Court.
## Section 2.5 Other Provisions

(a) The Parties agree that the Final Chattem Settlement Trust is being established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and has given rise to claims asserting liability arising out of a tort. The Initial Chattem Settlement Trust and the Final Chattem Settlement Trust shall be structured and managed pursuant to the Initial Settlement Trust Agreement and the Final Settlement Trust Agreement, respectively, and will contain customary provisions for such trusts including obligations of the Final Chattem Settlement Trust to provide such information to Chattem and Class Counsel as Chattem or Class Counsel shall reasonably request for financial, legal, regulatory and tax purposes.

(b) The Parties agree that all of the amounts being paid to or on behalf of Class Members pursuant to the terms of this Settlement Agreement are being paid as damages (other than punitive damages) on account of alleged personal physical injuries or alleged physical sickness of the members of the Settlement Class, including physical injuries or physical sickness resulting from alleged emotional harm, as described in 26 U.S.C. § 104(a)(2). · The Parties further agree that the claims set forth in the definition of Settled Claims in Article 1 have their origin in such alleged physical personal injuries or physical sickness.

(c) Chattem shall not have any financial obligations under this Settlement Agreement other than the payment obligations explicitly set forth in this Settlement Agreement. Neither Chattem nor any of the other Released Parties shall have any liability to any Class Member arising from the handling of claims by the Trustee, the Claims Administrator, the Chattem Claims Coordinator, or the Class Counsel Claims Coordinator.

(d) All cash and property transferred into the Initial Chattem Settlement Trust and the Final Chattem Settlement Trust shall be the sole property of the Initial Chattem Settlement Trust and the Final Chattem Settlement Trust, respectively, and shall be exempt from Chattem's creditors. All of the assets in the Final Chattem Settlement Trust shall be pledged to secure the performance of all of Chattem's obligations under this Settlement Agreement.

(e) The Trustee shall withhold and pay over such taxes as may be required and shall fulfill all tax filing obligations, including applicable reporting obligations with respect to all distributions and payments pursuant to the terms of this Settlement Agreement. The Initial Chattem Settlement Trust and the Final Chattem Settlement Trust each shall be responsible for all fees, taxes and other costs of administration of the respective Trusts, including, without limitation, taxes on any income or gain earned on any assets in the respective Trusts.

### ARTICLE 3—CLASS MEMBER RIGHTS AND BENEFITS

**Section 3.1 Benefit Payments To Class Members**

The portion, if any, of the Benefit Fund to which a Class Member is entitled shall be determined pursuant to the terms of the Dexatrim® Case Scoring System and Matrix, attached hereto as *Annex I.*

**Section 3.2 Payment Of Benefits**

Payments made pursuant to Section 3.1 shall be made as soon as practical, but in no event later than thirty (30) days after the date on which a Final Benefit Determination is made pursuant to Section 4.2(d) or Section 4.2(e).

**Section 3.3 Extraordinary Damages Benefits**

(a) In addition to the benefits set forth in Section 3.1, Class Members may be eligible to receive additional compensation under this Settlement Agreement (*"Extraordinary Damage Fund Benefits"* or *"EDF Benefits"*). The EDF Benefits, if any, to which a Class Member is entitled shall be determined pursuant to the terms of the Dexatrim® Case Scoring System and Matrix, and are sometimes referred to in the Matrix as the "EIF Award."

(b) Class Members are eligible to receive EDF Benefits if the Class Member; (1) sustained a hemorrhagic stroke or an ischemic stroke, (2) has a Final Determination Matrix Level of IV, V, or VI, and (3) has Documented Unreimbursed or Unreimbursable Economic Damages of at least $250,000.

(c) *"Documented Unreimbursed or Unreimbursable Economic Damages"* means the following items, but only to the extent that they relate to a hemorrhagic or ischemic stroke that was caused by the ingestion of a Dexatrim® Product: (1) non-reimbursed out-of-pocket past medical expenses, (2) non-reimbursable future medical expenses, (3) non-reimbursable future living expenses, (4) non-reimbursed past lost wages; (5) non-reimbursable future lost wages, (6) non-reimbursable loss of earning capacity (both past and future), and (7) the amount that a Class Member is required to pay a third party to extinguish a lien for medical expenses. Documentation may consist of medical records, billing records, tax returns, social security

earnings statements, expert reports (e.g. economists, life care planners, neurologists, physiatrists, etc.) or any other documentation or evidence found acceptable by the Class Counsel Claims Coordinator.

## Section 3.4 Opt–Out Rights

(a) All Class Members (except as provided in Section 3.4(b) below) are eligible to opt out of the Settlement represented by this Settlement Agreement (the *"Opt–Out Right"*). Each Class Member wishing to exercise an Opt–Out Right must submit a written letter, signed by the Class Member, that includes the following information: (i) his or her name, address and telephone number; (ii) with respect to each Dexatrim® Product, the date of ingestion; (iii) with respect to each Dexatrim® Product, the lot number and product number, if available; (iv) whether such Class Member is represented by counsel and if so, the name, address and telephone number of his or her lawyer; and (v) the type of injury alleged (hemorrhagic stroke, ischemic stroke, cardiac injury, or other injury). A copy of the letter must be sent to an address that is set forth in the Notice and postmarked no later than the Opt–Out Deadline, as set by the Trial Court. The Claims Administrator shall promptly forward copies of all such letters to Chattem and to Class Counsel and shall file a list of all such Class Members who exercise an Opt–Out Right with the Court.

(b) In the event that there is both a Dexatrim® Product User or a Representative Claimant and one or more Derivative Claimants, the Dexatrim® Product User's or the Representative Claimant's exercise or failure to exercise an Opt–Out Right shall be binding on the associated Derivative Claimant(s).

## ARTICLE 4—CLAIMS ADMINISTRATION

### Section 4.1 Benefit Claim Forms

(a) Each Class Member claiming benefits must submit a claim form (*"Benefit Claim Form"*) attached hereto as Annex III, to the Claims Administrator on or before the Benefit Claim Form Deadline. The Class Member must complete the portions of the Benefit Claim Form relating to the category(ies) that the Class Member believes entitle him or her to Benefits under Section 3.1. Any Class Member who does not submit a Benefit Claim Form on or before the Benefit Claim Form Deadline shall not be eligible to receive any benefits under this Settlement Agreement.

(b) Within thirty (30) days after the Claims Administrator receives a Benefit Claim Form, the Claims Administrator shall: (i) assign a unique identifying number to the claim (*"Chattem Settlement Claim Number"*) where one has not already been assigned; and (ii) if necessary, notify the Class Member or the Class Member's Counsel regarding the nature of any deficiency in the Benefit Claim Form. Benefit Claim Forms that fail to provide required information and/or documentation shall not be considered "complete." Within thirty (30) days after receiving a complete Benefit Claim Form, or earlier if requested by the Chattem Claims Coordinator, the Claims Administrator shall provide a copy of the complete Benefit Claim Form and any other information or documentation submitted by the Class Member with the Benefit Claim Form to the Chattem Claims Coordinator.

(c) Within thirty (30) days after the Chattem Claims Coordinator receives a complete Benefit Claims Form from the Claims Administrator, or upon Final Judicial Approval, whichever is later, the Claims Administrator shall, at the request of the Chattem Claims Coordinator, request the additional information and documentation specified in the Supplemental Benefit Claim Form attached hereto as Annex IV (*"Supplemental Benefit Claim Form"*). The Claims Administrator shall establish a deadline by which the Class Member must complete the Supplemental Benefit Claim Form. This deadline shall be a date that is no less than one hundred and twenty (120) days from the date the Claims Administrator mails the Supplemental Benefit Claim Form to the Class Member.

(d) Each Class Member to whom it is sent must complete the Supplemental Benefit Claim Form and return it along with all requested documentation to the Claims Administrator on or before the deadline set forth in the Supplemental Benefit Claim Form. Any Class Member who is required to submit a Supplemental Claim Form and who does not submit a

Supplemental Claim Form on or before the deadline shall not be eligible to receive any benefits under this Settlement Agreement.

(e) Within thirty (30) days after the Claims Administrator receives a Supplemental Benefit Claim Form, the Claims Administrator shall notify the Class Member or the Class Member's Counsel of any additional information that is necessary to make a preliminary determination as to the benefit, if any, to which the Class Member is entitled. A Supplemental Benefit Claim Form shall be deemed "complete" when the Class Member has submitted all information and documentation specified in the Supplemental Claim Form Completeness Checklist, attached hereto as Annex IV. Within thirty (30) days after receiving a complete Supplemental Benefit Claim Form, or earlier if requested by the Chattem Claims Coordinator, the Claims Administrator shall provide to the Chattem Claims Coordinator a copy of the complete Supplemental Benefit Claim Form and any other information or documentation submitted by the Class Member with the Supplemental Benefit Claim Form.

**Section 4.2 Benefit Determination**

(a) As soon as practicable, but in no event more than one hundred and twenty (120) days after receiving a complete Benefit Claim Form and, if applicable, a complete Supplemental Benefit Claim Form, the Chattem Claims Coordinator shall meet and confer with the Class Member or the Class Member's Counsel to make a preliminary determination as to whether the Class Member is entitled to any benefits, and if so, the benefit to which the Class Member is entitled (the *"Preliminary Benefit Determination"*). The Preliminary Benefit Determination shall be determined pursuant to the terms of the Dexatrim® Case Scoring System and Matrix. If, after meeting and conferring in good faith pursuant to this Section 4.2(a), the Chattem Claims Coordinator and the Class Member or Class Member's Counsel are unable to agree on a Preliminary Benefit Determination, the Chattem Claims Coordinator shall provide the Claims Administrator with a completed Case Scoring Worksheet representing the Chattem Claims Coordinator's Preliminary Benefit Determination.

(b) Within ten (10) days of receiving the Chattem Claims Coordinator's Preliminary Benefit Determination described in Section 4.2(a), the Claims Administrator shall mail, via Certified Mail—Return Receipt Requested, notice to the Class Member or the Class Member's Counsel of such determination, and shall attach the completed Case Scoring Worksheet.

(c) Within thirty (30) days after the date on which the Claims Administrator mails notice of the Chattem Claims Coordinator's Preliminary Benefit Determination to the applicable Class Member or the Class Member's Counsel, the Class Member may challenge the Chattem Claims Coordinator's Preliminary Benefit Determination. To challenge the Chattem Claims Coordinator's Preliminary Benefit Determination, the Class Member must submit a complete Case Scoring Worksheet along with a narrative description that is no more than ten (10) pages in length, excluding exhibits, and that: (i) identifies the specific Case Scoring Component(s) in the Chattem Claims Coordinator's Preliminary Benefit Determination that the Class Member is challenging; and (ii) for each Case Scoring Component that the Class Member is challenging, states the Total Matrix Score the Class Member believes is accurate and sets forth all facts and arguments in support of the Total Matrix Score that the Class Member believes is accurate.

(d) If the Class Member does not challenge the Chattem Claims Coordinator's Preliminary Benefit Determination within the time frame set forth in Section 4.2(c), the Chattem Claims Coordinator's Preliminary Benefit Determination shall constitute a final and binding determination of all benefits (except, if applicable, EDF Benefits pursuant to Section 3.3) to which that Class Member is entitled (*"Final Benefit Determination"*). The Final Benefit Determination shall be determined pursuant to the terms of the Dexatrim® Case Scoring System and Matrix. If the Class Member challenges the Chattem Claims Coordinator's Preliminary Benefit Determination as set forth in Section 4.2(*o*), the Special Master described in Section 4.2(e) shall make a Final Benefit Determination in accordance with Section 4.2(*o*).

(e) The Parties shall request that the Trial Court appoint Judge John Keefe (Ret.) as a Special Master to, among other things, make final determinations when a Class Member challenges the Chattem Claims Coordinator's Preliminary Benefit Determination (*"Special Master"*). The Trial Court has the authority to remove the Special Master and to appoint

more than one Special Master. The Special Master shall be compensated a reasonable fee for his time from the Benefit Fund. For each challenge of a Preliminary Benefit Determination, the Special Master shall meet and confer with the Chattem Claims Coordinator and the applicable Class Member or Class Member's Counsel and shall determine the scope of discovery and schedule an arbitration hearing at a date, time, and place of the Special Master's choosing, which should be no later than one hundred and twenty (120) days after the "meet and confer" with the Special Master. Neither the Class Member nor the Chattem Claims Coordinator need personally appear at the "meet and confer" with the Special Master or the arbitration hearing, and either side may appear by telephone. The Special Master shall have the discretion to create reasonable and ordinary procedural rules and requirements for the arbitration. Within thirty (30) days after the arbitration hearing set forth in this Section 4.2(e), the Special Master shall render a Final Benefit Determination based on the application of the Matrix and the guidelines set forth in this Agreement.

(f) The Chattem Claims Coordinator shall be entitled to obtain reasonable discovery related to any Class Member who challenges a Preliminary Benefit Determination. The scope of such discovery shall be limited to the Case Scoring Component(s) challenged by the Class Member and may specifically include, but is not limited to, access to the Class Member's medical records and the ability to take oral depositions of the Class Member and the medical providers that diagnosed and treated the injury for which the Class Member seeks benefits. Class Members are also entitled to obtain reasonable discovery limited to the Case Scoring Component(s) challenged by the Class Member; however, it is expressly understood that Class Members are not entitled to obtain any discovery from any Released Parties. The Special Master shall resolve any disputes regarding the scope of the Chattem Claims Coordinator's right to discovery. The Special Master shall allow a reasonable time for the Chattem Claims Coordinator to conduct discovery prior to the arbitration hearing date described in Section 4.2(c).

(g) The arbitration pursuant to Section 4.2(e) shall be limited to deciding only the Case Scoring Component(s) challenged by the Class Member at the time he or she submitted his or her challenge pursuant to Section 4.2(c). All Case Scoring Components not challenged by the Class Member in the time permitted by Section 4.2(c) shall be deemed conclusively established. The Special Master shall conduct a de novo review of the Case Scoring Component(s) challenged by the Class Member, and neither party bears any higher burden than the other party.

(h) The Special Master shall have the sole discretion to exclude any evidence from the arbitration hearing described in Section 4.2(e). The Special Master shall exclude all evidence that would have been responsive to the Benefit Claim Form or the Supplemental Benefit Claim Form, but was not submitted by the Class Member to the Claims Administrator on or before the date that the Class Member's Benefit Claim Form or Supplemental Benefit Claim Form was due; however, the Special Master has the authority to make exceptions to this exclusionary rule upon the showing of good cause.

(i) When making a Final Determination, the Special Master shall make a decision with respect to each Case Scoring Component(s) challenged by the Class Member. The Special Master shall then complete a Case Scoring Worksheet and arrive at Matrix Level to which the Class Member is assigned and the Settlement Compensation Amount to which the Class Member is entitled. After determining the Settlement Compensation Amount to which the Class Member is entitled, the Special Master shall choose between: (a) the Settlement Compensation Amount in the Case Scoring Worksheet submitted with the Chattem Claims Coordinator's Preliminary Benefit Determination, and (b) the Settlement Compensation Amount in the Case Scoring Worksheet submitted by the Class Member at the time he or she challenged the Chattem Claims Coordinator's Preliminary Benefit Determination. The Special Master shall select the one of the two Settlement Compensation Amounts that the Special Master finds most reasonable and appropriate pursuant to the application of the Dexatrim® Case Scoring System and Matrix and the guidelines set forth in this Agreement. If the Special Master chooses the amount submitted by the Chattem Claims Coordinator, the Class Member shall pay a penalty to the Final Chattem Settlement Trust, and if the Special Master chooses the amount submitted by the Class Member, Chattem shall pay a penalty to the Final Chattem Settlement Trust. Such penalty shall be decided by the Special Master, but in no event shall the penalty be less than $10,000.

### Section 4.3 Extraordinary Damage Benefit Claim Form

(a) Each Class Member claiming benefits under Section 3.3 must submit a complete claim form for payment of benefits out of the Extraordinary Damage Fund (*"EDF Benefit Claim Form"*) attached hereto as Annex VI, to the Claims Administrator. The deadline to submit an EDF Benefit Claim Form shall be the date the Class Member is required to submit a Supplemental Benefit Claim Form. Any Class Member who does not submit an EDF Benefit Claim Form on or before this deadline shall not be eligible to receive EDF Benefits.

(b) Within thirty (30) days after the Claims Administrator receives an EDF Benefit Claim Form, the Claims Administrator shall: (I) if necessary, notify the Class Member or the Class Member's Counsel regarding the nature of any deficiency in the EDF Benefit Claim Form; and (II) serve a copy of the EDF Benefit Claim Form and any other information or documentation submitted by the Class Member with the EDF Benefit Claim Form to the Class Counsel Claims Coordinator and the Chattem Claims Coordinator. EDF Benefit Claim Forms shall be deemed "complete" when the Class Member has submitted all information and documentation specified on the EDF Benefit Claim Form Completeness Checklist, attached hereto as Annex VI. Class Members shall be required to correct any deficiencies within thirty (30) days after they are notified of such deficiencies.

(c) Within sixty (60) days after the Chattem Claims Coordinator and the Class Counsel Claims Coordinator receive an EDF Benefit Form from the Claims Administrator, the Chattem Claims Coordinator and the Class Counsel Claims Coordinator shall meet and confer to determine if sufficient information exists to make a preliminary determination as to the EDF Benefit, if any, to which the Class Member is entitled. If either the Class Counsel Claims Coordinator or the Chattem Claims Coordinator believes that additional information is required before making such determination, such information shall be requested from the Class Member or Class Member's Counsel, if any. When the Chattem Claims Coordinator and the Class Counsel Claims Coordinator agree that sufficient information exists to make a preliminary determination as to the EDF Benefit, if any, to which the Class Member is entitled, the EDF Benefit Claim Form shall be considered "complete."

### Section 4.4 Extraordinary Damages Benefit Determination

(a) Within thirty (30) days after a Final Benefit Determination is rendered for all Class Members who submitted a Benefit Claim Form, the Chattem Claims Coordinator and the Class Counsel Claims Coordinator shall meet and confer and make a recommendation as to the distribution of the Extraordinary Damages Fund (the *"EDF Distribution Recommendation"*). The EDF Distribution Recommendation shall be determined pursuant to the terms of the Dexatrim® Case Scoring System and Matrix.

(b) Within five (5) days of making the EDF Distribution Recommendation described in Section 4.4(a), the Class Counsel Claims Coordinator shall provide the Special Master with a copy of the EDF Distribution Recommendation and a copy of all EDF Benefit Claims Forms submitted by Class Members. The Class Counsel Claims Coordinator shall also serve a copy of the EDF Distribution Recommendation on all Class Members who submitted in EDF Benefit Claim Form. Any such Class Member may submit an alternative recommendation to the Special Master.

(c) Within sixty (60) days after the date that the Class Counsel Claims Coordinator mails notice of the EDF Distribution Recommendation, the Special Master shall make a final and binding determination as to the distribution of the Extraordinary Damages Fund (*"Final EDF Distribution Determination"*). The Final EDF Distribution Determination shall be determined pursuant to the terms of the Dexatrim® Case Scoring System and Matrix.

### Section 4.5 Liens

(a) *Liens In General.* Class Members are each responsible for any and all claims or liens, past, present or future, known or unknown, by any person, entity, insurance carrier, company, business, firm, corporation or governmental entity or agency (including, but not limited to government liens) as a result of any injury the Class Member alleges arises out of the Class Member's ingestion of a Dexatrim® Product.

(b) *Government Liens.* If the Chattem Claims Coordinator or the Class Counsel Claims Coordinator is aware that a state or federal government agency may have a lien on benefits due to a Class Member, the Claims Administrator shall withhold that amount, as ordered by the Trial Court, that is reasonably necessary to satisfy such lien(s). In order to facilitate this process and to ensure government liens are identified, the name, date of birth, and social security number of each class member shall be made available for the inspection of the appropriate government agency.

(c) *Lien Hearing.* The Parties shall request that the Trial Court hold a hearing for the purpose of determining the amounts owed to state or federal governmental agencies to satisfy liens related to any Settled Claim.

(d) *Attorney Liens.* If the Class Member states that he or she is represented by counsel in the Benefit Claim Form, the Claims Administrator shall endeavor to make all benefits payable made in the name of the Class Member and the attorney(s) identified by the Class Member in the Benefit Claim Form. However, none of the Released Parties nor the Claims Administrator shall be responsible for any failure to do so. Any notice of representation or change in representation other than that which is made in the Benefit Claim Form shall not change the application of this section.

(e) *Indemnity.* Any Class Member who receives Benefits from this Settlement Agreement shall be required to indemnify and hold harmless the Released Parties and Class Counsel (but only in their capacity as Class Counsel) from any and all claims, demands, causes of action, of any and every nature whatsoever, made by any person, entity, firm or corporation claiming by, through or under such Class Member, by right of assignment or subrogation, in connection with the Released Claims, or by virtue of having paid or reimbursed medical expenses or other compensation arising out of or related to such Class Member's alleged use of a Dexatrim Product.

### Section 4.6 Claims Administration Procedures

(a) Any disagreement as to the interpretation of the Settlement Agreement or the Matrix as they relate to deciding the benefits, if any, to which a Class Member is entitled shall be resolved by the Special Master. Class Counsel, the Claims Administrator, and Chattem may request that the Special Master issue an opinion to resolve an actual controversy regarding the interpretation of the Settlement Agreement or the Matrix.

(b) The Special Master shall, where necessary, create Claims Administration Procedures that provide specific details about how claims are administered. The Claims Administration Procedures promulgated by the Special Master shall comply with the terms set forth in the Settlement Agreement and the Matrix.

### Section 4.7 General Claims Administration Matters

(a) Any and all materials submitted by a Class Member pursuant to this Article 4 shall be deemed submitted on the date that such material is post-marked. In the absence of a post-mark or if such post-mark is illegible, the date of receipt shall be the date such material is deemed submitted.

(b) None of Chattem, the Claims Administrator, the Initial Chattem Settlement Trust, the Final Chattem Settlement Trust, the Chattem Claims Coordinator, or the Class Counsel Claims Coordinator shall be responsible for or in any way accept any liability with respect to deficient Claim Forms.

(c) None of the Claims Administrator, the Chattem Claims Coordinator nor the Class Counsel Claims Coordinator shall be liable to the Initial Chattem Settlement Trust or the Final Chattem Settlement Trust to any person holding a personal injury claim or to any other person except for the Claims Administrator's, the Chattem Claims Coordinator's or the Class Counsel Claims Coordinator's own breach of trust committed in had faith or for willful misconduct. None of the Claims Administrator, the Chattem Claims Coordinator or the Class Counsel Claims Coordinator shall be liable for any act or omission of any of their

respective officers, agents, employees, consultants, or other Representative unless the Claims Administrator, the Chattem Claims Coordinator or the Class Counsel Claims Coordinator acts with bad faith or willful misconduct in the selection or retention of such officer, agent, employee, consultant, or other representative.

(d) The provisions of this Section 4.7 shall apply to all persons or entities engaged by the Claims Administrator, the Chattem Claims Coordinator, and the Class Counsel Claims Coordinator to render services relating to the Settlement.

(e) The Claims Administrator shall be compensated reasonable fees from the Benefit Fund.

### Section 4.8 Fraudulent Claims

(a) In the event that the Special Master determines that any Class Member has submitted a fraudulent claim or allegation, the Special Master may reduce the benefits to which the Class Member may be entitled under this Settlement Agreement by any amount deemed appropriate by the Special Master. In addition to reducing or eliminating a Class Member's benefits, the Special Master, in his or her discretion, may refer and recommend to the Trial Court or any other appropriate court, monetary or injunctive sanctions against the Class Member and/or the Class Member's Counsel including, but not limited to, forfeiture of attorney fees and costs, or the institution of grievance proceedings.

(b) Nothing in this Settlement Agreement shall restrict the Chattem Claims Coordinator from obtaining discovery related to suspected fraudulent claims, as permitted by the Special Master.

### ARTICLE 5—ATTORNEYS' FEES

### Section 5.1 Existing Contingency Fee Agreements

(a) Attorneys who entered into contingency fee agreements with Class Members after December 21, 2003 are entitled only to reasonable fees for filling out claim forms and consulting with their clients, up to a cap of 10% of the Class Member's Total Settlement Compensation, or $10,000, whichever is less. It is hereby understood that any date that any different provision in the Matrix is replaced with this provision.

(b) Except as set forth in Section 5.1(a), nothing in this agreement is intended to void or to otherwise alter reasonable contingent fee contracts.

### Section 5.2 Plaintiff's Litigation Expense Fund

(a) Before making any payment to any Class Member under this Settlement Agreement, the Trustee of the Final Chattem Settlement Trust shall deduct that amount, if any, required by MDL 1407 Amended Case Management Order No. 8 and 16 Establishing Plaintiff's Litigation Expense Fund.

(b) The Trustee of the Final Chattem Settlement Trust shall deposit all amounts deducted in accordance with Section 5.2(a) to the MDL 1407 Fee and Cost Account in accordance with MDL 1407 Amended Case Management Order No. 8 and 16 Establishing Plaintiff's Litigation Expense Fund.

(c) For the purposes of applying MDL 1407 Amended Case Management Order No. 8 and 16 Establishing Plaintiff's Litigation Expense Fund, all claims settled by this Settlement Agreement are deemed to be settled within the jurisdiction of the Trial Court.

### Section 5.3 Any Other Attorneys Fees or Costs

Class Counsel agree that they will not seek any attorneys fees or costs from any of the Released Parties; however, the Released Parties agree that they will not object to any reasonable application by Class Counsel for common benefit fees from other sources.

### ARTICLE 6—GENERAL TERMINATION AND RELEASE

### Section 6.1 Good Faith Settlement

The Parties agree that this Settlement Agreement is made in good faith and in accordance with the laws of the jurisdictions in which Dexatrim® Products Related lawsuits have been filed. If required by any court or tribunal, Class Counsel agree to cooperate with Chattem and the other Released Parties by providing affidavits and/or testimony concerning the circumstances of the settlement contemplated by this Settlement Agreement and attesting to the fact that it is a good faith settlement.

### Section 6.2 Release

(a) Unless this Settlement Agreement shall have been terminated in accordance with Article 8 hereof, after the Court approves this Settlement Agreement as a good faith, fair, adequate and reasonable settlement, the Parties hereby agree that every Settled Claim of each Class Member (other than a Class Member who exercises an Opt–Out Right pursuant to Section 3.4) shall be conclusively compromised, settled and released as to Chattem and each other Released Party. Such releases shall remain effective regardless of changes in the circumstances or condition of Chattem, the other Released Parties or such Class Members, discovery of new or additional facts, or changes in applicable law. In making such releases each Class Member (other than a Class Member who exercises an Opt–Out Right pursuant to Section 3.4) shall be deemed to expressly acknowledge and waive all rights that such Class Member may have under any statute, regulation or common law principle that would limit the effect of the release provided in this Settlement Agreement to those claims actually known and/or suspected to exist at the time the release is giving, including, without limitation, the provisions of Section 1542 of the Civil Code of the State of California (notwithstanding that this Settlement Agreement does not provide for the application of California law), which provides that "[a] general release does not extend to claims which the creditor does not know or suspect exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor." Consistent with the provisions of Article 8 of this Settlement Agreement, the releases herein shall extinguish any claims for contribution and/or indemnification against Chattem or the other Released Parties.

(b) By entering into this Settlement Agreement, Class Members agree that they have no standing to pursue claims under any of the Released Parties' insurance policies or rights under those policies with regard to any insurance proceeds or any other obligations owed or potentially owed under the policies, and any agreement between the Released Party(ies) and any of their insurers regarding such policies, coverage limits and payments of insurance proceeds shall be binding on the Class Members.

### Section 6.3 Requests to the Trial Court

The Parties hereby agree to request that the Court enter an order finding this Settlement Agreement to be a good faith settlement and barring and enjoining, to the extent permitted by applicable law, the commencement and prosecution of any contribution and/or indemnification claim or action by or on behalf of any Class Member (other than a Class Member who exercises an Opt–Out Right pursuant to Section 3.4) or entity against Chattem or any other Released Party for reimbursement for payments made or to be made to or on behalf of any such Class Member for Dexatrim® Products Related claims, actions or injuries, or for expenses incurred in defending against any such claims, actions or proceedings. The Parties agree that Chattem and the other Released Parties shall be entitled to dismissal with prejudice of any claims against them by or on behalf of any Class Member (other than a Class Member who exercises an Opt–Out Right pursuant to Section 3.4) that violate or are inconsistent with this bar.

### Section 6.4 No Recovery from Released Parties Outside This Agreement

The Parties agree that no Class Member (other than Class Members who properly and timely exercise their Opt–Out Rights) may recover, directly or indirectly, any sums from Chattem or any other Released Party other than those received under this Settlement Agreement.

### Section 6.5 Claim Forms

Each Class Member (other than a Class Member who exercises an Opt–Out Right pursuant to Section 3.4) otherwise entitled to receive benefits under this Settlement Agreement shall be required, as a further condition to receive benefits hereunder, to execute and deliver a complete Benefit Claim Form and, if applicable, a complete Supplemental Claim Form and, if applicable, a complete EDF Benefit Claim Form by the deadlines set forth in Article 4.

## ARTICLE 7—CONTINUING JURISDICTION

### Section 7.1 Trial Court Retains Jurisdiction

The Court shall retain exclusive and continuing jurisdiction of the Complaint, the Parties, all Class Members (other than a Class Member who exercises an Opt–Out Right pursuant to Section 3.4), Chattem and the other Released Parties, and over this Settlement Agreement with respect to the performance of the terms and conditions of the Settlement Agreement, to assure that all disbursements are properly made in accordance with the terms of the Settlement Agreement, and to interpret and enforce the terms, conditions and obligations of this Settlement Agreement. Other than provided herein, the Court shall have the power to approve the designation, appointment and removal of auditors, consultants and disbursing agents, the Chattem Claims Coordinator, the Class Counsel Claims Coordinator, and the execution of contracts as necessary and appropriate to assure the administration of this Settlement Agreement. Any dispute that arises under this Settlement Agreement shall be submitted to the Court. If any dispute is so submitted, each party concerned shall be entitled to seven (7) days' written notice (or otherwise as the Court may for good cause direct) and the opportunity to submit evidence and to be heard on oral argument as the Court may direct. To the extent that additional or different procedures for dispute resolution are provided, or standards to be applied in connection therewith are devised, under any other provision of this Settlement Agreement, such other provisions shall control.

## ARTICLE 8—TERMINATION

### Section 8.1 Termination By Chattem

(a) In the event that more than one hundred and ninety (190) Class Members submit a Benefit Claim Form that alleges either an ischemic stroke or a hemorrhagic stroke, Chattem shall have the option to terminate and withdraw from this Settlement Agreement at any time prior to 5:00 p.m. Pacific Time on the date that is five (5) days prior to the Fairness Hearing Date. The Fairness Hearing shall be set on a date that is at least 50 days after the Benefit Claim Form Deadline.

(b) In the event that the aggregate benefits which all persons who exercised the Opt–Out Right and who allege either a hemorrhagic stroke or an ischemic stroke would have received pursuant to the Dexatrim® Case Scoring System and Matrix if those persons had not exercised the Opt–Out Right ("*Aggregate Opt–Out Matrix Value* ") exceed $13,750,000, Chattem shall have the option to terminate and withdraw from this Settlement Agreement at any time prior to 5:00 p.m. Pacific Time on the date that is five (5) days prior to the Fairness Hearing Date.

(c) If Chattem intends to terminate this Settlement Agreement pursuant to Section 8.1(b), Chattem shall file a Notice of Termination with the Trial Court and serve it on Class Counsel by fax and U.S. mail on or before the date that is five (5) days prior to the Fairness Hearing Date. If Chattem terminates this Settlement Agreement under any provision, the Fairness Hearing shall be cancelled. If Class Counsel believes that the Aggregate Opt–Out Matrix Value does not exceed $13,750,000, Class Counsel may object to Chattem's termination of this Agreement by filing a Notice of Objection to Termination with the Trial Court and serving it on the Special Master and Chattem by fax and U.S. Mail within three (3) days of the date on which Chattem filed and served its Notice of Termination. If Class Counsel files a Notice of Objection to Termination, the Special Master shall, after a hearing with the Chattem Claims Coordinator and Class Counsel, make a final and binding determination of the Aggregate Opt–Out Matrix Value. If the Special Master determines that the Aggregate Opt–Out Matrix Value did not exceed $13,750,000, the Trial Court shall re-schedule the Fairness Hearing to an appropriate date and make all orders necessary and related thereto.

(d) Any proceedings before the Special Master to determine the Aggregate Opt–Out Matrix Value, as well as all documents related thereto, shall remain confidential and shall not be used for any purpose other than to determine the Aggregate Opt–Out Matrix Value for purposes of this termination provision.

(e) If Chattem exercises its right to terminate and withdraw from this Settlement Agreement, it shall give written notice to the Court and to Class Counsel.

(f) In the event that any of the conditions set forth in Section 9.3 have not been satisfied or waived by Chattem, as applicable (and such conditions are no longer capable of being satisfied), Chattem shall have the right to terminate and withdraw from this Settlement Agreement by written notice to the Court and Class Counsel.

(g) In the event that Chattem terminates and withdraws from this Settlement Agreement in accordance with this Section 8, no Party shall have any further obligations hereunder.

## ARTICLE 9—SETTLEMENT IMPLEMENTATION

### Section 9.1 General

(a) In order to become effective, this Settlement Agreement must receive Final Judicial Approval.

### Section 9.2 Approval Process Provisions

(a) After the date of this Settlement Agreement, the Parties shall file a joint motion requesting preliminary approval of the Settlement Agreement and approval of the forms of notice (the "*Notice*").

(b) Chattem shall consent to class certification for settlement purposes only; however, Chattem shall retain its right to contest class certification for any purposes other than the approval of this Settlement Agreement.

(c) The Parties shall cooperate and assist in all of the filings and proceedings relating to the obtaining Trial Court Approval and in any further filings and proceedings necessary to obtain Final Judicial Approval of the Settlement, and in any related appeals.

(d) Upon Final Judicial Approval, the Class Counsel and all Class Members shall cooperate with Chattem and any other Released Party to cause the dismissal, with prejudice and without costs, of any action against Chattem or any Released Party assenting a Settled Claim brought by or on behalf of any Class Member (other than a Class Member who exercises an Opt–Out Right pursuant to Section 3.4) entitled to benefits hereunder, including but not limited to class actions, whether or not certified as such, which are pending in any State or federal court. Upon Trial Court Approval, the Class Counsel and all such Class Members shall cooperate with Chattem and any other Released Party to cause further proceedings in all such settled actions to be stayed pending Final Judicial Approval.

### Section 9.3 Conditions

(a) Chattem's obligations under this Settlement Agreement will be subject to the following conditions:

 (i) Trial Court Approval of the Settlement, which approval order or orders shall:

 (1) Confirm the certification of the Settlement Class, under Fed.R.Civ.P. 23(a), 23(b)(2) and 23(b)(3) for settlement purposes only;

 (2) Confirm the appointment of the Class Representatives as the Representatives of the Settlement Class;

 (3) Approve this Settlement Agreement in its entirety pursuant to Fed.R.Civ.P. 23(e) as fair, reasonable, adequate, and non-collusive;

(4) Dismiss with prejudice and without costs all claims and actions asserting Settled Claims against any Released Party pending before the Court (other than claims and actions of a Class Member who exercises an Opt–Out Right pursuant to Section 3.4);

(5) Bar and enjoin all Class Members (other than a Class Member who exercises an Opt–Out Right pursuant to Section 3.4) entitled to benefits hereunder from asserting and/or continuing to prosecute against Chattem or any other Released Party any and all Settled Claims which the Class Member (other than a Class Member who exercises an Opt–Out Right pursuant to Section 3.4) had, has, or may have in the future in any federal or State court;

(6) Reserve the Court's continuing and exclusive jurisdiction over the Parties, including Chattem and the Class Members (other than a Class Member who exercises an Opt–Out Right pursuant to Section 3.4), to administer, supervise, interpret, and enforce this Settlement Agreement in accordance with its terms and to supervise the operation of the Initial Chattem Settlement Trust and the Final Chattem Settlement Trust; and

(7) Enter such other orders as are needed to effectuate the terms of the Settlement Agreement; and

(ii) Final Judicial Approval of this Settlement Agreement.

## ARTICLE 10—ASSIGNMENT OF CLAIMS

### Section 10.1 Class Members' Claims Against Alps

Class Members hereby assign to Chattem, effective upon Final Judicial Approval, any and all claims against Alps Pharmaceutical Ind. Co., Ltd., regardless of legal theory, that arise out of or relate to any of the Dexatrim® Products or their development, manufacture, formulation, testing, distribution, marketing, labeling, regulatory submissions, advertising, sale, or ingestion. ("*Assigned Alps Claims* ").

### Section 10.2 Recovery From Alps

Class Counsel may reach a settlement agreement of the Assigned Alps Claims at any time prior to the date that is fourteen (14) days prior to Trial Court Approval, provided that Alps agrees to pay a sum acceptable to Chattem (in consultation with Class Counsel) into the Initial Chattem Settlement Trust. Half of any amount paid by Alps in satisfaction of such agreement shall be allocated to the Extraordinary Damages Fund and the other half shall be allocated to the Benefit Fund.

### Section 10.3 Duty to Cooperate With Assigned Claims

Other than expressly provided in Section 10.2, Class Members and Class Counsel shall take no action that compromises Chattem's ability to prosecute the Assigned Alps Claims. Class Members and Class Counsel shall use reasonable efforts to cooperate with Chattem in the prosecution of these claims.

## ARTICLE 11—MISCELLANEOUS

### Section 11.1 Confidential Information

Any information provided by or regarding a Class Member or otherwise obtained pursuant to this Settlement Agreement shall be kept confidential and shall not be disclosed except to appropriate persons to the extent necessary to process Claims or provide benefits under this Settlement Agreement or as otherwise expressly provided in this Settlement Agreement (including, but not limited to, information to be released in connection with the determination of government liens in accordance with Section 4.5(b). All Class Members shall be deemed to have consented to the disclosure of this information for these purposes.

### Section 11.2 Successors and Assigns

This Settlement Agreement shall be binding on the successors and assigns of the Parties.

### Section 11.3 Use of Settlement and Negotiations in Other Proceedings

The Parties to the Settlement, including Chattem, the other Released Parties, or any Class Member, shall not seek to introduce and/or offer the terms of the Settlement Agreement, any statement, transaction or proceeding in connection with the negotiation, execution or implementation of this Settlement Agreement, any statements in the Notice documents delivered in connection with this Settlement Agreement, stipulations, agreements, or admissions made or entered into in connection with the fairness hearing or any finding of fact or conclusion of law made by the Trial Court, or otherwise rely on the terms of this Settlement Agreement, in any judicial proceeding, except insofar as it is necessary to enforce the terms of the Settlement Agreement (or in connection with the determination of any income tax liability of a Party). If a Class Member who is not entitled to benefits hereunder seeks to introduce and/or offer any of the matters described herein in any proceeding, the restrictions of this Section 11.3 shall not be applicable to Chattem and the other Released Parties with respect to that Class Member. If a Class Member who has timely and properly exercised an Opt–Out Right seeks to introduce and/or offer any of the matters described herein in any proceeding, the restrictions of this Section 11.3 shall not be applicable to Chattem and the other Released Parties with respect to that Class Member.

### Section 11.4 No Admission of Liability or Lack of Merit

Neither this Settlement Agreement nor any Annex, document or instrument delivered hereunder nor any of the statements in the notice documents in connection herewith, nor any statement, transaction or proceeding in connection with the negotiation, execution or implementation of this Settlement Agreement, is intended to be or shall be construed as or deemed to be evidence of an admission or concession by Chattem, or the Released Parties of any liability or wrongdoing or of the truth of any allegations asserted by any plaintiff against it or them, or as an admission by the Class Representatives or members of the Settlement Class of any lack of merit in their claims, and no such statement, transaction or proceeding shall be admissible in evidence for any such purpose except for purposes of obtaining approval of this Settlement Agreement in this or any other proceeding.

### Section 11.5 Titles and Headings

The headings of the sections and paragraphs of this Settlement Agreement are included for convenience only and shall not be deemed to constitute part of this Settlement Agreement or to affect its construction.

### Section 11.6 Distribution of Remaining Funds

(a) After all claims are paid in accordance with Section 3.2 and all appeals are resolved in accordance with Section 4.2(f), any finds remaining in the Benefit Fund shall be paid to Chattem.

(b) If, after all claims are paid in accordance with Section 3.3, any funds remain in the Extraordinary Damages Fund, Class Counsel shall propose an equitable distribution plan for approval by the Trial Count.

### Section 11.7 Notice to Parties

Any notice, request, instruction or other document to be given by any Party to another Party shall be in writing and delivered personally or sent by Federal Express or facsimile (which such facsimile notice shall be deemed effective as of the time of receipt of confirmation by the sending party) as follows, or as otherwise instructed by a notice delivered to the other Party pursuant to this subsection:

*If to Chattem:*

Miller & Martin PLLC
Suite 1000 Volunteer Building
832 Georgia Avenue
Chattanooga, TN 37402–2289
Attention: Roger Dickson, Esq.
C. Crews Townsend, Esq.
Facsimile: (423) 785–8480

*If to the Class Representatives or Class Counsel:*

Christopher Seeger and Stephen Weiss
Seeger Weiss LLP
One William Street
New York, N.Y. 10004
Facsimile: (212) 584–0799

With copies to:
James Green and Mike Heaviside
Ashcraft & Gerel LLP
2000 L Street, N.W. Suite 400
Washington, D.C. 20036
Facsimile: (202) 416–6392

Ramon Rossi Lopez,
Lopez, Hodes, Restaino, Milman & Skikos
450 Newport Center Drive
Second Floor
Newport Beach, California 92660
Facsimile: (949) 640–8294

Ron Michael Meneo
Early, Ludwick & Sweeney, LLC
One Century Tower
265 Church Street
New Haven, CT 06508–1866
Facsimile: (203) 785–1671

### Section 11.8 Receipt of Documentation

Unless otherwise specified, any form or other documentation required to be submitted under this Settlement Agreement shall be deemed timely if it is postmarked on or before the date by which it is required to be submitted under this Settlement Agreement.

### Section 11.9 No Third Party Beneficiaries

No provision of this Settlement Agreement or any Annex hereto is intended to create any third-party beneficiary to this Settlement Agreement, except the Released Parties.

### Section 11.10 Entire Agreement

This Settlement Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and, except as specifically set forth herein or therein, supersedes and cancels all previous agreements, negotiations, and commitments in writings between the Parties hereto with respect to the subject matter hereof. This Settlement Agreement may not be changed or modified in any manner unless in writing and signed by a duly authorized officer of Chattem and by a duly authorized representative of the Class Representatives.

### Section 11.11 Governing Law

This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee without regard to conflict of laws principles thereunder.

### Section 11.12 Certification of Different Classes

In the event that the Court approves a certification of the Settlement Class other than that contemplated by this Settlement Agreement, the parties hereby agree that they shall amend this Settlement Agreement to reflect such certification.

### Section 11.13 Original Signatures

This Settlement Agreement may be signed in multiple counterparts, each of which shall be deemed to be an original and all of which shall be deemed to be one and the same instrument.

### Section 11.14 Severance of Agreement

Chattem, prior to Trial Court Approval and with the mutual consent of the other Parties and the Court, may separate the Settlement Class and this Settlement Agreement into separate Settlement Classes and Settlement Agreements.

IN WITNESS WHEREOF, the Parties have duly executed this Class Action Settlement Agreement among Chattem and the Class Representatives, by their respective counsel as set forth below, as of the 13th day of April, 2004.

COUNSEL FOR CHATTEM, INC:

MILLER & MARTIN PLLC

By: _____ Date: 4-13-04

COUNSEL FOR CLASS MEMBERS :

SEEGER WEISS LLP

By: _____ Date: 4/13/04

ASHCRAFT & GEREL

By: _____ Date: 4/13/04

LOPEZ, HODES, RESTAINO, MILMAN & SKIKOS

By: _____ Date: 4/13/04

EARLY, LUDWICK & SWEENEY, LLC

By: _____ Date: 4/13/04

Exh. A Annex I

## FOR SETTLEMENT ONLY

### Dexatrim Case Scoring System & Matrix

### For the Chattem Dexatrim Class Action Settlement

This Dexatrim Case Scoring System and Matrix (the "Chattem Matrix" or the "Matrix") is the system for scoring claims to be submitted pursuant to the Dexatrim Class Action Settlement ("DCAS"). In addition to Plaintiffs, the Matrix applies only to Chattem, Inc. and Sidmak Laboratories, Inc. (the "Dexatrim Defendants"). The Chattem Matrix cannot be used for any purposes in contravention of Federal Rule of Evidence 408. The Chattem Matrix does not reflect, and is not intended to reflect, the litigation positions of either the Dexatrim Defendants or Plaintiffs and is intended solely to facilitate the resolution of the litigation brought by Plaintiffs who allege injuries based on ingestion of Dexatrim appetite-suppressant products that contained phenylpropanolamine ("PPA").[1]

### I. *The Dexatrim Case Scoring System & Matrix*

#### A. *Overview of the Scoring System*

In order to distinguish between cases and grade them consistently, the attached Matrix is based on a Case Scoring System. This System has seven components:

1. Product Identification;
2. Temporal Relationship;
3. The Liability and Causation Score;
4. The Damages Score;
5. Adjustment for Ischemic Stroke

6. Adjustment for Statute of Limitations; and
7. Adjustment for Other Independent, Potentially Liable Defendants.

Product Identification and Temporal Relationship are threshold inquiries. If a case passes the Product Identification and Temporal Relationship threshold inquiries, the resulting scores from each component (Product Identification; Temporal Relationship; Liability and Causation Score; Damages Score) are then added together to arrive at a Total Matrix Score.

The range of possible Total Matrix Scores are then assigned to a Matrix Level of Severity. The resulting Settlement Amount is then adjusted in the event that other independent, potentially liable defendants are involved in the lawsuit, and adjusted by the remoteness of the filing of Plaintiff's Complaint to Plaintiff's injury. Unless otherwise noted, scoring within each category is not cumulative. Within a scoring category, the point value that results in the greatest addition or greatest deduction is to be applied (e.g., A plaintiff who uses 4 pills per day for 6 months receives a deduction of $-3$ for Overdose, but not an additional deduction of $-1$ for Disregard of Labeling).

#### B. *The Matrix*

The Matrix has a vertical axis consisting of: (i) injuries other than stroke or cardiac ("Other Injuries")[2], (ii) "Cardiac Injuries"[3] and (iii) seven levels of "Stroke Injuries"[4]— with Level 0 assigned the least and Level VI the highest level of resulting severity. The horizontal axis of the Matrix consists of six

---

**1.** Products marketed, distributed and/or manufactured by Thompson Medical Company, Inc. (succeeded by The Delaco Company) that contained phenylpropanolamine include, but are not limited to, the brand names Dexatrim®, Control®, Appedrine®, Prolamine®, Anorexin®, Coffee, Tea, and a New Me®, Grapefruit Plus® and Vita Slim®. All of these products are collectively referred to throughout this document as "Dexatrim".

**2.** "Other Injuries" are limited to seizures, transient ischemic attacks and hypertensive crisis

where medical documentation contemporaneous with the injury establishes the injury and indicates that the Plaintiff consumed Dexatrim within the 96 hours prior to the injury.

**3.** "Cardiac Injuries" means myocardial infarction/heart attack.

**4.** "Stroke Injuries" means hemorrhagic stroke and ischemic stroke, but does not mean transient ischemic attacks.

(6) age ranges, with the Plaintiff's age at the date of injury as the focal point as follows:

 0–20 years
 21–29 years
 30–39 years
 40–49 years
 50–59 years
 60 and older

A range of values has been ascribed to each injury type and stroke level. The values have then been assigned in equal amounts across the horizontal axis ("Age Increments"). The Matrix is attached as Exhibit A.

## II. *Product Identification*

This component of the Case Scoring System operates as a threshold issue. If a Plaintiff scores "−3" on this issue, that Plaintiff is not eligible for further consideration under the Matrix. If a Plaintiff scores "−2" or higher, the score is incorporated into the Case Scoring System for Stroke Injuries or Cardiac Injuries.

| Factor | Score |
| --- | --- |
| Positive product identification | 0 |

(*e.g., initial injury hospitalization records refer to brand name of PPA product sold by Thompson Medical or Chattem; blood toxicology test[5] specifically for PPA is positive, packaging from ingested product*)

| | |
| --- | --- |
| Testimony of plaintiff *or* third party who has personal knowledge | −1 |
| Urinalysis Negative for PPA | −1 |

(*Urinalysis test performed for either: (i) phenylpropanolamine specifically; or (ii) sympathomimetic amines generally (provided that the nature or protocol of the test for sympathomimetic amines would reasonably be expected to identify phenylpropanolamine if it were present in the*

urine); and the urine for the toxicology test must have been drawn within 18 hours of the alleged ingestion of Dexatrim.)

| | |
| --- | --- |
| Strong evidence that plaintiff did not use Dexatrim | −2 |

(*e.g., incorrect description of product, medical records from initial hospitalization for injury reflect use of non-prescription product (except OTC pain medication taken in response to symptoms relating to stroke) but do not mention OTC appetite suppressants or the brand name of PPA product sold by Thompson Medical or Chattem)*

| | |
| --- | --- |
| No product identification | −3 |
| Conclusive evidence that plaintiff did not use Dexatrim | −3 |

(*e.g., alleged ingestion predates manufacture of product, blood toxicology test specifically for PPA is negative*)

## III. *Temporal Relationship of Last Dose of Dexatrim to Onset of Symptoms*

This component of the Case Scoring System also operates as a threshold issue. If a Plaintiff scores "−3" on this issue, that Plaintiff is not eligible for further consideration under the Matrix and shall receive $200 in Settlement Compensation for Stroke Injuries or Cardiac Injuries, and zero compensation for Other Injuries. If a Plaintiff scores "−2" or higher, the score is incorporated into the Case Scoring System for Stroke Injuries or Cardiac Injuries. Temporal relationship is to be established by showing that the alleged ingestion of Dexatrim occurred within 96 hours of the onset of symptoms (it being understood that such onset of symptoms must be established through medical records that were generated at or about the time of the onset of symptoms).[6]

---

**5.** "Blood Toxicology Test" means a toxicology test performed for either; (i) phenylpropanolamine specifically; or (ii) sympathomimetic amines generally (provided that the nature or protocol of the test for sympathomimetic amines would reasonably be expected to identify phenylpropanolamine if it were present in the bloodstream); and the blood for the toxicology test must have been drawn: (a) within 34 hours of

the alleged ingestion of sustained-released Dexatrim; or (b) within 24 hours of the alleged ingestion of immediate release Dexatrim.

**6.** The terms "onset of symptoms", "injury" and "stroke" are used interchangeably throughout this document, unless the context suggests otherwise.

*Time between alleged*
*ingestion of Dexatrim and*
*the onset of symptoms* *Score*

| | |
|---|---|
| 0 minutes—60 minutes [7] | −1 |
| >60 minutes—24 hours | 0 |
| >24 hours—72 hours | −1 |
| >73 hours—96 hours | −2 |
| >96 hours | −3 |

## IV. *Liability/Causation Score*

This component of the Case Scoring System operates to assign a separate score for factors that influence the relative strength of the Plaintiff's case. This component is broken down into three sections: General Liability/Causation Factors that apply to all cases, and sections for the specific injuries Hemorrhagic Stroke and Ischemic Stroke. Other Injuries and Cardiac Injuries are to be scored under Sections II, III, VIII, IX, and are exempt from scoring under Sections IV, V, VI, VII, X, and XI. A scoring sheet for Hemorrhagic Stroke is attached at Exhibit E, a scoring sheet for Ischemic Stroke is attached at E Adjustment for Statute of Limitations Exhibit F, a scoring sheet for Other Injuries and Cardiac Injuries is attached at Exhibit G.

7. This deduction applies where a plaintiff ingested Dexatrim one hour or less before the injury *and did not* ingest Dexatrim at any other time in the 96 hours before the injury. In the event that a plaintiff ingested Dexatrim one hour or less before the injury *and* consumed Dexatrim more than one hour, but less than 96 hours, before the injury, the time of the dose that was taken more than one hour, but less than 96 hours, before the injury should be used for scoring this factor. The following examples illustrate how this factor is to be scored: (i) if Plaintiff consumed Dexatrim 35 minutes before the injury and had not consumed any PPA product at any other time in the week preceding the injury, the score for this factor would be − 1 (0–60 minutes); (ii) if Plaintiff consumed Dexatrim 35 minutes before the injury and also consumed Dexatrim 7 hours before the injury, without taking any PPA in between, the score for this factor would be 0 (61 minutes–24 hours); (iii) if Plaintiff consumed Dexatrim 35 minutes before the injury and also consumed Dexatrim 36 hours before the injury, with no doses of PPA in between, then the score for this factor would be − 1 (24–72 hours); (iv) if Plaintiff consumed Dexatrim 35 minutes before the injury and also consumed Dexatrim 98 hours before the injury, with no doses of PPA in between, then the score for this factor would be − 1 (0–60 minutes).

### A. *General Liability/Causation*
### Factors *Score*

| | |
|---|---|
| Exposure to PPA [8] | |
| Use of PPA within 24 hours of injury and no use of PPA during preceding 14 days | +2 |
| Use of PPA within 48 hours of injury and no use of PPA during preceding 14 days | +1 |
| Use of PPA within 0–48 hours and intermittent use of PPA during preceding 14 days, (*without 3 or more consecutive days of use the latest of which occurred within 96 hours of injury* ) | 0 |
| Use of PPA for 3 or more consecutive days prior to injury, the latest of which occurred within 96 hours of injury | −1 |
| | |
| Date of Injury (Warning) | |
| Before June 1, 1994 | 0 |
| June 1, 1994—May 10, 2000 | −2 |
| After May 10, 2000 | 0 |
| | |
| Misuse of Product | |
| Overdose (*3 or more daily doses* [9] *of PPA* ) | −3 |

8. The following examples illustrate how this factor is to be scored: (i) if Plaintiff took PPA on the day of the injury, but had not consumed PPA for 14 days or more prior to that dose, the score for this factor is + 2; (ii) if Plaintiff took PPA on the day of the injury, and had consumed PPA every other day for a week prior to that dose, the score for this factor would be 0; (iii) if Plaintiff took PPA for 5 days in a row, stopped taking PPA for 2 days, then resumed taking PPA and the injury occurred on the day that Plaintiff returned taking Dexatrim, the score for this factor would be − 1.

9. "Daily dose" means the dosage indicated on the labeling of the PPA product(s) ingested. For instance, the daily dose of Maximum Strength Dexatrim is one 75 mg time-released capsule per 24 hours period; cough/cold medicines commonly recommend four 25 mg immediate release doses per 24 hour period. For purposes of this factor, using the above-described daily doses, four 25 mg doses of a PPA containing cough/cold medicines (1 daily dose) and two 75 mg Dexatrim pills (2 daily doses) within a 24 hour period (3 daily doses total) is an overdose. Conversely, using the above-described daily doses, two 25 mg doses of a PPA containing cough/cold medicine (1/2 daily dose) and two 75 mg Dexatrim pills (2 daily doses) within a 24 hour period (2 1/2 daily doses total) is not an overdose, but, rather, is disregard of labeling.

Disregard of labeling −1
(*Use for more than 3 consecutive months; use of more than one pill within 24 hours; use by person under 12; use by person between 12–18 or over 60 without consultation of doctor; use while being treated for depression or eating disorder; use by person with heart disease, diabetes, thyroid disease, pregnancy, nursing a baby without consultation of doctor; use by someone with nervousness, dizziness, sleeplessness, palpitations, headache; concomitant use of any other PPA product; or use within 2 weeks of use of MAOL* )

**B.** *Hemorrhagic Stroke Factors* [10] (Use Score Sheet at Exhibit E)

Head trauma within 7 days of onset
 Severe (Glasgow coma scale 8
 or less) −10
 Moderate (Glasgow coma
 scale 9–12) −4
 Mild (Glasgow coma scale 13–
 15) 0
 Medically documented but
 not severity not noted −1

Prior stroke [11]
 Prior hemorrhagic stroke −3
 Prior ischemic stroke −1
 Family history of stroke [12] −1

Chronic Hypertension
 Previously Diagnosed and
 Uncontrolled −4
 Previously Diagnosed and
 Controlled −1
 Previously Unknown −2
 (*Medically diagnosed at time of stroke with previously undiagnosed chronic hypertension* )

Aneurysm (medically documented, at stroke site [13])
 Diameter 24 mm or greater −7
 Diameter 10–23 mm −4
 Diameter less than 10 mm −1
 Diameter not measured −3

**10.** "Hemorrhagic Stroke" means primary hemorrhagic stroke. In other words, an ischemic stroke that results in a hemorrhagic conversion will not be scored under this Section IV.B., but rather will be scored under Section IV.C., the ischemic stroke factors portion of the Dexatrim Scoring System & Matrix.

**11.** Prior stroke does not include cardiac injuries, seizures, transient ischemic attacks, hypertensive crises, or any injury other than hemorrhagic ischemic stroke.

 Family History −1

AVM
 Medically Documented at
 stroke site −6
 Medically Documented not at
 stroke site −3
 Family History −1

Brain tumors
 Medically Documented at
 stroke site −6
 Medically Documented not at
 stroke site −3
 Family History −1

Leukemia, Medically Documented −4

Pre–existing bleeding disorders,
 Medically Documented −3
 (*hemophilia, Disseminated Intravascular Coagulation, Sickle Cell Anemia, any disease causing coagulopathy or autoanticoagulation* )

Use of anticoagulants, within 7 days
 of injury −1
 (*Use of prescribed anticoagulants (e.g. Heparin, Coumadin, Warfarin; excluding aspirin)*)

Age
 66 and older −3
 55–65 −1
 18–54 0
 1–17 +3

Cocaine/PCP Use/Unprescribed
 Amphetamine
 Within 24 hours of injury −7
 Within 24–96 hours of injury −4

Prescribed Amphetamine
 Within 24 hours of injury −4
 Within 24–96 hours of injury −2

Other illicit drug use
 Within 24 hours of injury −1

Smoking [14]

**12.** Family history of stroke only applies if Plaintiff does not receive deductions for Chronic Hypertension, Aneurysm AVM, Brain Tumors, Leukemia or Pre–Existing Bleeding Disorders.

**13.** "Stroke site" means the location in the brain in which the bleed or blockage occurred.

**14.** The largest quantity of cigarettes regularly smoked within the period of five years prior to

No smoking 0
1–20 cigarettes per day −1
Over 20 cigarettes per day −3

Alcohol consumption [15]
0–5 drinks per day 0
Over 5 drinks per day −3

Exercise & Exertion [16]
At or within 6 hours of onset +1
Other 0

C. **Ischemic Stroke Factors** (Use Score Sheet at Exhibit F)

Head trauma within 7 days of onset
Severe (Glasgow coma scale 8 or less) −6
Moderate (Glasgow coma scale 9–12) −3
Mild (Glasgow coma scale 13–15) 0
Medically documented but not severity not noted −1

Prior Transient Ischemic Attack
0–2 years −4
3–5 years −3
over 5 years −2

Prior stroke [17]
Prior ischemic stroke −3
Prior hemorrhagic stroke −1
Family history of stroke [18] −1

Chronic Hypertension
Previously Diagnosed and Uncontrolled −4
Previously Diagnosed and Controlled −1
Previously Unknown −2

*(Medically diagnosed at time of stroke with previously undiagnosed chronic hypertension )*

Brain tumors
Medically Documented at, or near, stroke site −6
Medically Documented not at stroke site −3
Family History −1

Cancer [19] −4
*(Systemic cancer, i.e., cancer with documented mestastasizes and/or distant lymph node infiltration OR cancer in situ treated with chemotherapy)*
Coronary Artery Disease −4

Carotid Artery Disease/Stenosis
Severe −4
*(stenosis ≥ 70%; diastolic vel. >79cm/sec and systolic vel.>125cm/sec)*
Moderate −2
*(stenosis 50–69%; systolic vel. >124cm/sec)*
Mild 0
*(stenosis <50%)*
Severity unknown, but disease medically documented −2

Prior myocardial infarction
0–30 days −5
31 days–1 year −3
more than 1 year to 2 years −1
more than 2 years 0
unspecified −1

the stroke should be used for scoring purposes. For example, if Plaintiff smoked 1 ppd for three years immediately preceding the stroke, and smoked 1½ ppd for two years before that (4 and 5 years before the stroke), then the score for this factor is −3. By way of further example, if Plaintiff quit smoking within the two years immediately preceding the stroke, and smoked 15 cigarettes per day for two years before that (3 and 4 years before the stroke), then the score for this factor is −1.

15. The largest quantity of alcohol regularly consumed within the period of five years prior to the stroke should be used for scoring purposes. For example, if Plaintiff consumed 3 drinks per day for the three years immediately preceding the stroke, and drank 6 drinks per day for two years before that (4 and 5 years before the stroke), then the score for this factor is −3.

16. Documentary evidence of any such exercise and/or exertion must have been in existence prior to the date that the MOU was signed.

17. Prior stroke does not include cardiac injuries, seizures, transient ischemic attacks, hypertensive crisis, or any injury other than hemorrhagic or ischemic stroke.

18. Family history of stroke only applies if Plaintiff does not receive deductions for Chronic Hypertension, Brain Tumors, Cancer, Coronary Artery Disease, Carotid Artery Disease/Stenosis, Prior Myocardial Infraction, Heart Disease or Defect, Cerebral Venous Thrombosis, Peripheral Artery Disease, Pervious Embolism, Atrial Fibrillation, Cholesterol Problems, or Diabetes.

19. This deduction does not apply to primary brain tumors, which are addressed in the Matrix as a separate category.

Heart Disease or Defect −4
(*e.g. Dilated cardiomyopathy, left-sided heart valve disease (moderate or greater left-sided valvular regurgitation [20]), q wave infarction, tumors, atrial myxoma, patent foramen ovale, replaced valve, endocarditis* )

Cerebral Venous Thrombosis −3

Peripheral Arterial Disease
 medical records note as severe, symptomatic, or contain reference to claudication −3
 mild or moderate or condition not defined −1

Previous Embolism
 Medically Documented organic embolism at any time −3 *(excluding reference to a suspected embolism in medical records without proof of a rest having been performed)*
 Embolism caused by trauma within 30 days prior to stroke −2
 Embolism caused by trauma more than 30 days prior to stroke 0

Atrial fibrillation (preexisting and medically documented history at initial hospitalization for stroke), concurrent with stroke −1

Major surgery/trauma within 14 days prior to stroke [21] −2

Cholesterol problems −1
 (High blood cholesterol (240 mg/dL or higher), high LDL cholesterol (greater than 100 mg/dL), or low HDL cholesterol (less than 40 mg/dL))

Diabetes Type I
 Onset more than 6 years preceding stroke −4
 Onset between 3 and 6 years preceding stroke −2
 Onset within 3 years preceding stroke 0
 Unknown −2

Diabetes Type II
 Onset more than 8 years preceding stroke −4
 Onset between 4 and 8 years preceding stroke −2
 Onset within 4 years preceding stroke 0
 Unknown −2

Bleeding/Clotting disorders [22], Medically Documented
 Previously Diagnosed and Uncontrolled −3
 Discontinuance of anticoagulants within 90 days [23] −2
 Previously Diagnosed and Controlled −1
 Unknown −2

Age
 66 and older −3
 55–65 −1
 18–54 0
 1–17 +3

Gender
 Women 0
 Men −1

Heroin/Cocaine/PCP Use/Unprescribed Amphetamine
 Within 24 hours of injury −7
 Within 24–96 hours of injury −4

Prescribed Amphetamine
 Within 24 hours of injury −4

**20.** Right-sided valvular disease is excluded, unless the medical records show that it actually was the cause of stroke.

**21.** "Major Surgery" means intra-abdominal, knee or hip surgery (specifically excluding arthroscopic surgery) or any surgical procedure that involves general anesthesia or respiratory assistance, or is generally recognized to carry a risk of a thrombotic or embolic event (vaginal childbirth is excluded unless a general anesthecia or respiratory assistance was required). "Major Trauma" means serious bodily injury or shock that is generally recognized to carry a risk of a thrombotic or embolic event. This factor is not to be considered if a Plaintiff receives a score for head trauma or prior embolism caused by trauma.

**22.** Bleeding/Clotting disorder does not include clotting problems from a surgical procedure or trauma that occurred 14 days prior to stroke.

**23.** Discontinuance must have been upon medical advice. Discontinuance without medical advise is considered "uncontrolled."

Within 24–96 hours of injury −2

Other illicit drug use
 Within 24 hours of injury −1

Smoking [24]
 No smoking 0
 1–20 cigarettes per day −1
 Over 20 cigarettes per day −3
 Concomitant use of oral con-
 traceptives and cigarette
 smoking in any amount −1
 (*within the 2 years prior to
 stroke*)

Alcohol consumption [25]
 0–5 drinks per day 0
 Over 5 drinks per day −3

## V. *Damages Score for Strokes*

### A. *Overview*

The Damages Score for Strokes is a combination of the first 2 Components for AHA's Stroke Classification System, the Barthel Index which measures Basic Activities of Daily Living ("BADL") and the Lawton/Brody Scale, which measures Instrumental Activities of Daily Living ("IADL"). If Plaintiff has suffered more than one stroke, the damages calculation is made only from the stroke which Plaintiff alleges was preceded by Dexatrim ingestion by 96 hours or less.

### B. *Components of AHA Stroke Classification System*

1. *Number of Domains Impaired.* The domains evaluated are: Motor, Sensory, Vision, Language, Cognition and Affect. See Exhibit B for a description of each domain. The AHA classification is 0 to 3 as follows:
- 0 = 0 domains impaired
- 1 = 1 domain impaired
- 2 = 2 domains impaired, and
- 3 = more than 2 domains impaired

2. *Severity of Impairment.*—See Exhibit B for a description of the three grades:
 A. No or minimal deficit due to stroke in any domain
 B. Mild to moderate deficit due to stroke in 1 or more domain
 C. Severe deficit due to stroke in 1 or more domains

### C. *Basic Activities of Daily Living.*—
See Exhibit C for a description of guidelines.

Feeding
 unable 0
 needs help cutting, spreading butter, etc., or requires modified diet 5
 independent 10

Bathing
 dependent 0
 independent (or in shower) 5

Grooming
 needs to help with personal care 0
 independent face/hair/teeth/shaving (implements provided) 5

Dressing
 dependent 0
 needs help but can do about half unaided 5
 independent (including buttons, zips, laces, etc.) 10

Bowels
 incontinent (or needs to be given enemas) 0
 occasional accident 5
 continent 10

Bladder
 incontinent, or catheterized and unable to manage alone 0

---

24. The largest quantity of cigarettes regularly smoked for the period of five years prior to the stroke should be used for scoring purposes. For example, if Plaintiff smoked 1 ppd for three years immediately preceding the stroke, and smoked 1½ ppd for two years before that (4 and 5 years before the stroke), then the score for this factor is −3. By way of further example, if Plaintiff quit smoking within the two years immediately preceding the stroke, and smoked 15 cigarettes per day for two years before that (3 and 4 years before the stroke), then the score for this factor is −1.

25. The largest quantity of alcohol regularly consumed within the period of five years prior to the stroke should be used for scoring purposes. For example, if Plaintiff consumed 3 drinks per day for the three years immediately preceding the stroke, and drank 6 drinks per day for two years before that (4 and 5 years before the stroke), then the score for this factor is −3.

occasional accident 5
continent 10

Toilet Use
 dependent 0
 needs some help, but can do something alone 5
 independent (on and off, dressing, wiping) 10

Transfers (bed to chair, and back)
 unable, no sitting balance 0
 major help (one or two people, physical), can sit 5
 minor help (verbal or physical) 10
 independent 15

Mobility (on level surfaces)
 immobile or < 50 yards 0
 wheelchair independent, including corners, > 50 yards 5
 walks with help of one person (verbal or physical) > 50 yards 10
 independent (but may use any aid) > 50 yards 15

Stairs
 unable 0
 needs help (verbal, physical, carrying aid) 5
 independent 10

**D.** *Instrumental Activities of Daily Living.*

Ability to Use a Telephone
 Operates telephone on own initiative 1
 Dials a few well known numbers 1
 Answers telephone but does not dial 1
 Does not use telephone at all 0

Shopping
 Takes care of all shopping needs independently 1
 Shops independently for small purchases 0
 Needs to be accompanied on any shopping trip 0
 Completely unable to shop 0

Food Preparation
 Plans, prepares, and serves adequate meals independently 1
 Prepares adequate meals if supplied with ingredients 0

Prepares meals but does not maintain adequate diet 0
Needs to have meals prepared and served 0

Housekeeping
 Maintains house alone or with occasional assistance 1
 Performs light daily tasks such as dish washing, bed making 1
 Performs light daily tasks but cannot maintain acceptable level of cleanliness 1
 Needs help with all home maintenance tasks 1
 Does not participate in any housekeeping tasks 0

Laundry
 Does personal laundry completely 1
 Launders small items 1
 All laundry must be done by others 0

Mode of Transportation
 Travels independently on public transportation or drives own car 1
 Arranges own travel via taxi, but does not otherwise use public transportation 1
 Travels on public transport when accompanied by another 1
 Travel limited to taxi or vehicle with assistance of another 0
 Does not travel at all 0

Responsibility for Own Medication
 Is responsible for taking medication in correct dosage at correct time 1
 Takes responsibility if medication is prepared in advance in separate dosages (may need reminding) 0
 Is not capable of dispensing own medication 0

Ability to Handle Finances
 Manages financial matters independently 1
 Manages day-to-day purchases, but needs help with banking major transactions 1
 Incapable of making financial decisions or handling money 0

## E. *Scoring*

For purposes of scoring, the first two components (Number of Domains Impaired and Severity of Impairment) are evaluated as of the date of discharge from the Plaintiff's initial hospitalization and at six months after the stroke. If six month records are not available, use the records as close to six months as possible that were created more than six months after the stroke, but not more than nine months after the stroke. If no records exist that were created between six months and nine months after the stroke, use records as close to six months after the stroke as possible that were created between three and six months after the stroke. If records between three and six months after the stroke are unavailable, use the next closest records, but the final score will be subject to review by the Administrator.

For purposes of scoring, the second two components (Basic Activities of Daily Living and Instrumental Activities of Daily Living) are evaluated as of one year after the stroke. If one year records are not available, use the records as close to one year as possible that were created more than one year after the stroke, but not more than eighteen months after the stroke. If no records exist that were created between one year and eighteen months after the stroke, use records as close to one year after the stroke as possible that were created between six months and one year after the stroke. If records between six months and one year after the stroke are unavailable, use the next closest records, but the final score will be subject to review by the Administrator.

### 1. *Domain/Severity Score*

Calculate the Domain/Severity Score as follows:

● Determine the Number of Domains Impaired and Severity of Impairment as of the day the Plaintiff was released from in-patient care (acute care and in-patient rehabilitation). Using the tables below at Section IV.E.4.(1). and IV.E.4.(2)., assign the appropriate score for each component.

● Add the scores together to arrive at the "Discharge Score."

● Next, calculate the Number of Domains Impaired and the Severity of Impairment as of 6 months after the stroke. Using the tables below at Section IV.E.4.(1). and IV. E.4.(2)., assign the appropriate score for each component.

● Add the scores together to arrive at the "6 Month Score."

● Average the Discharge Score and the 6 Month Score to arrive at the "Average Score."

● If the Average Score is more than 3 points lower than the Discharge Score, subtract 3 points from the Discharge Score to arrive at the "Domain/Severity Score."

● If the Average Score is 3 or less points lower then the Discharge Score, the Average Score is the Domain/Severity Score.[26]

### 2. *BADL/IADL Scores*

Calculate the BADL Score by determining Plaintiff's level of functioning one year after the stroke and assigning the appropriate point values as indicated in Section IV.C. Add the points for the BADL component and using the table below at Section IV.E.4.(3)., compute the BADL Score.

Calculate the IADL Score by determining Plaintiff's level of functioning one year after the stroke and assigning the appropriate-point values as indicated in Section IV.D. Add the points for the IADL component and using the table below at Section IV.E.4.(4)., compute the IADL Score.

### 3. *Total Damages Score*

Calculate the Total Damage Score by adding together the Domain/Severity Score, BADL Score, IADL Score, Inpatient Treatment Score, and. Outpatient Rehabilitation Score.

| 4. *Component Subpart* | *Number of Points* |
|---|---|

---

**26.** For instance, if the Discharge Score is 18 and the 6 Month Score is 10, the Average Score would be 14 and the Domain/Severity Score is 15. If, however, the Discharge Score is 18 and the 6 Month Score is 12, the Average Score would be 15 and the Domain/Severity Score would be 15.

(1) *Number of Domains Impaired*
| | |
|---|---|
| 0 | + 2 |
| 1 | + 4 |
| 2 | + 6 |
| 3 or more | + 8 |

(2) *Severity of Impairment*
| | |
|---|---|
| A | + 2 |
| B | + 6 |
| C | + 10 |

(3) *BADL Factors*
| | |
|---|---|
| 81–100 | + 2 |
| 61–80 | + 3 |
| 41–60 | + 4 |
| 21–40 | + 5 |
| 0–20 | + 6 |

(4) *IADL Factors*
| | |
|---|---|
| 7–8 | + 2 |
| 5–6 | + 3 |
| 3–4 | + 5 |
| 0–2 | + 6 |

5. *Inpatient Treatment*
| | |
|---|---|
| Less than one day | 0 |
| 1–14 days | + 1 |
| 15–28 days | + 2 |
| More than 28 days | + 3 |

6. *Outpatient Rehabilitation for stroke related deficits*
| | |
|---|---|
| None | 0 |
| 1–60 days | + 1 |
| More than 60 days | + 2 |

Using this system, the Damages Score for any one case can range from a low of 8 to a maximum of 35.

### F. *Plaintiffs Who Leave Medical Treatment Against Medical Advice*

In the event that medical records show that Plaintiff left his or her initial hospitalization against medical advice, Plaintiff's Total Adjusted Settlement Compensation shall be reduced by 10%.

If Plaintiff believes that the Total Adjusted Settlement Compensation should be reduced by 5% or less, or should not be reduced, Plaintiff shall have the opportunity to challenge the 10% adjustment and shall have the burden of proof by clear and convincing evidence (that was generated prior to the date of the MOU) that the Total Adjusted Settlement Compensation should be reduced by 5% or less, or not reduced at all.

27. To be eligible for Level VI, Plaintiffs must have positive product identification (i.e., a score

If a Dexatrim Defendant believes that the Total Adjusted Settlement Compensation should be reduced by 15% or more, the Dexatrim Defendant shall have the opportunity to challenge the 10% adjustment and shall have the burden of proof by clear and convincing evidence (that was generated prior to the date of the MOU) that the Total Adjusted Settlement Compensation should be further reduced. In no event shall the Total Adjusted Settlement Compensation be reduced by more than 50%.

Adjustments to the Total Adjusted Settlement Compensation shall be within the sole discretion of the Settlement Administrator. The parties shall meet and confer prior to any arbitration proceeding.

### G. *Deceased Plaintiffs*

Deceased Plaintiffs, whose death was causally related to their stroke, will be scored according to the Scoring Criteria, however, they will be assigned a Damages Score of 35. Ten years will be added to a Deceased Plaintiff's age at injury for purposes of placing that plaintiff on the Matrix. For plaintiffs who were 60 or older at the age of injury, their Settlement Compensation shall be reduced by one Age Increment for the category into which they are placed by virtue of their Total Matrix Score.

### VI. *The Total Matrix Score*

The Product Identification, Temporal Relationship, Liability and Causation Factors Scores and the Damages Score are then added together to arrive at a combined Total Matrix Score. A Case Scoring Sheet is attached as *Exhibit* C. Once a Total Matrix Score is determined, the case is assigned to a particular Matrix Level as follows:

| Matrix Level | Scoring Range |
|---|---|
| Level 0 | less than 0 points |
| Level I | 0–5 points |
| Level II | 6–10 points |
| Level III | 11–17 points |
| Level IV | 18–24 points |
| Level V | 25–37 points |
| Level VI | 38 or more points [27] |

of 0 on Product Identification). Deceased Plaintiffs are not eligible for Level VI.

## VII. Adjustment for Ischemic Stroke Cases

After calculating the appropriate matrix level for ischemic stroke cases, the Gross Settlement Compensation is to be reduced by 15%.

## VIII. Adjustment for Statute of Limitations/Repose

After calculation of the Settlement Compensation, a reduction of the Settlement Compensation shall be made based on the application of the following principles that relate to statutes of limitations and repose that apply to a particular claim. Attached as Exhibit D is a list of the applicable time frames from the statutes of limitations and statutes of repose for each state. Upon review, the time frames set forth in Exhibit D may only be altered by the Settlement Administrator.

### A. Cases filed prior to the announcement of the settlement

0% *Timely cases:* The lawsuit was filed before the applicable statute of limitations had run assuming no discovery rule in the forum state and state of Plaintiff's residence at the time of injury.

66% *No discovery rule or discovery of injury cases:* Both the forum state and the state of residence at the time of injury do not recognize a discovery rule (or recognizes only a rule of discovery of injury) for statute of limitations purposes. The lawsuit was filed after the statute of limitations had run.

13% *No Conflict/False Conflict cases:* The forum state and the state of Plaintiff's residence at the time of the injury recognize the same discovery rule for statute of limitations purposes. The lawsuit was filed within the applicable statute of limitations assuming the statute of limitations commenced on November 6, 2000, pursuant to a discovery rule, but after the statute of limitations had run without respect to any discovery rule.

15% *Conflict cases:* The forum state and the state of Plaintiff's residence at the time of the injury recognize different laws regarding discovery or limitations rules. The lawsuit was filed within the applicable statute of limitations assuming the statute of limitations commenced on November 6, 2000, pursuant to a discovery rule, but after the statute of limitations: (i) had run without respect to any discovery rule; and (ii) had run in either of the forum or residence states.

66% *Untimely cases:* The lawsuit was filed after the applicable statute of limitations had run assuming a discovery rule in both the forum state and state of Plaintiff's residence at the time of injury starting on November 6, 2000.

$200 In Stroke Injury and Cardiac Injury cases where the forum and residence both have a statute of repose that would bar the lawsuit, or the forum state's statute of repose would bar the lawsuit.

$100 In Other Injury cases where the forum and residence both have a statute of repose that would bar the lawsuit, or the forum state's statute of repose would bar the lawsuit.

66% In cases in which a statute of repose in the residence state would bar the lawsuit and the forum state is not FL, NY, or NJ.

25% In cases in which a statute of repose in the residence state would bar the lawsuit and the forum state is FL, NY, or NJ.

### B. Lawsuits Filed or Claims Made After November 6, 2003

If a claim is made or a lawsuit is filed after November 6, 2003, and after the statute of limitations had run in either the forum state or the state of plaintiff's residence at the time of the injury, the amount of the award shall be not more than $200 for Stroke Injuries and Cardiac Injuries, and not more than $100 for Other Injuries, provided Plaintiff's ingestion of Dexatrim or OTC appetite suppressant is documented in the medical records of the initial hospitalization. If Plaintiff's ingestion of Dexatrim or OTC appetite suppressant is not documented in the medical records of the initial hospitalization, Plaintiff is not eligible for any compensation under this Dexatrim Scoring System and Matrix. For purposes of this sub-section VII.B., all statutes of limitations shall be deemed to have commenced on the later of November 6, 2000, or the date of injury.

Attorneys who entered into contingency fee agreements after November 6, 2003, are entitled only to reasonable fees for filling out claim forms and consulting with their clients, up to a cap of 10% of Plaintiff's Total Settlement Compensation, or $10,000, whichever is less.

## IX. Adjustment for Other Independent, Potentially Liable Defendants

Several Plaintiffs claim that they took other products at or near the time that they ingested Dexatrim.[28] In those cases in which another PPA or ephedrine product is implicated an adjustment to the Plaintiff's Settlement Compensation under this Matrix shall be made as follows:

| | 1 other product | 2 other products | 3 other products |
|---|---|---|---|
| Same day (0–24 hours) co–ingestion | −40% | −45% | −50% |
| Dexatrim ingestion stopped between 24.96 hours prior to injury, other product(s) consumed between 0–24 hours prior to injury | −55% | −65% | −75% |
| Other product(s) stopped between 24–96 hours prior to injury, Dexatrim consumed between 0–24 hours prior to injury | −15% | −25% | −35% |

## X. Application of Adjustments

Adjustments for Ischemic Stroke, Statutes of Limitations/Repose, and other Independent, Potentially Liable Defendants (Co–Ingestion Adjustment) are to be applied sequentially as follows:

Ischemic Adjustment—Reduce Gross Settlement Compensation by 15%

Statute of Limitations/Repose Adjustment—After Ischemic Stroke Adjustment is applied, reduce net subtotal by the applicable Statute of Limitations/Repose adjustment, but if Ischemic Stroke Adjustment is inapplicable, reduce Gross Settlement Compensation by the applicable Statute of Limitations/Repose Adjustment.

Co–Ingestion Adjustment—After Ischemic Stroke Adjustment is applied, and/or after Statute of Limitations/Repose Adjustment is applied, reduce net subtotal by the applicable Co–Ingestion Adjustment; but if neither Ischemic Stroke Adjustment nor Statute of Limitations/Repose Adjustment is applicable, reduce Gross Settlement Compensation by the applicable Co–Ingestion Adjustment.

## XI. Extraordinary Injury Fund

### A. Eligibility Requirements for the Extraordinary Injury Fund

An Extraordinary Injury Fund (the "EIF") in the amount of $5 million will be established from which any Plaintiff who meets the eligibility requirements set forth in this Section X (an "Eligible Plaintiff") shall receive an amount equal to his/her Documented Non–Reimbursed/Non–Reimbursable Economic Damages (as defined below), subject to the following adjustments (the "EIF Award"):

1. First, such Eligible Plaintiff's Documented Non–Reimbursed/Non–Reimbursable Economic Damages shall be subject to reduction by the same percentage adjustments set forth in Section V F. (Plaintiffs Who Leave Medical Treatment Against Medical Advice), Section IX (Adjustment for Other Independent, Potentially Liable Defendants), Section VIII (Adjustment for Statute of Limitations/Repose), and Section VII (Adjustment for Ischemic Stroke Cases)

---

**28.** Legal or factual contentions made by Plaintiffs in Complaints, Fact Sheets, Affirmations, deposition testimony, and other documents will be strictly construed against the Plaintiffs so that this provision applies.

In cases where Plaintiff sued a defendant(s) in addition to the Dexatrim Defendants and claimed that the other defendant(s) is jointly responsible for Plaintiffs' injuries due to that defendant's responsibility for a product other than Dexatrim, co-ingestion of that other product(s) will be deemed to have occurred on the same day as Dexatrim if it is unclear when such FPA or other product was ingested in relation to the alleged ingestion of Dexatrim, based on a review of information in that Plaintiff's Complaints, Fact Sheets, Affirmations, deposition testimony, or

medical record (and which medical record is generated in the ordinary course of medical treatment contemporaneous with the Plaintiff's injury).

If Plaintiff has sued no other defendant, and Plaintiff's Complaints, Fact Sheets, Affirmations, deposition testimony, or medical record (and which medical record is generated in the ordinary course of medical treatment contemporaneous with the Plaintiff's injury) indicate that a product containing PPA (other than Dexatrim) was ingested by Plaintiff within 96 hours before that Plaintiff's injury, but it is unclear when such other PPA product was ingested in relation to the alleged ingestion of Dexatrim, then co-ingestion of that other product will be deemed to have occurred on the same day as Dexatrim.

to which such Eligible Plaintiff's Gross Settlement Compensation is subject under this Dexatrim Case Scoring System and Matrix;

2. Second, if the total of all Eligible Plaintiffs' Documented Non–Reimbursed/Non–Reimbursable Economic Damages, after adjustment pursuant to Paragraph 1 above, exceeds $5 million, each Eligible Plaintiff's Documented Non–Reimbursed/Non–Reimbursable Economic Damages (after any applicable adjustment pursuant to Paragraph 1) of the $5 million EIF fund shall be the product of $5 million multiplied by a fraction:

(1) the numerator of which shall be the Eligible Plaintiff's Documented Non–Reimbursed/Non–Reimbursable Economic Damages (after any applicable adjustment pursuant to Paragraph 1); and

(2) the denominator of which shall be the total of all Eligible Plaintiffs' Documented Non–Reimbursed/Non–Reimbursable Economic Damages, after any applicable adjustment pursuant to Paragraph 1.

In order for a Plaintiff to receive an EIF Award, he or she (a) must fall within Matrix Levels IV, V or VI; and (b) must have documented, Non–Reimbursed/Non–Reimbursable Economic Damages (as defined below) totaling at least $250,000.

"Non–Reimbursed/Non–Reimbursable Economic Damages" is comprised of any one or more of the following Documented[29] categories:

- Non-reimbursed out-of-pocket past medical expenses;
- Non-reimbursable future medical expenses;
- Non-reimbursable future living expenses;
- Non-reimbursed lost wages;
- Non-reimbursable future lost wages;
- Non-reimbursable loss of earning capacity (both past and future); and

- Other documented non-reimbursed/non-reimbursable economic damages.

Any and all determination(s) regarding a Plaintiff's eligibility and EIF Award amounts will be made by the EIF Administrator, as identified by the parties in the applicable Settlement Agreement(s) or other document(s).

## XII. Miscellaneous Provisions

### A. Attorney Fees & Costs

Plaintiffs' attorney fees and costs will be paid only from the Total Adjusted Settlement Compensation (including any EIF Award) awarded to individual Plaintiffs. That the Dexatrim Defendants will set aside from the Total Adjusted Settlement Compensation and pay to the MDL assessment fund the amount required by CMOs 8 and 16. The Dexatrim Defendants will not contribute to any other separate fund for attorney's fees or costs.

### B. Liens

Plaintiffs will be responsible for all *lien* payments.

### C. Derivative Claims

The treatment of an injured plaintiff ("Primary Claimant") under the settlement shall be cumulative of the derivative claims of any spouse, child or other individuals related to, or who have some other personal relationship with the Primary Claimant. The derivative claims of such related parties shall be deemed released by the treatment afforded the claims of the Primary Claimant under the settlement.

## XIII. Administration

### A. Administrator

The Parties shall employ a mutually-acceptable Administrator. The Administrator shall, where necessary, create Claims Administration Procedures that provide specific details about how claims are administered. The Claims Administration Procedures pro-

---

**29.** "Documented" means medical records, billing records, tax returns, social security earnings statements, expert reports (e.g. economists, Life Care planners, neurologists, physiatrists, etc.) or any other documentation or evidence requested by, or otherwise found acceptable by, the EIF Administrator.

mulgated by the Administrator shall comply with the terms set forth in the Matrix and other relevant documents.

### B. *Amended or Changed Factual Allegations*

Any amendment or change to factual allegations (other than those required by CMO 15 and 15A) after the date of the MOU shall be subject to a rebuttable presumption that the change should be disregarded for purposes of calculating Plaintiff's Total Adjusted Settlement Compensation under this Dexatrim Scoring System & Matrix. The presumption can be overcome by clear and convincing evidence at the sole discretion of the Administrator.

### C. *Fraudulent Claims or Allegations*

In the event that the Administrator determines that any Plaintiff has submitted fraudulent claims or allegations, the Administrator may reduce the amount of that Plaintiff's Total Adjusted Settlement Compensation by any amount deemed appropriate by the Administrator. In addition to reducing or eliminating a Plaintiff's compensation under the settlement, the Administrator, in his or her discretion, may refer and recommend to the MDL Court or any other appropriate court, monetary or injunctive sanctions against the Plaintiff or Plaintiff's counsel including, but not limited to, forfeiture of attorney fees and costs, or the institution of grievance proceedings.

Exh. A Annex I Exhibit A

## Exhibit A

### Injury Matrix

| Severity | 0 - 20 | 21 - 29 | 30 - 39 | 40 - 49 | 50 – 59 | 60 Greater |
|---|---|---|---|---|---|---|
| Other Injury | $1,000 | $820 | $640 | $460 | $280 | $100 |
| Cardiac Injury | $2,000 | $1,640 | $1,280 | $920 | $560 | $200 |
| Stroke Level 0 | $2,000 | $1,640 | $1,280 | $920 | $560 | $200 |
| Stroke Level I | $100,000 | $95,000 | $90,000 | $85,000 | $80,000 | $75,000 |
| Stroke Level II | $450,000 | $420,000 | $390,000 | $360,000 | $330,000 | $300,000 |
| Stroke Level III | $850,000 | $775,000 | $700,000 | $625,000 | $550,000 | $475,000 |
| Stroke Level IV | $2,000,000 | $1,800,000 | $1,600,000 | $1,400,000 | $1,200,000 | $1,000,000 |
| Stroke Level V | $4,000,000 | $3,620,000 | $3,240,000 | $2,860,000 | $2,480,000 | $2,100,000 |
| Stroke Level VI | $5,000,000 | $4,800,000 | $4,600,000 | $4,400,000 | $4,200,000 | $4,000,000 |

### Exhibit B

### Components of the Domains/Severity Score

The six domains that are to be considered for scoring purposes are listed and described below. Under each description of the domain is the description of the severity of impairment that is to be considered for each domain. To establish the severity of impairment, documentary evidence (including medical records) from the initial hospitalization and at or about six months after injury, or a sworn statement from Plaintiff's treating physician must show at least one of the components listed under the appropriate deficit level.

Plaintiff's most severe injury under each domain should be used for scoring purposes. For example, a Plaintiff who has minor to partial paralysis of face (*mild to moderate deficit under Motor Domain*) and negligible or no movement of the left arm (*severe deficit under Motor Domain*) should be scored as having a severe deficit.

● *Motor:* Motor impairments are the most prevalent of all deficits seen after stroke, usually with involvement of the face, arm, and leg, alone or in various combinations. Motor functions assessed in the AHA.SOC include cranial nerve function (including speech and swallowing), muscle power and tone, reflexes, balance, gait, coordination, and apraxia.

#### Severity of impairment

*No or minimal deficit:* normal movement of face and limbs; no drift in arms (arm holds 90 degrees for full 10 seconds); no drift in legs (leg hold at 30 degrees for 5 seconds); normal extension of fingers; no ataxia of limbs.

*Mild to moderate deficit:* minor to partial paralysis of face (asymmetry with smiling and spontaneous speech, or definite weakness, but some movement remains); or arm drift (e.g. arm holds 90 degrees, but drifts down before full 10 seconds); or arm has some effort against gravity, but cannot get to or maintain 90 degrees; or leg drift (e.g. leg

holds at 30 degrees but falls by end of 5 seconds); or leg has some effort against gravity but falls to bed before 5 seconds; or some extension of fingers, but full extension in 5 seconds not attainable; or ataxia present in one limb.

*Severe deficit:* substantial paralysis of one or both sides of the face (absence of facial movement in the upper and lower face); limbs have negligible or no effort against gravity or negligible or no movement; negligible or no voluntary extension of fingers; or ataxia present in more than one limb.

● *Sensory:* Sensory deficits range from loss of primary sensations to more complex loss of perception. Patients may describe numbness, tingling, or altered sensitivity. The more complex sensory losses include astereognosis, agrapha, and extinction to double simultaneous stimuli.

#### Severity of impairment

*No or minimal deficit:* normal, no sensory loss

*Mild to moderate deficit:* Plaintiff experiences some numbness, tingling or altered sensitivity. With pinprick test, Plaintiff feels pinprick (or other pain/tactile evaluation) is less sharp or is dull on the affected side; or there is a loss of superficial pain but Plaintiff is aware that he/she is being touched.

*Severe deficit:* Plaintiff is not aware of being touched in the face, arm or leg.

● *Vision:* Stroke can cause monocular visual loss, partial or complete hemianopia, or cortical blindness.

#### Severity of impairment

*No or minimal deficit:* no visual loss

*Mild to moderate deficit:* partial hemianopia (vision loss in up to half the field)

*Severe deficit:* substantial, complete or bilateral hemianopia (vision loss in more than half the field)

● *Language:* Dysphasia may be exhibited by disturbances in word-finding, comprehension, naming, repetition, fluency, reading, or writing.

*Severity of Impairment*

*No or minimal deficit:* no impairment

*Mild to moderate deficit:* some obvious loss of fluency or facility of comprehension without significant limitation on ideas expressed or form of expression; or word-finding difficulty, or reduction of speech and/or comprehension makes conversation difficult. Slurs words, and, at worst, can be understood with some difficulty.

*Severe deficit:* all verbal communication is through fragmentary expression, great need for inference, questioning and guessing by the listener. Range of information that can be exchanged is limited; listener carries the burden of communication. Slurring of words makes speech unintelligible.

● *Cognition:* Stroke can cause impairments in memory, attention, orientation, calculation abilities, intelligence and construction. It is important to assess ability to learn and retain new information in the cognitive evaluation.

*Severity of impairment*

*No or minimal deficit:* Impairment levels are compatible with all useful functioning.

*Mild to moderate deficit:* Impairment levels are compatible with some, but not all, useful functioning—Plaintiff experienced at least one of the following: 1) impaired ability to understand, remember, or carry out instructions; 2) impaired ability to maintain attention for extended periods of time; 3) impaired ability to sustain an ordinary routine without special supervision; or 4) impaired ability to perform tasks at a consistent pace without an unreasonable number of rest periods; 5) moderate decrease from pre-stroke intelligence; or 6) impaired ability to safely operate a motor vehicle (assuming the loss is not the result of an impairment in a different domain, such as motor skills or vision).

*Severe deficit:* Impairment levels preclude or significantly impede useful functioning—Plaintiff experienced at least one of the following: 1) inability to understand, remember, or carry out instructions; 2) inability to maintain attention for extended periods of time; 3) inability to sustain an ordinary rou-

tine without special supervision; 4) inability to perform tasks at a consistent pace without an unreasonable number of rest periods; 5) significant decrease from pre-stroke intelligence; or 6) complete loss of the ability to safely operate a motor vehicle (assuming the loss is not the result of an impairment in a different domain, such as motor skills or vision).

● *Affect:* Depression is the most common affective disturbance seen after stroke. It tends to be observed more often in the months after stroke than during the acute event. Symptoms may include loss of energy, lack of interests, loss of motivation, listlessness, loss of appetite, insomnia, sexual dysfunction, irritability, lack of inhibition, anxiety, apathy, withdrawal from social activities, or emotional disturbances.

Assessment of affect and/or depression is based on the Plaintiff's ability to engage in useful functioning, which includes activities of daily living, social functioning, concentration, and adaptation. Limitation in one's activities of daily living must be related to the affect disorder flowing from the stroke, as opposed to impairment from some other domain. "Social functioning" refers to an individual's capacity to interact appropriately and communicate effectively with other individuals. Concentration is necessary for task completion, which refers to the ability to sustain focused attention long enough the permit a timely completion of tasks commonly found in activities of daily living or work setting. Adaptation refers to one's ability to adapt to stressful circumstances.

*Severity of Impairment*

*No or minimal deficit:* Impairment levels are compatible with all useful functioning.

*Mild to moderate deficit:* Impairment levels are compatible with some, but not all, useful functioning—Plaintiff experienced at least one of the following: 1) impaired ability to function in activities of daily living and requires dependency on another person for care; 2) impaired ability to engage in meaningful social contact with others; 3) impaired ability to attend to any conversation or any productive task; or 4) impaired ability to tolerate any change in routines or in environ-

ment; or 5) limited ability to resume pre-stroke sexual activity.

*Severe deficit:* Impairment levels preclude or significantly impede useful functioning—Plaintiff experienced at least one of the following: 1) inability to function in activities of daily living and requires dependency on another person for care; 2) negligible or no ability to engage in meaningful social contact with others; 3) negligible or no ability to attend to any conversation or any productive task; 4) negligible or no tolerance for any change at all in routines or in environment; or 5) inability to resume pre-stroke sexual activity.

Exh. A Annex I Exhibit C

### Exhibit C

### The Barthel ADL Index: Guidelines

The index should be used as a record of what a patient does, not as a record of what a patient could do.

The main aim is to establish degree of independence from any help, physical or verbal, however minor and for whatever reason.

The need for supervision renders the patient not independent.

A patient's performance should be established using the best available evidence. Asking the patient, friends/relatives and nurses are the usual sources, but direct observation and common sense are also important. However direct testing is not needed.

Usually the patient's performance over the preceding 24–48 hours is important, but occasionally longer periods will be relevant.

Middle categories imply that the patient supplies over 50 per cent of the effort. Use of aids to be independent is allowed.

Exh. A Annex I Exhibit D

### Exhibit D

*Applicable Statutes of Limitation and Repose*

| STATE | SOL | SOR |
| --- | --- | --- |
| Alabama | 2N | N/A |
| Alaska | 2D | N/A |
| Arizona | 2D | N/A |
| Arkansas | 3D | N/A |
| California | 1D | N/A |
| Colorado | 2D | N/A |
| Connecticut | 3D | N/A |
| Delaware | 2N | N/A |
| DC | 3D | N/A |
| Florida | 4D | N/A |
| Georgia | 2D | 10R |
| Hawaii | 2D | N/A |
| Idaho | 2N | N/A |
| Illinois | 2N | 10R |
| Indiana | 2D | 10R |
| Iowa | 2D | 15R |
| Kansas | 2N | N/A |
| Kentucky | 1D | 8R |
| Louisiana | 1D | N/A |
| Maine | 6N | N/A |
| Maryland | 3D | N/A |
| Massachusetts | 3D | N/A |
| Michigan | 3D | N/A |
| Minnesota | 6D | N/A |
| Mississippi | 3D | N/A |
| Missouri | 5D | N/A |
| Montana | 3D | N/A |
| Nebraska | 4N | N/A |
| Nevada | 2D | N/A |
| New Hampshire | 3D | N/A |
| New Jersey | 2D | N/A |
| New Mexico | 3D | N/A |
| New York | 3N | N/A |
| North Carolina | 3N | 6R |
| North Dakota | 6N | N/A |
| Ohio | 2D | N/A |
| Oklahoma | 2D | N/A |

| STATE | SOL | SOR | STATE | SOL | SOR |
|-------|-----|-----|-------|-----|-----|
| Oregon | 2N | 8R | Virginia | 2N | N/A |
| Pennsylvania | 2D | N/A | Washington | 3D | N/A |
| Rhode Island | 3D | N/A | West Virginia | 2D | N/A |
| South Carolina | 3D | N/A | Wisconsin | 3D | N/A |
| South Dakota | 3N | N/A | Wyoming | 4D | N/A |
| Tennessee | 1D | 6R | | | |
| Texas | 2D | N/A | | | |
| Utah | 4D | N/A | | | |
| Vermont | 3D | N/A | | | |

* "D" indicates a discovery rule; "N" indicates no discovery rule or discovery of injury; "R" indicates statute of repose. Thus, 3D means the state has a 3 year statute of limitations and a discovery rule that requires discovery of cause or wrongdoing.

Exh. A Annex I Exhibit E

## Exhibit E

### Matrix Scoring Worksheet for Hemorrhagic Stroke Cases

Plaintiff Name: Date of Injury:

| | Rating | Score |
|---|---|---|
| Part II—Product Identification Score | | |
| Part III—Temporal Relationship Score | | |
| Part IV—Liability/Causation Score | | |
| Exposure to PPA | | |
| Date of Injury | | |
| Misuse of Product | | |
| Head trauma | | |
| Prior stroke | | |
| Hypertension | | |
| Aneurysm | | |
| AVM | | |
| Brain tumors | | |
| Leukemia | | |
| Bleeding disorders | | |
| Anticoagulants | | |
| Age | | |
| Cocaine/Amphetamine/PCP Use | | |
| Prescribed Amphetamine | | |
| Other illicit drug use | | |
| Smoking | | |
| Alcohol consumption | | |
| Exercise & Exertion | | |

■■■■■■■■

| Product ID, Temporal Relationship, Liability/Causation Subtotal: | | |
|---|---|---|
| | | *Continued* |

Plaintiff Name: Date of Injury:

| | Rating | Score |
|---|---|---|
| Part V—Damages Score | | |
| | Discharge | 6 Month |
| Number of Domains Affected | | |
| | | |
| Level of Severity | | |
| Subtotal: | | |
| Average Score: | | |
| Domain/Severity Score: | | |
| | | |
| BADL Factors | | |
| Feeding | | |
| Bathing | | |
| Grooming | | |
| Dressing | | |
| Bowels | | |
| Bladder | | |
| Toilet Use | | |
| Transfers | | |
| Mobility | | |
| Stairs | | |
| BADL Total: | | |
| | | |
| IADL Factors | | |
| Telephone | | |
| Shopping | | |
| Food Preparation | | |
| Housekeeping | | |
| Laundry | | |
| Mode of Transportation | | |
| Responsibility for Medication | | |
| Ability to Handle Finances | | |
| | | |
| IADL Total: | | |

Inpatient Treatment

Outpatient Rehabilitation

Damages Score Subtotal:

Product ID, Temporal Relationship, Liability/Causation Subtotal:

Total Matrix Score:

Matrix Level:

Age on Stroke Date:

Gross Settlement Compensation:

*Continued*

Part VIII—Statute of Limitations/Repose Adjustment (if applicable)

Time elapsed from injury to filing: __ years, __ months

Residence Forum

__% deduction from Gross Settlement Compensation

Adjustument for statute of limitations/repose:

Subtotal:

Part IX—Co–Ingestion Adjustment (if applicable)

Products Ingested Date and Time of Ingestion

__% deduction from Statute of Limitation Adjustment
Subtotal

Adjustment for co-ingestion:

Total Adjusted Settlement Compensation:

Exh. A Annex I Exhibit F

**Exhibit F**

**Matrix Scoring Worksheet for Ischemic Stroke Cases**

Plaintiff Name: Date of Injury:

| | Rating | Score |
|---|---|---|
| Part II—Product Identification Score | | |
| Part III—Temporal Relationship Score | | |
| Part IV—Liability/Causation Score | | |
| Exposure to PPA | | |
| Date of Injury | | |
| Misuse of Product | | |
| Head trauma | | |
| Prior Transient Ischemic Attacks | | |
| Prior Stroke | | |
| Hypertension | | |
| Brain tumors | | |
| Cancer | | |
| Coronary Artery Disease | | |
| Carotid Artery Disease/Stenosis | | |
| Prior Myocardial Infection | | |
| Heart Disease or Defect | | |
| Cerebral Venous Thrombosis | | |
| Peripheral Arterial Disease | | |
| Previous Embolism | | |
| Atrial Fibrillation | | |
| Major Surgery/Trauma | | |
| Cholesterol Problems | | |
| Diabetes | | |
| Bleeding/Clotting Disorders | | |
| Age | | |
| Gender | | |
| Heroin/Cocaine/PCP Use/Unprescribed Amphetamine | | |
| Prescribed Amphetamine | | |
| Other illicit drug use | | |
| Smoking | | |
| Oral Contraceptive + smoking | | |
| Alcohol consumption | | |
| Product ID, Temporal Relationship, Liability/Causation Subtotal: | | |

*Continued*

Part V—Damages Score

| | Discharge | 6 Month |
|---|---|---|
| Number of Domains Affected | | |
| | | |
| Level of Severity | | |
| Subtotal: | | |
| Average Score: | | |
| Domain/Severity Score: | | |

Plaintiff Name: Date of Injury:

| | Rating | Score |
|---|---|---|
| BADL Factors | | |
| Feeding | | |
| Bathing | | |
| Grooming | | |
| Dressing | | |
| Bowels | | |
| Bladder | | |
| Toilet Use | | |
| Transfers | | |
| Mobility | | |
| Stairs | | |
| BADL Total: | | |
| | | |
| IADL Factors | | |
| Telephone | | |
| Shopping | | |
| Food Preparation | | |
| Housekeeping | | |
| Laundry | | |
| Mode of Transportation | | |
| Responsibility for Medication | | |
| Ability to Handle Finances | | |
| | | |
| IADL Total: | | |
| | | |
| Inpatient Treatment | | |

Outpatient Rehabilitation

| | |
|---|---|
| Damages Score Subtotals: | |
| Product ID, Temporal Relationship, Liability/Causation Subtotal: | |
| Total Matrix Score: | |
| Matrix Level: | |
| Age on Stroke Date: | |
| Gross Settlement Compensation: | |

*Continued*

Part VII—Ischemic Stroke Adjustment

15% deduction from Gross Settlement Compensation:

| | |
|---|---|
| Adjustment for Ischemic stroke: | |
| Subtotal: | |

Part VIII—Statute of Limitations/Repose Adjustment (if applicable)

Time elapsed from injury to filing: __years, __months

Residence Forum

__% deduction from *Ischemic Stroke Adjustment Subtotal*

| | |
|---|---|
| Adjustment for statute of limitations/repose: | |
| Subtotal: | |

Part IX—Co–Ingestion Adjustment (if applicable)

Plaintiff Name: Date of Injury:

| | Rating | Score |
|---|---|---|
| Products Ingested Date and Time of Ingestion | | |

__% deduction from Statute of Limitations Adjustment Subtotal:

| | |
|---|---|
| Adjustment for co-ingestion: | |

| | |
|---|---|
| Total Adjusted Settlement Compensation: | |

Exh. A Annex I Exhibit G
**Exhibit G**

## Matrix Scoring Worksheet for Other Injuries and Cardiac Injuries

| Plaintiff Name: | Date of Injury: |
|---|---|

| | Rating | Score |
|---|---|---|
| Part II—Product Identification Score | | |

Part III—Temporal Relationship Score

| | Matrix Level: |
|---|---|
| | Age on Stroke Date: |
| | Gross Settlement Compensation: |

Part VIII—Statute of Limitations/Repose Adjustment (if applicable)

Time elapsed from injury to filing: ___years, ___ months

Residence Forum

___% deduction from Gross Settlement Compensation:

Adjustment for statute of limitations/repose:

Subtotal:

Part IX—Co–Ingestion Adjustment (if applicable)

Products Ingested Date and Time of Ingestion

___% deduction from Statute of Limitations Adjustment Subtotal:

Adjustment for co-ingestion:

Total Adjusted Settlement Compensation:

## Exh. A. Annex II
## IN RE DEXATRIM CLASS SETTLEMENT BENEFIT CLAIM FORM

Please provide the following information for each individual on whose behalf a claim is being made. You must complete the entire form. Reference to the terms "Claimant" or "You" refer to the person who used Dexatrim®. To make a claim, the Claimant must have ingested Dexatrim on or after December 21, 1998 and suffered injury. If this form is being completed on behalf of a Claimant (e.g., by a representative on behalf of a deceased person or minor) please complete section 1 f. below.

**616**

1. *CLAIMANT INFORMATION.*

a. Last Name _____ First Name _____ Middle Name _____

b. Address, Telephone Number and E–Mail Address:
 _____
 _____
 _____

c. Date of Birth: _____

d. Social Security Number:_____

e. Sex: M___ F___

f. Is this form being completed in a representative capacity (e.g., on behalf of a deceased person or minor)? Yes _____ No _____

 If Yes, please complete the following:

 i) Names of Claimant's Representative: _____

 ii) Address: _____
 _____

 iii) Your relationship to deceased or represented person:_____

 iv) If you were appointed by a court, state the date you were appointed and the court that appointed you.
 _____

 v) If you represent a decedent's estate, state the date of death of the decedent:___
 _____

g. Has a lawsuit previously been filed on your behalf? Yes _____ No _____

 If the answer is Yes, please identify the style of the lawsuit together with the docket number and court where filed:_____

h. Are you currently employed? Yes _____ No _____
i. Has the Claimant or Claimant's representative hired an attorney? Yes _____ No _____

 If the answer is Yes, please provide the name, address, telephone number and e-mail address of your attorney:
 _____
 _____

2. *PRODUCT INFORMATION.*

a. Identify the Dexatrim® product that you claim caused your injury (e.g., Dexatrim® Vitamin C/Caffeine Free):_____

b. Are you or your attorney in possession of the package of the Dexatrim® that you allege caused your injuries? Yes _____ No _____

 If Yes, please retain the package and provide with this form a copy of the front, back, and sides of the Dexatrim® box together with a copy of the silver foil blister pack.
 Failure to retain the package may negatively impact the amount of your settlement.

c. Please provide the lot number and expiration date appearing on the package of the Dexatrim® that you allege caused your injuries:

d. When did you purchase the Dexatrim® that you allege caused your injuries? _____

e. Where did you purchase the Dexatrim that you allege caused your injuries?_____

f. Please list *all* medications (prescription or over the counter) and dietary supplements (including Dexatrim®) you took during the 4 days leading up to the date of your injury and the dates and times you took them.

Name of Medication:

Date(s) and Time(s) of Day Ingested:

_____ _____

_____ _____

_____ _____

_____ _____

3. *YOUR INJURY.*

a. State the date you were injured as a result of taking Dexatrim®._____

b. Place an "X" by the type(s) of injury you have suffered as a result of taking Dexatrim®;

_____Hemorrhagic Stroke
_____Ischemic Stroke
_____Cardiac (e.g., heart attack, arrhythmia, cardiomyopathy)
_____Seizure
_____Transient Ischemic Attack or TIA
_____Psychosis
_____Other

c. Please describe the injury you suffered._____

_____

_____

_____

d. If the Claimant is deceased, does the Claimant's estate contend the death was caused by the ingestion of Dexatrim® containing PPA? Yes _____ No _____

e. Have any of your medical bills related to the treatment of your injuries been paid for by any government-sponsored health care plan (e.g. Medicare, Medicaid, Veteran's Administration, Champus, Tricare)? Yes _____ No _____

If yes, please state:

(i) the government plan(s) that have paid benefits (e.g. Medicaid): _____.

(ii) the address and telephone number of the government office(s) where you submitted applications or claims for benefits: _____.

f. Please complete the attached Authorization for Medical records relating to the treatment of your injuries.

g. Please identify on the attached List of Medical Providers the name and address of all medical healthcare providers that the claimant was treated by, examined by or consulted with; (i) during the 10 years immediately before his/her injury; and (ii) in regard to treatment for his/her injury, during the three years after the injury.

h. The Claimant's or Claimant's Representative, by signing below, hereby consents to the disclosure of the information contained herein to the extent necessary to process claims

for benefits including, but not limited to, the disclosure to any Federal or state government body or agency.

## CERTIFICATION

I certify under penalty of perjury that all of the information provided in this Preliminary Claim Form is true and correct to the best of my knowledge, information and belief.

_____ _____
Signature of Claimant Date
or Claimant's Representative

[This form must be signed by the Claimant or, if the claimant is deceased or a minor, the Claimant's Representative.]

### *In Re: Phenylpropanolamine (PPA) Product Liability Litigation*

### Release of Claims

Every Settled Claim of each Class Member (other than a Class Member who exercises an Opt–Out Right) shall be conclusively compromised, settled and released as to Chattem and each other Released Party.

*"Settled Claim"* means any and all claims, including assigned claims, whether known or unknown, asserted or unasserted, regardless of the legal theory, existing now or arising in the future by any or all members of the Settlement Class arising out of or relating to any of the Dexatrim® Products or their development, manufacture, formulation, testing, distribution, marketing, labeling, regulatory submissions, advertising, sale, or ingestion. These *"Settled Claims"* include, without limitation and by way of example, all claims for damages or remedies of whatever kind or character, known or unknown, that are now recognized by law or that may be created or recognized in the future by statute, regulation, judicial decision, or in any other manner, for:

 (i) personal injury and/or bodily injury, damage, death, fear of disease or injury, mental or physical pain or suffering, emotional or mental harm, or loss of enjoyment of life;

 (ii) loss of wages, income, earnings, and earning capacity, medical expenses, doctor, hospital, nursing, and drug bills;

 (iii) loss of support, services, consortium, companionship, society or affection, or damage to familial relations, by spouses, parents, children, other relatives or "significant others" of Class Members;

 (iv) wrongful death and survival actions;

 (v) medical screening and monitoring, injunctive and declaratory relief;

 (vi) consumer fraud, refunds, unfair business practices, deceptive trade practices, Unfair and Deceptive Acts and Practices (*"UDAP,"*) unjust enrichment, disgorgement and other similar claims whether arising under statute, regulation, or judicial decision;

 (vii) compensatory damages, punitive, exemplary, statutory and other multiple damages or penalties of any kind including, without limitation, economic or business losses or disgorgement of profits arising out of personal injury;

 (viii) pre-judgment or post-judgment interest; and/or

 (ix) attorneys' fees, costs of court or litigation expenses.

*"Released Parties"* means:

(i) Chattem, Inc. and each of its past, present and future direct or indirect parent companies, subsidiaries, affiliates, divisions, joint venturers, predecessors, successors, and assigns;

(ii) The Delaco Company, as successor by merger to Thompson Medical Company, Inc. (*"Delaco"*) and each of its past, present and future direct or indirect parent companies, subsidiaries, affiliates, divisions, joint venturers, predecessors, successors, and assigns;

(iii) Sidmak Laboratories, Inc. ("Sidmak") and each of its past, present and future direct or indirect parent companies, subsidiaries, affiliates, divisions, joint venturers, predecessors, successors, and assigns;

(iv) suppliers of the raw material Phenylpropanolamine hydrochloride used in the manufacture of Dexatrim® Products (including, without limitation, Sidmak); however, it is expressly understood that Alps Pharmaceutical Ind. Co., Ltd. (*"Alps"*) is not a Released Party;

(v) suppliers of materials other than Phenylpropanolamine, machines or equipment used in the manufacture of Dexatrim® Products;

(vi) Chattem's contract manufacturers of finished Dexatrim® Products (including, without limitation, Sidmak);

(vii) any and all distributors of Dexatrim® Products, including without limitation, wholesale distributors, private label distributors, retail distributors, pharmacies and pharmacists;

(viii) any other person or entity (specifically including the Consumer Healthcare Products Association and its predecessors ("CHPA")) involved in the development, design, manufacture, formulation, testing, distribution, marketing, labeling, regulatory submissions, advertising or sale of Dexatrim® Products (including, without limitation, consultants to Delaco or Chattem); however, nothing in this sub-section shall affect the rights of individuals from pursuing their claims against CHPA to the extent those claims do not relate to a Dexatrim® Product; and

(ix) for each entity identified above, all of its past, present and future direct or indirect parent companies, subsidiaries, affiliates, divisions, joint venturers, predecessors, successors, and assigns and, collectively, all of their past, present and future directors, officers, employees, agents, attorneys, shareholders, underwriters and insurers, and for each person identified above, all of his, her, or their respective past, present or future heirs, estates and personal representatives.

*"Dexatrim Product"* means all appetite suppressant products bearing the trademark Dexatrim® marketed, distributed and/or manufactured by Chattem, Inc., and/or The Delaco Company, as successor by merger to Thompson Medical Company, Inc. that contained Phenylpropanolamine.

_____
Full Name
_____
Social Security Number
_____
Date of Birth

**IN RE: PHENYLPROPANOLAMINE ("PPA") PRODUCTS LIABILITY LITIGATION**
**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON AT SEATTLE**
**MDL NO. 1407**

**Chattem Class Action Settlement**

620

## AUTHORIZATION FOR RELEASE OF MEDICAL RECORDS

### In compliance with HIPAA, 45 CFR § 164.508

**DO NOT COMPLETE THIS SECTION**

TO: _____

Name of Entity

_____

Address

_____

City, State and Zip Code

You are hereby authorized to release my entire medical records file to the defendant or its authorized representative listed below ("Record Requestor"). This release authorizes you to furnish copies of all medical records, including but not limited to medical reports and notes, laboratory reports, pathology slides, reports, notes and specimens, radiographic films, CT scans, X-rays, MRI films, MRA films, correspondence, progress notes, prescription records, echocardiographic recordings, written statements, employment records, wage records, insurance, Medicaid, Medicare, and disability records, and medical bills regarding my injuries, diseases, diagnoses, or treatment, specifically including but not limited to HIV/AIDS testing or treatment, drug testing, drug or alcohol abuse treatment, marriage or family counseling, as well as psychological/psychiatric treatment, notes and evaluations. Please note that this authorization is not limited in any way to the records or treatments specified above. This authorization does not permit you to disclose anything other than documents and records to anyone.

This authorization is being given at my request in conjunction with the civil litigation matter listed above. You are hereby authorized to release these records to the following Record Requestor for their use in the above-entitled litigation. The defendants have agreed to pay reasonable charges to supply copies of such records. All documents should be provided to: _____

*(Records Requestor)* **DO NOT COMPLETE THIS SECTION**

_____

_____

I intend that this authorization shall be continuing in nature. If information responsive to this authorization is created, learned or discovered at any time in the future, either by you or another party, you must produce such information to the requestor at that time. Further, I hereby agree that a photostatic copy of this authorization may serve as an original.

This authorization shall not be valid unless the Record Requestor named above has executed the acknowledgement at the bottom of this authorization.

I understand that this authorization pertains directly to the civil litigation referenced above. Therefore, this authorization shall expire upon the final resolution by all parties of the aforementioned civil litigation, either by final adjudication, final settlement agreement, final judicial dismissal, or by other final judicial order, including, but not limited to the resolution of any and all appeals.

I understand that any documents or records released by you could potentially be re-disclosed by the aforementioned Record Requestor, and that any information re-disclosed by that party is not subject to this authorization or the regulations imposed by 45 CFR § 164.508.

I understand that you will not condition treatment, payment, enrollment or eligibility for benefits on my signing this authorization.

I understand that I have the right to revoke this authorization at any time by providing to you a written revocation stating my intentions, and if I do exercise such revocation, I agree to simultaneously provide a copy of such revocation to the Record Requestor. I also understand that any revocation of this authorization shall not affect any disclosures that were made prior to my written revocation.

This authorization is executed and served in compliance with the Federal Regulations governing the release of private health information as outlined under 45 CFR § 164.508.

_____ Date: _____

Claimant, Guardian or Personal
Representative Signature

_____

Description of the Guardian's or Personal Representative's Authority to Act for the Claimant.

_____ Date: _____

Witness Signature

## LIST OF MEDICAL PROVIDERS

### (Use Additional Sheets if Necessary)

1. Name: _____
 Specialty: _____
 Street Address: _____
 City, State, Zip Code: _____

2. Name: _____
 Specialty: _____
 Street Address: _____
 City, State, Zip Code: _____

3. Name: _____
 Specialty: _____
 Street Address: _____
 City, State, Zip Code: _____

4. Name: _____
 Specialty: _____
 Street Address: _____
 City, State, Zip Code: _____

5. Name: _____
 Specialty: _____
 Street Address: _____
 City, State, Zip Code: _____

6. Name: _____
 Specialty: _____
 Street Address: _____
 City, State, Zip Code: _____

Exh. A Annex III
### SUPPLEMENTAL BENEFIT CLAIM FORM QUESTIONNAIRE
In re Phenylpropanolamine (PPA) Products Liability Litigation
Case No. 2–01–md–1407 (MDL No. 1407)
United States District court for
The Western District of Washington

**622**

Please carefully read the instructions included with this Questionnaire before completing it. This Questionnaire should be used by a party who has submitted a claim alleging physical injury or death (an "Injured Party") related to his or her use of Dexatrim on or after December 21, 1998. The term "Dexatrim" shall mean Dexatrim that contained PPA. In order to be paid or to have your claim allowed, complete ALL applicable questions and attach ALL required documents and supporting information to the Questionnaire. IN ORDER TO BE VALID, THE QUESTIONNAIRE MUST BE SIGNED BY THE CLAIMANT OR THE CLAIMANT'S AUTHORIZED AGENT OR THE CLAIMANT'S ATTORNEY.

Send your completed Questionnaire and all required documents and supporting information to:

Chattem Claims Administrator
P.O. Box 1776
Richmond, VA 23218–1776

YOUR QUESTIONNAIRE AND ALL REQUIRED SUPPORTING DOCUMENTS MUST BE <u>POSTMARKED BY</u> NO LATER THAN 5:00 P.M. EASTERN TIME ON_____, 2004

The instructions accompanying this Questionnaire form are incorporated herein and should be carefully reviewed before you complete your Questionnaire. All information included in your Questionnaire, and all supporting documents submitted with your Questionnaire, constitute statements made under penalty of perjury, and false statements are punishable by a fine of up to $500,000 or imprisonment or both.

**PART I. IDENTIFYING INFORMATION**

1. **Injured Party.** Complete the following information for the Injured Party.

_____ _____ _____
First Name M.I. Last Name

_____
All other names that the Injured Party has ever used

_____
Street Address

_____ _____ _____
City State Zip Code

_____ _____
Telephone Number Email Address

_____ _____
Birth Date (MM/DD/YYYY) Social Security Number

_____
Gender

2. **Representative.** If you are completing this Questionnaire on behalf of an Injured Party whom you represent, as his or her estate, administrator, other legal representative, heir or beneficiary, etc. (a "Representative"), complete the following information:

_____ _____ _____
First Name M.I. Last Name

_____
Street Address

_____ _____ _____
City State Zip Code

_____ _____
Telephone Number Email Address

_____
Your relationship to the Injured Party
If you are a Representative, attach a copy of the court order or other official document appointing you the Injured Party's legal representative.

If you are representing a deceased Injured Party's estate, attach a certified or official copy of the death certificate along with any letters of administration, probate or surrogate's certificate. State the place and date of death.

_____ _____
Place of Death Date of Death (MM/DD/YYYY)

3. **Representation by Counsel.** Complete the following information if you are represented by legal counsel:

_____
Attorney's Name

_____
Law Firm

_____
Street Address

_____ _____ _____
City State Zip Code

_____ _____
Telephone Number Facsimile Number

_____ _____
Email Address State Bar Number (if applicable)

**PART II. LITIGATION HISTORY**

4. Does the Injured Party have or has the Injured Party ever had a lawsuit pending in any court related to the injuries allegedly resulting from ingesting Dexatrim?

___No (If no, skip to question 8)

___Yes (If yes, complete the following information and attach a copy of the complaint)

_____
Jurisdiction/Court in which the case is or was pending

_____
Docket or Case Number

_____
Date Original Complaint was Filed (MM/DD/YYYY)

5. Does the Injured Party have a lawsuit pending in _In re: Phenylpropanolamine (PPA) Products Liability Litigation_ MDL 1407 (W.D.Wa.), New Jersey state court, California state court, New York City Supreme Court, or in the Philadelphia Court of Common Pleas?

___No (If no, skip to next question)

___Yes (If yes, attach a copy of the completed Plaintiffs' Fact Sheet and all medical records and authorizations required by the Plaintiffs' Fact Sheet, unless already served on defense counsel.)

6. Has the Injured Party settled a claim related to an injury that you believe was caused by PPA?

___No (If no, skip to next question)

___Yes (If yes, complete the following information:)

_____

**624**

Date of Settlement (MM/DD/YYYY)

_____
Settling Defendant(s)

7. Has the Injured Party received any judgment against any defendant for any lawsuit related to an injury that you believe was caused by PPA?

____No (If no, skip to next question)

____Yes (If yes, complete the following information and attach a copy of the judgment:)

_____
Date of Judgment (MM/DD/YYYY)

_____
Liable Defendant(s)

## PART III. PRODUCT IDENTIFICATION AND INGESTION INFORMATION

8. Indicate all of the over-the-counter products the Injured Party took during the 60 days prior to the date of the injury, the number of pills, tablets, capsules or teaspoons consumed, and the dates and times at which each product was consumed (please attach additional sheets, if necessary). With respect to the dosage, answering "as recommended" or "as directed" is not a sufficient answer and the Questionnaire will not be considered complete until the specific information is provided.

| Product | Dosage | Date (MM/DD/YYYY) | Time |
|---|---|---|---|
| Product | Dosage | Date (MM/DD/YYYY) | Time |
| Product | Dosage | Date (MM/DD/YYYY) | Time |
| Product | Dosage | Date (MM/DD/YYYY) | Time |

9. Indicate the date and time that the Injured Party last took Dexatrim prior to his or her injury.

_____ _____ _____
Date (MM/DD/YYYY) Time (hour: min. am/pm) Product taken

10. Indicate the date on which the Injured Party purchased or obtained the Dexatrim that you claim is responsible for his or her injury.

_____
Date (MM/DD/YYYY)

11. Indicate the place or person from which the Injured Party purchased or obtained the Dexatrim that you claim is responsible for his or her injury.

_____
Name of store or person from whom obtained

_____
Address

_____
Address

_____
City, State, Zip Code

12. Indicate all dates that the Injured Party took Dexatrim for the six months prior to his or her injury.

| Date (MM/DD/YYYY) | Date (MM/DD/YYYY) |
|---|---|
| Date (MM/DD/YYYY) | Date (MM/DD/YYYY) |
| Date (MM/DD/YYYY) | Date (MM/DD/YYYY) |
| Date (MM/DD/YYYY) | Date (MM/DD/YYYY) |

13. Describe in detail the particular Dexatrim product and packaging that the Injured Party claims to have taken before his or her injury (including, color of pills, color of packaging, type of pills).

14. Which of the following are you submitting with this Questionnaire as proof that the Injured Party took: Dexatrim? Attach a copy of the proof that the Injured Party took Dexatrim. (Check all that apply)

 ___ Dexatrim product packaging
 ___ Medical records from initial hospitalization referring to a Dexatrim product
 ___ Sworn Testimony from a person who has personal knowledge that the Injured Party took Dexatrim (including without limitation a declaration under penalty of perjury as recognized by applicable state law, notarized affidavit or other sworn written testimony).

15. Did a care provider perform a toxicology test for the presence of PPA during the Injured Party's initial hospitalization for his or her injury?

___No (If no, skip to the next question)

___Yes (If yes, attach a copy of the toxicology test)

**PART IV. INJURY INFORMATION**

16. Indicate by checking the appropriate box the injury that the Injured Party claims to have sustained as a result of taking Dexatrim.

 ☐ Hemorrhagic Stroke
 ☐ Ischemic Stroke (not transient ischemic attack)
 ☐ Heart Attack: please describe _____
 ☐ Other: please describe _____

17. Indicate the date and time at which the Injured Party began feeling symptoms that he or she believes were associated with his or her injury.

_____ _____
Date of Onset (MM/DD/YYYY) Time of Onset (hour: min. am/pm)

**PART IV.A. HEMORRHAGIC STROKE INFORMATION**

18. Does the Injured Party claim to have sustained a hemorrhagic stroke that was caused by the ingestion of Dexatrim?

___No (If no, skip to Part IV.B.)

___Yes (If yes, attach all available medical records relating to the stroke, all available medical records generated for 3 years immediately after the stroke, all available medical records for 10 years immediately prior to the stroke, and executed, notarized HIPPA-compliant authorizations permitting Chattem, its legal counsel or the Chattem Claims Coordinator to obtain any necessary medical records. Failure to include all requested available medical records and authorizations will not result in your Questionnaire being deemed untimely, but your claim may be disallowed, or payments on account of your claim will not be made until and unless the documents are submitted.

19. Did the Injured Party ever have a stroke before the stroke that the Injured Party alleges was caused by the ingestion of Dexatrim?

___No (If no, skip to next question)

___Yes (If yes, indicate the type of stroke that the Injured Party previously sustained and attach all medical records related to that stroke)

 ___Hemorrhagic Stroke
 ___Ischemic Stroke

20. Did the Injured Party's mother, father, grandmother, grandfather or sibling ever have a stroke, aneurysm, arteriovenous malformation (AVM), or brain tumors?

___No (If no, skip to next question)

___Yes (If yes, complete the following information:)

_____ _____

Condition _____ Relationship (mother, father, etc.) _____

Condition _____ Relationship (mother, father, etc.) _____

Condition _____ Relationship (mother, father, etc.) _____

Condition Relationship (mother, father, etc.)

21. Check any of the conditions listed below that the Injured Party have had at any time in his or her life. List the date that the Injured Party first experienced each condition that applies, the doctor who disgnosed each condition, and attach all medical records related to each condition.

Condition Date (MM/DD/YYYY) Doctor

☐ Head Trauma _____ _____
☐ Hypertension _____ _____
☐ Aneurysm _____ _____
☐ Arteriovenous Malformation (AVM) _____ _____
☐ Brain Tumors _____ _____
☐ Leukemia _____ _____
☐ Bleeding Disorders _____ _____

22. List each medication (both prescription and over-the-counter) that the Injured Party has taken before his or her stroke for any of the conditions listed in question 21. State the name of the medication, the date(s) taken, the daily dosage taken, and where the Injured Party obtained the medications (please attach additional sheets, if necessary). With respect to dosage, answering "as recommended" or "as directed" is not a sufficient answer and the Questionnaire will not be considered complete and your claim will not be processed for payment until the specific information is provided.

Medication Date (MM/DD/YYYY) Daily Dosage Obtained From
_____ _____ _____ _____
_____ _____ _____ _____
_____ _____ _____ _____

23. Did the Injured Party take blood thinning medication or anticoagulants?

____No (If no, skip to next question)

____Yes (If yes, complete the following information:)

Medication Date (MM/DD/YYYY) Dosage
_____ _____ _____
_____ _____ _____
_____ _____ _____

Name of doctor(s) or healthcare professional(s) who prescribed the blood thinner or anticoagulant?

_____
Doctor or Healthcare Professional

_____
Address

_____
City, State, Zip Code

24. Did the Injured Party use cocaine, PCP, or any other amphetamine that was not prescribed by a doctor during the 90 days before his or her stroke?

____No (If no, skip to next question)

____Yes (If yes, complete the following information:)

_____
Name of Drug Date(s) (MM/DD/YYYY)

_____ _____
Name of Drug Date(s) (MM/DD/YYYY)

_____ _____
Name of Drug Date(s) (MM/DD/YYYY)

_____ _____
Name of Drug Date(s) (MM/DD/YYYY)

25. Did the Injured Party take an amphetamine that was prescribed by a doctor during the 90 days before his or her stroke?

____No (If no, skip to next question)

____Yes (If yes, complete the following information:)

_____ _____
Name of Drug Date(s) (MM/DD/YYYY)

_____ _____
Name of Drug Date(s) (MM/DD/YYYY)

_____ _____
Name of Drug Date(s) (MM/DD/YYYY)

Name of doctor or healthcare professional who prescribed the amphetamines?

_____
Doctor or Healthcare Professional

_____
Address

_____
City, State, Zip Code

_____
Doctor or Healthcare Professional

_____
Address

_____
City, State, Zip Code

_____
Doctor or Healthcare Professional

_____
Address

_____
City, State, Zip Code

26. Other than information previously provided in answers to this Questionnaire, did the Injured Party use any other drugs (legal or illegal), medicines, over-the-counter products (for example, appetite suppressants, cough-cold medicines, nutritional supplements, weight loss products, vitamins) within 7 days before the onset of symptoms of his or her stroke?

____No (If no, skip to next question)

____Yes (If yes, complete the following information:)

_____ _____ _____ _____
Name of Product Date (MM/DD/YYYY) Time (hour:min. am/pm Dosage

_____ _____ _____ _____
Name of Product Date (MM/DD/YYYY) Time (hour:min. am/pm Dosage

_____ _____ _____ _____
Name of Product Date (MM/DD/YYYY) Time (hour:min. am/pm Dosage

■■■■■■■■■■■■■■■

| _____ | _____ | _____ | _____ |
| Name of Product | Date (MM/DD/YYYY) | Time (hour:min. am/pm | Dosage |

27. Did the Injured Party smoke cigarettes, cigars or pipe tobacco at any time in the 5 years before his or her stroke?

____No (If no, skip to next question)

____Yes (If yes, complete the following information:)

What is the greatest amount of cigarettes that the Injured Party regularly smoked per day in the 5 years before his or her stroke?

_____
Greatest Amount

What is the greatest amount of cigars that the Injured Party regularly smoked per day in the 5 years before his or her stroke?

_____
Greatest Amount

What is the greatest amount of pipe tobacco that the Injured Party regularly smoked per day in the 5 years before his or her stroke?

_____
Greatest Amount

28. Did the Injured Party drink alcohol at any time in the 5 years before his or her stroke?

____No (If no, skip to next question)

____Yes (If yes, complete the following information:)

What is the greatest amount of alcohol that the Injured Party drank per day regularly in the 5 years before his or her stroke?

_____
Greatest Amount

29. Describe in detail the Injured Party's activities for the 6 hours before he or she felt the onset of his or her stroke:

_____
_____
_____
_____
_____

## PART IV.B. ISCHEMIC STROKE INFORMATION

30. Does the Injured Party claim to have sustained an ischemic stroke that was caused by the ingestion of Dexatrim?

____No (If no, skip to Part V)

____Yes (If yes, attach all available medical records relating to the stroke, all available medical records generated for 3 years immediately after the stroke, all available medical records for 10 years immediately prior to the stroke, and executed, notarized HIPPA-compliant authorizations permitting Chattem, its legal counsel or the Chattem Claims Coordinator to obtain any necessary medical records. Failure to include all requested available medical records and authorizations will not result in your Questionnaire being deemed untimely, but your claim may be disallowed, or payments on account of your claim will not be made until and unless the documents are submitted.

31. Did the Injured Party ever have a stroke before the stroke that the Injured Party alleges was caused by the ingestion of Dexatrim?

____No (If no, skip to next question)

___Yes (If yes, indicate the type of stroke that the Injured Party previously sustained and attach all available medical records related to that stroke)

 ___Hemorrhagic Stroke
 ___Ischemic Stroke

32. Did the Injured Party's mother, father, grandmother, grandfather or any sibling ever have a stroke, aneurysm, arteriovenous malformation (AVM), or brain tumor?

___No (If no, skip to next question)

___Yes (If yes, complete the following information:)

| Condition | Relationship (mother, father, etc.) |
|---|---|
| _____ | _____ |
| Condition | Relationship (mother, father, etc.) |
| _____ | _____ |
| Condition | Relationship (mother, father, etc.) |
| _____ | _____ |
| Condition | Relationship (mother, father, etc.) |

33. Check any of the conditions listed below that the Injured Party had at any time before his or her stroke. List the date that the Injured Party first experienced each condition that applies, the doctor who diagnosed each condition, and attach all available medical records related to each condition.

| Condition | Date (MM/DD/YYYY) | Doctor |
|---|---|---|
| ☐ Head Trauma | | |
| ☐ Transient Ischemic Attack (TIA) | | |
| ☐ Hypertension | | |
| ☐ Brain Tumors | | |
| ☐ Cancer (describe: _____) | | |
| ☐ Coronary Artery Disease | | |
| ☐ Carotid Artery Disease | | |
| ☐ Heart Attack | | |
| ☐ Heart Disease | | |
| ☐ Heart Defect (describe: _____) | | |
| ☐ Cerebral Venons Thrombosis | | |
| ☐ Embolism | | |
| ☐ Atrial Fibrillation | | |
| ☐ Major Surgery or trauma 14 days before stroke | | |
| ☐ Cholesterol problems | | |
| ☐ Diabetes (what type _____) | | |
| ☐ Bleeding or Clotting Disorders | | |

34. List each medication (both prescription and over-the-counter) that the Injured Party has taken for any of the conditions listed in question 33. State the name of the medication, the date(s) taken, the daily dosage taken, and where the Injured Party obtained the medications (please attach additional sheets, if necessary). With respect to dosage, answering, "as recommended" or "as directed" is not a sufficient answer and your Questionnaire will not be considered complete and your claim will not be processed for payment until the specific information is provided.

| Medication | Date (MM/DD/YYYY) | Daily Dosage | Obtained From |
|---|---|---|---|
| | | | |
| Medication | Date (MM/DD/YYYY) | Daily Dosage | Obtained From |
| | | | |
| Medication | Date (MM/DD/YYYY) | Daily Dosage | Obtained From |
| | | | |
| Medication | Date (MM/DD/YYYY) | Daily Dosage | Obtained From |

35. Did the Injured Party use heroin, cocaine, PCP, or any amphetamine that was not prescribed by a doctor during the 90 days before his or her stroke?

___No (If no, skip to next question)

___Yes (If yes, complete the following information:)

_____ _____
Name of Drug Date(s) (MM/DD/YYYY)
_____ _____
Name of Drug Date(s) (MM/DD/YYYY)
_____ _____
Name of Drug Date(s) (MM/DD/YYYY)
_____ _____
Name of Drug Date(s) (MM/DD/YYYY)

36. Did the Injured Party take an amphetamine that was prescribed by a doctor during the 90 days before his or her stroke?

___No (If no, skip to next question)

___Yes (If yes, complete the following information:)

_____ _____
Name of Drug Date(s) (MM/DD/YYYY)

_____ _____
Name of Drug Date(s) (MM/DD/YYYY)

_____ _____
Name of Drug Date(s) (MM/DD/YYYY)

_____ _____
Name of Drug Date(s) (MM/DD/YYYY)

Name of doctor or health care professional who prescribed the amphetamines?

_____
Doctor or Healthcare Professional

_____
Address

_____
City, State, Zip Code

_____
Doctor or Healthcare Professional

_____
Address

_____
City, State, Zip Code

_____
Doctor or Healthcare Professional

_____
Address

_____
City, State, Zip Code

37. Other than information previously provided in answers to this Questionnaire, did the Injured Party use any other drugs (legal or illegal), medicines, over-the-counter products (for example, appetite suppressants, cough-cold medicines, nutritional supplements, weight loss products, vitamins) within 7 days before the onset of symptoms of his or her stroke?

___No (If no, skip to next question)

____Yes (If yes, complete the following information:)

_____ _____ _____ _____
Name of Product Date (MM/DD/YYYY) Time (hour:min. am/pm Dosage

_____ _____ _____ _____
Name of Product Date (MM/DD/YYYY) Time (hour:min. am/pm Dosage

_____ _____ _____ _____
Name of Product Date (MM/DD/YYYY) Time (hour:min. am/pm Dosage

_____ _____ _____ _____
Name of Product Date (MM/DD/YYYY) Time (hour:min. am/pm Dosage

38. Did the Injured Party smoke cigarettes, cigars or pipe tobacco at any time in the 5 years before his or her stroke?

____No (If no, skip to next question)

____Yes (If yes, complete the following information:)

What is the greatest amount of cigarettes that the Injured Party regularly smoked per day in the 5 years before his or her stroke?

_____
Greatest Amount

What is the greatest amount of cigars that the Injured Party regularly smoked per day in the 5 years before his or her stroke?

_____
Greatest Amount

What is the greatest amount of pipe tobacco that the Injured Party regularly smoked per day in the 5 years before his or her stroke?

_____
Greatest Amount

39. Did the Injured Party take oral contraceptives during the 5 years before his or her stroke?
____No (If no, skip to next question)

____Yes (If yes, when _____)
 date
40. Did the Injured Party drink alcohol at any time in the 5 years before his or her stroke?

____No (If no, skip to next question)

____Yes (If yes, complets the following information:)

What is the greatest amount and least amount of alcohol that the Injured Party drank per day regularly in the 5 years before his or her stroke?

_____ _____
Greatest Amount Least Amount

**PART V. MEDICAL INFORMATION**

41. List every medical healthcare provider that the Injured Party was treated by, examined by or consulted with: (i) during the 10 years immediately before his/her injury: and (ii) in regard to treatment for his/her injury, during the three years after the injury.

_____ _____
Healthcare Provider's Name Healthcare Provider's Name

_____ _____
Address Address

_____ _____
City, State, Zip Code City, State, Zip Code

Healthcare Provider's Name | Healthcare Provider's Name
Address | Address
City, State, Zip Code | City, State, Zip Code

Healthcare Provider's Name | Healthcare Provider's Name
Address | Address
City, State, Zip Code | City, State, Zip Code

Healthcare Provider's Name | Healthcare Provider's Name
Address | Address
City, State, Zip Code | City, State, Zip Code

42. List every prescription medication that the Injured Party has taken for the 3 years immediately after his or her injury and for the 10 years immediately prior to his or her injury. Also list the place where the medication was obtained and the doctor/healthcare provider who prescribed the drug. (Use additional sheets if necessary)

| Prescription Medication | Obtained From | Prescribing Healthcare Provider |
|---|---|---|
| Daily Dosage | Address | Address |
| | Address | Address |
| | City, State, Zip Code | City, State, Zip Code |

| Prescription Medication | Obtained From | Prescribing Healthcare Provider |
|---|---|---|
| Daily Dosage | Address | Address |
| | Address | Address |
| | City, State, Zip Code | City, State, Zip Code |

| Prescription Medication | Obtained From | Prescribing Healthcare Provider |
|---|---|---|
| Daily Dosage | Address | Address |
| | Address | Address |
| | City, State, Zip Code | City, State, Zip Code |

| Prescription Medication | Obtained From | Prescribing Healthcare Provider |
|---|---|---|
| Daily Dosage | Address | Address |
| | Address | Address |
| | City, State, Zip Code | City, State, Zip Code |
| Prescription Medication | Obtained From | Prescribing Healthcare Provider |
| Daily Dosage | Address | Address |
| | Address | Address |
| | City, State, Zip Code | City, State, Zip Code |

## PART VI. MATRIX SCORE

43. Have you scored the Injured Party's claim under the Dexatrim Scoring System & Matrix attached hereto?

___No (If no, you must score your claim and submit the appropriate fully completed score sheet included in the Dexatrim Scoring System & Matrix or your claim may be disallowed and you will not receive any payment for your claim.)

___Yes (If yes, complete the following information and submit your completed score sheet with this Questionnaire.)

Damages Score

Product ID, Temporal Relationship, Liability/Causation Score

Total Matrix Score

Matrix Level

Age at Injury

Adjustment for Ischemic Stroke

Adjustment for Statute of Limitations

Adjustment for Co–Ingestion

## PART VII. MEDICAL EXPENSES PAID BY INSURANCE OR GOVERNMENT SPONSORED HEALTH PLAN
44. Has any federal or state-sponsored health care benefit program (e.g. Medicare, Medicaid, Veterans Administration, Champus, Tricare) provided medical coverage or health benefits to the Injured Party for his or her injuries?

___No (If no, proceed to next question.)

___Yes (If yes, complete the following information and provide copies of all documentation reflecting amounts of benefits provided to the Injured Party or on his or her behalf.)

 a. State the name of the government-sponsored program: _____.

 b. State the amount of health benefits provided to the Injured Party or on the Injured Party's behalf $_____.

45. Has any health Insurance company or health management organization (HMO) provided medical coverage or health benefits to the Injured Party for his or her Injuries?

___No (If no, proceed to next question.)

___Yes (If yes, complete the following information and provide copies of all documentation reflecting amounts of benefits provided to the Injured Party or on his or her behalf.)

 a. State the name of the insurance company or HMO _____.

 b. State the Injured Party's membership number or group number _____.

 c. Provide an executed, notarized HIPPA-compliant authorization for the claims administrator to obtain records from the insurance company or HMO.

46. Does any insurance company, government entity, or other entity have a lien against any settlement proceeds obtained by the Injured Party?

___No (If no, proceed to next question.)

___Yes (If yes, complete the following information and provide copies of all documentation reflecting amounts of liens.)

 a. State the name of the party or entity who holds the lien _____.

 b. State the amount of the lien $_____.

**IT IS YOUR RESPONSIBILITY TO DETERMINE THE AMOUNT OF GOVERNMENT HEALTH BENEFITS PROVIDED TO THE INJURED PARTY AND THE AMOUNT OF ANY LIENS AGAINST THE SETTLEMENT PROCEEDS. ALL LIENS AND DEMANDS FROM GOVERNMENT–SPONSORED HEALTH CARE BENEFIT PROGRAMS ARE THE RESPONSIBILITY OF THE INJURED PARTY, YOUR CLAIM WILL NOT BE PAID UNTIL THIS INFORMATION IS PROVIDED.**

## PART VIII. MISCELLANEOUS

47. Document Submission. All documents submitted in support of a claim must be page numbered and each page must be clearly labeled with the Injured Party's name and last four digits of his or her Social Security Number.

48. Changes to Injured Party's or Representative's Contact Information. Injured Parties or Representatives must provide updated names, addresses, and telephone numbers in order to ensure processing of their claim. Failure to provide updates may result in a delay in payment of your claim or inability to pay your claim.

49. Confidentiality. The person(s) signing below hereby consent(s) to the disclosure of the information contained herein to the extent necessary to process claims for benefits including, but not limited to, the disclosure to any Federal or state government body or agency.

50. Documents. You must submit the following documents with your Questionnaire in order for it to be complete. Failure to include these documents will not result in your Questionnaire being deemed untimely, but your claim may be disallowed, or payments on account of your claim will not be made until and unless the following documents are submitted:

- Medical Records (as requested)

- Certificate of official capacity (if Representative is filing form)

- Death Certificate (if applicable)

- Proof of product identification

- Signed HIPPA–Compliant Authorizations for the Release of Medical Records

- Plaintiffs' Fact Sheet (if applicable)

- Judgments (if applicable)

- Applicable Score sheet from Dexatrim Scoring System & Matrix and supporting documentation

FURTHER RECORDS, AUTHORIZATIONS, DISCLOSURES, OR QUESTIONS MAY BE SOUGHT BY THE CLAIMS ADMINISTRATOR, CHATTEM OR OTHER AUTHORIZED PARTY TO VERIFY CLAIMS.

51. Declaration Under Penalty of Perjury. Each person signing this Questionaire acknowledges and understands that this form is an official document sanctioned by the United States District Court for the Western District of Washington. After reviewing the information that has been provided on this form, including information that was supplied by a physician or an attorney, each person signing this form declares under penalty of perjury that all of the information provided in this form is true and correct to the best of the person's knowledge and belief. False statements are punishable by a fine of up to $500,000 or imprisonment or both.

_____ _____
Signature of Injured Party Date (MM/DD/YYYY)

_____ _____
Signature of Representative Date (MM/DD/YYYY)

**INSTRUCTIONS FOR COMPLETING THE SUPPLEMENTAL CLAIM QUESTIONNAIRE**

Any party asserting a claim (an "Injured Party Claim") based on his or her ingestion of Dexatrim occurring on or after December 21, 1998 was required to submit a completed Preliminary Claim Form postmarked on or before July 7, 2004.

If you filed an Injured Party Claim, you are required to complete and return this Questionnaire to the Chattem Claims Administrator or so that it is postmarked on or before _____, or your Injured Party Claim will be barred and you will not receive any payment for your Injured Party Claim, Any Related Claim will be barred and the claimant will not be entitled to any payment on account of his or her Related Claim if a completed Questionnaire regarding the Injured Party from whom the Related Claim derives is not received by the Chattem Claims Administrator.

**If you need additional Questionnaires, or have any questions regarding the Questionnaire or the status of your claim, you may contact the Chattem Claims Administrator at 1–866–866–1729.**

The following definitions apply to the Questionnaire, and are provided for your assistance in completing it.

*Injured Party.* A party asserting a claim based on his or her alleged physical injury or wrongful death related to his or her use of a Dexatrim product on or after December 21, 1998.

*Questionnaire.* The personal injury questionnaire required to be completed and returned to the Chattem Claims Administrator. The Questionnaire is an integral part of the Proof of Claim. Failure to timely submit a completed Questionnaire, notwithstanding timely submission of a completed Personal Injury Proof of Claim Form may result in the disallowance of the Injured Party's claim.

*Representative.* A person completing this Questionnaire on behalf of an Injured Party he or she represents. For example, an administrator, heir or beneficiary, or other legal representative.

*Toxicology Text.* A test performed by a medical professional on either blood or urine to detect the presence of a substance in the body.

If the claimant has more information than fits in the space provided on any part of the Questionnaire, please make additional copies of the applicable pages before writing on them.

Please *type* or *print* clearly and use *black* or *blue* ink.

Be *accurate* and *truthful.* This Questionnaire is an official court document that you are submitting under penalty of perjury and may be used as evidence in any legal proceedings regarding your claim. *The penalty for presenting a fraudulent claim is a fine of up to $500,000 or imprisonment or both.*

Make a copy of your completed Questionnaire and keep a copy for your records. Send only the original Questionnaire to the Chattem Claims Administrator at the following address:

**Chattem Claims Administrator**
**P.O. Box 1776**
**Richmond, VA 23218–1776**

If you wish to receive confirmation that Questionnaire was received, enclose a copy of the completed Questionnaire and a self-addressed return envelope with applicable postage. *Keep this confirmation for your records—It is your only proof that your Questionnaire was received.*

Submitting a fully-completed Questionnaire requires that the claimant attach copies of any and all medical records supporting all claimed injuries or conditions related to the Injured Party's use of a Dexatrim product, such as copies of discharge summaries, emergency medical technician reports, CT scans, MRIs, rehabilitation records, etc. You must submit the following documents with your Questionnaire in order for it to be complete. Failure to submit these documents may result in disallowance or delay of your claim, and you may not be entitled to any payment on your claim:

- Medical Records (as requested)
- Certificate of official capacity (If Representative is filing form)
- Death Certificate (if applicable)
- Proof of product identification
- Signed HIPPA—compliant Authorizations for the Release of Medical Records
- Plaintiffs' Fact Sheet (if applicable)
- Judgments (if applicable)
- Applicable Score Sheet from Dexatrim Scoring System & Matrix and supporting documentation

You may be required to provide additional information if Chattem, in its sole discretion, decides that your Questionnaire was unclear or unresponsive. Failure to provide such additional information at Chattem's request may result in the disallowance of your claim.

Exh. A Annex IV
**Annex IV**

COMPLETION CHECKLIST
SUPPLEMENTAL BENEFIT CLAIM FORM
QUESTIONNAIRE FOR USE BY CHATTEM CLAIMS ADMINISTRATOR

| | | | Not Applicable | Completed Response |
|---|---|---|---|---|
| **Part I.** | **IDENTIFYING INFORMATION.** | | | |
| | 1. | Injured Party. | ☐ | ☐ |
| | 2. | Representative. | ☐ | ☐ |
| | 3. | Representation by counsel. | | ☐ |
| **Part II.** | **LITIGATION HISTORY.** | | | |
| | 4. | Lawsuits related to Dexatrim? | | ☐ |
| | 5. | MDL Lawsuits? | | ☐ |
| | 6. | Settled PPA claim. | | ☐ |
| | 7. | Judgment against PPA defendant. | | ☐ |
| | 10. | Date of purchase of Dexatrim. | | |
| | 11. | Identifies seller or provider of Dexatrim. | | ☐ |
| | 12. | Identifies dates of ingestion of Dexatrim for six months prior to injury. | | ☐ |
| | 13. | Description of Dexatrim product ingested. | | ☐ |
| | 14. | Proof of Dexatrim ingestion. | | ☐ |
| | 15. | Toxicology test. | | ☐ |
| **Part IV.** | **INJURY INFORMATION.** | | | |
| | 16. | Identified type of injury. | | ☐ |
| | 17. | Date and time of onset of symptoms. | | ☐ |
| | A. | *Hemorrhagic Stroke Information.* | | ☐ |
| | 18. | If injured party did not have hemorrhagic stroke, skip to IV.B. | | ☐ |
| | 19. | Prior stroke. | | ☐ |
| | 20. | Family history of stroke, aneurysm, AVM or brain tumor. | | ☐ |

21. Stroke risk conditions. ☐
22. Medications taken for conditions listed in Item 21 ☐
23. Ingestion of blood thinning medications or anticoagulants. ☐
24. Ingestion of cocaine or PCP or other nonprescribed amphetamine. ☐
25. Prescribed amphetamine. ☐
26. Use of other drugs within seven days before onset of stroke symptoms. ☐
27. Tobacco history. ☐
28. Alcohol consumption. ☐
29. Injured party's activities six hours prior to stroke. ☐
B. *Ischemic stroke information.*
30. If injured party did not have an ischemic stroke skip to V. ☐
31. Prior stroke and type. ☐
32. Family history of stroke, aneurysm or brain tumor. ☐
33. Stroke risk conditions. ☐
34. Medications taken for conditions listed in Item 33.
35. Use of heroine, cocaine, or PCP, or any amphetamine not prescribed within 90 days before stroke. ☐
36. Ingestion of prescribed amphetamine within ninety days. ☐
37. Use of other drugs within seven days before onset of symptoms. ☐
38. Tobacco history. ☐
39. Use of oral contraceptives. ☐
40. Alcohol consumption. ☐

**Part V. MEDICAL INFORMATION.**
41. Lists health care providers 10 years prior/3 years after injury. ☐
42. List of prescription medications 10 years prior/3 years after. ☐

**Part VI. 43. MATRIX SCORE.** ☐

**Part VII. MEDICAL EXPENSES PAID BY INSURANCE OR GOVERNMENT—SPONSORED HEALTH PLAN.** ☐
44. Benefits paid by Federal or State Sponsored Health Care Benefit Program. ☐
45. Medical expenses paid by health insurance. ☐
46. Existence of liens by government entity or insurance company. ☐

**Part VIII. MISCELLANEOUS.**
47. Consent of confidentiality. ☐
48. Documents submitted: ☐
 Medical records
 Certificate of official capacity ☐ ☐
 Proof of product ID.
 Signed HIPPA compliant authorization.
 Plaintiff's fact sheet. ☐ ☐
 Judgments. ☐ ☐
 Matrix score. ☐
49. All documents submitted in support of claim are page numbered and clearly labeled with injured party's name and last four digits of Social Security number ☐
50. Signature under penalty of perjury. ☐

Exh. A Annex V
ANNEX V

**EXTRAORDINARY DAMAGE FUND CLAIM FORM**
In re Phenylpropanolamine (PPA) Products Liability Litigation
Case No. 2:01–md–1407 (MDL No. 1407)
United States District Court for
The Western District of Washington

This Form must be completed by any party submitting a claim against Chattem's Extraordinary Damage Fund ("EDF"). To be eligible for an EDF award, a claimant must fall within Matrix Levels IV, V, or VI and must have documented, non-reimbursed/non-reimbursable economic damages totaling at least $250,000.00. For more information regarding the EDF, see Section XI of the Dexatrim Case Scoring Systems and Matrix. In order to be valid, this Form must be signed by the claimant or the claimants' authorized agent or the claimants' attorney, and must attach all documented evidence.

Please send your completed EDF Claim Form and all required documents and supporting information to:

 If by mail: If by hand or overnight delivery:

YOUR COMPLETED EDF CLAIM FORM MUST BE POSTMARKED NO LATER THAN
_____, 2004, ALL INFORMATION INCLUDED IN THIS FORM, AND ALL
SUPPORTING DOCUMENTS SUBMITTED WITH THIS FORM, CONSTITUTE STATEMENTS
MADE UNDER PENALTY OF PERJURY, AND FALSE STATEMENTS ARE PUNISHABLE BY A
FINE OR IMPRISONMENT OR BOTH.

PART I. IDENTIFYING INFORMATION.

 A. Chattem Settlement Claim Number:_____

 B. Name of injured party:_____

PART II. DOCUMENTED NON–REIMBURSED/NON–REIMBURSABLE ECONOMIC DAMAGES.

Please complete the following information concerning your documented non-reimbursed/non-reimbursable economic damages that you have incurred or will incur as a result of your stroke. For purposes of this Form, the term "Documented" means medical records, billing records, tax returns, social security earning statements, expert reports (e.g., economists, life care planners, neurologists, psychiatrists, etc.), or any other documentation or evidence requested by, or otherwise found acceptable by the Chattem Claims Administrator.

Please attach copies of all documents that support your calculation of non-reimbursed/non-reimbursable economic damages relating to your stroke. You must submit all documentation with this Form in order for it to be complete.

 A. State the amount of non-reimbursed out of pocket past medical expenses, if any, you have incurred:

 B. State the amount of non-reimbursable future medical expenses, if any, you expect to incur:

 C. State the amount of our non-reimbursable future living expenses, if any, you expect to incur:

 D. State the amount of your non-reimbursed lost wages, if any, you have incurred:

 E. State the amount of your non-reimbursable future lost wages, if any, you expect to incur:

 F. State the amount of your non-reimbursable loss of earning capacity, if any (both past and future):

 G. Please describe and state the amount of any other documented non-reimbursed/non-reimbursable economic damages, if any, you claim to have suffered:

ANY DOLLAR AMOUNT STATED IN ITEMS A–G ABOVE WILL BE DISREGARD-
ED UNLESS IT IS SPECIFICALLY SUPPORTED BY DOCUMENTED EVIDENCE
ATTACHED TO THIS FORM.

FURTHER RECORDS, OR DISCLOSURES, OR QUESTIONS MAY BE SOUGHT BY
THE CLAIMS ADMINISTRATOR, CHATTEM OR OTHER AUTHORIZED PARTY TO
VERIFY YOUR EDF CLAIM.

**PART III.** *Declaration of Penalty of Perjury.* Each person signing this EDF Claim Form acknowl-
edges and understands that this form is an official document sanctioned by the United
States District Court for the Western District of Washington. After reviewing the
information that has been provided on this form, including information that was supplied by
a physician or an attorney, each person signing this form shall declare under penalty of
perjury that all of the information provided in this form is true and correct to the best of
the person's knowledge and belief. False statements are punishable by a fine of up to
$500,000 or imprisonment or both.

**I declare under penalty of perjury under the laws of the United States of America that
the information I provided in this form is true and correct.**

| | |
|---|---|
| Signature of Injured Party | Date (MM/DD/YYYY) |
| Signature of Representative | Date (MM/DD/YYYY) |

Exh. A Annex VI

COMPLETION CHECKLIST
EXTRAORDINARY DAMAGE FUND CLAIM FORM
FOR USE BY CHATTEM CLAIMS ADMINISTRATOR

| | | Not Applicable | Completed Response |
|---|---|---|---|
| **Part I.** | **IDENTIFYING INFORMATION.** | | |
| | Claim Number | ☐ | |
| | Name of injured party | ☐ | |
| **PART II.** | **DOCUMENTED NON–REIMBURSED/ NON–REIMBURSABLE ECONOMIC DAMAGES.** | | |
| | A. Non-reimbursed out of pocket medical Expenses | ☐ | ☐ |
| | Supporting Documentation Provided | | ☐ |
| | B. Non-reimbursable future medical Expenses | ☐ | ☐ |
| | Supporting Documentation Provided | | ☐ |
| | C. Non-reimbursable future living Expenses | ☐ | ☐ |
| | Supporting Documentation Provided | | ☐ |
| | D. Non-reimbursed lost wages | ☐ | ☐ |
| | Supporting Documentation Provided | | ☐ |
| | E. Non-reimbursable future lost wages | ☐ | ☐ |
| | Supporting Documentation Provided | | ☐ |
| | F. Non-reimbursable loss of earning capacity | ☐ | ☐ |
| | Supporting Documentation Provided | | ☐ |
| | G. Miscellaneous non-reimbursed/non-reimbursable economic damages | ☐ | ☐ |
| | Supporting Documentation Provided | | ☐ |
| **PART III.** | **SIGNATURE UNDER PENALTY OF PERJURY** | ☐ | |

Exhibit B [1]

## FEDERAL CASES THAT THE FINAL ORDER and JUDGMENT DISMISSES

| Docket # | Plaintiff Name | State | Dismissed Parties |
|---|---|---|---|
| C03–368 | Aderholt, Charles | AL | Sidmak Laboratories, Inc.<br>Pliva D.D.<br>Sobel NV |
| C04–413 | Alewel, Kimberly | MO | Chattem Inc.<br>Sidmak Laboratories, Inc. and/or Pliva, Inc. |
| C02–027 | Ambrose, Kenneth (for the estate of Angela Ambrose) | LA | Thompson Medical Company |
| C01–2152 | Antoine, Dorothy | LA | Chattem, Inc. |
| C03–226 | Anzalone, Margie | OH | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc.<br>Thompson Medical Company, Inc.<br>Charles T. Noonan<br>Sidmak Laboratories, Inc.<br>Sobel NV<br>Pliva Prague |
| C03–3098 | Ashton, Joyce | LA | Chattem, Inc. |
| C04–414 | Baeseman, Katherine | MO | Chattem, Inc.<br>Sidmak Laboratories, Inc. and/or Pliva, Inc. |
| C03–224 | Bardlett, Michelle | NV | Chattem, Inc.<br>Thompson Medical Company, Inc. |
| C03–859 | Bass, John Martin | MS | Chattem, Inc.<br>Delaco Company f/k/a Thompson Medical Company, Inc.<br>Sidmak Laboratories, Inc.<br>Sobel N.V.<br>Pliva d.d. |
| C03–3291 | Baynes, Velma | MS | Chattem, Inc.<br>Wal–Mart Stores, Inc. |
| C04–1140 | Belt, Judy | MO | Chattem, Inc.<br>Signal Investment and Management<br>The Delaco Company<br>Sidmak Laboratories, Inc.<br>Sobel NV<br>Pam Holdings, Inc. f/k/a Sobel Holdings, Inc.<br>Plivaa D.D. |
| C04–685 | Bohahan, Letitia | AR | Chattem, Inc.<br>The Delaco Company<br>Thompson Medical Company, Inc.<br>Pliva, Inc. f/k/a Sidmak Laboratories, Inc. |
| C03–3125 | Breite, Shirley | MO | Chattem, Inc.<br>The Delaco Company |
| C04–412 | Brice, LaKisher | MO | Chattem, Inc. |

1. This list does not included cases naming Chattem, Inc. in which the plaintiff's date of injury is prior to December 21, 1998 because these plaintiffs are not Settlement Class Members.

| | | | |
|---|---|---|---|
| | | | The Delaco Company f/k/a Thompson Medical Company, Inc. |
| C03–212 | Brisco, Shonda | NJ | Chattem, Inc. <br> Sidmak Laboratories, Inc. <br> The Delaco Company <br> Thompson Medical Company, Inc. |
| C04–084 | Broadway, Estella | MS | Chattem, Inc., (Successor in Interest to) <br> The Delaco Co., (Successory by Merger to) <br> Thompson Medical Company |
| C04–689 | Broadway, Judy | AR | Chattem, Inc. <br> Chattem, Inc. Consumer Products Division <br> Chattem Chemicals, Inc. <br> Wal–Mart Stores, Inc. |
| C03–497 | Brown, Philip | PA | Chattem, Inc. <br> The Delaco Company <br> Thompson Medical Company, Inc. <br> Thompson Medical |
| C04–686 | Brown–Clark, Joanna | AR | Chattem, Inc. <br> The Delaco Company f/k/a Thompson Medical Company, Inc. <br> Pliva, Inc. f/k/a Sidmak Laboratories Inc. |
| C03–3468 | Bryan, Louise | SC | Chattem, Inc. |
| C04–399 | Bullock, Eddie (Alford) | MS | Chattem, Inc. |
| C04–399 | Butler, Eddie (Alford) | MS | Chattem, Inc. |
| C02–1729 | Cage, Gloria | LA | Chattem, Inc. |
| C03–2492 | Campbell, Pamaula | MS | Chattem, Inc. |
| C04–783 | Cannion, Jessie | MS | Chattem, Inc. |
| C04–415 | Carter, Kathy | MO | Chattem, Inc. <br> Sidmak Laboratories, Inc. and/or Pliva, Inc. |
| C04–399 | Carter, Lovell (Alford) | MS | Chattem, Inc. |
| C04–399 | Catlin, Janice (Alford) | MS | Chattem, Inc. |
| C03–476 | Cervas–Meyer, Katherine Anne | TX | Chattem, Inc. <br><br> Kroger Texas, L.P. |
| C01–1640 | Clark, Shirley Ann | AL | Chattem, Inc. <br> The Delaco Company f/k/a Thompson Medical Company, Inc. |
| C04–399 | Coachman, Victoria (Alford) | MS | Chattem, Inc. |
| C04–1142 | Cocklin, Dan C. | MS | Chattem, Inc. <br> The Delaco Co., f/k/a Thompson Medical Co., Inc. |
| C02–891 | Craft, Wallace | LA | Chattem, Inc. <br> Thompson Medical Co., Inc. |
| | | | Chattem Inc. <br> Delaco Co. f/k/a Thompson Medical Co., Inc. |

| | | | |
|---|---|---|---|
| C01–1836 | Crawford, Roy G. | AL | Sidmak Laboratories, Inc.<br>Sobel, NV<br>Signal Investment & Management Co.<br>Pam Holdings, Inc. (DE)<br>Pam Holdings, Inc. (NJ)<br>Plivaa D.D. |
| C03–1131 | Crothers, Judith E. | PA | Chattem, Inc.<br>Sidmak Laboratories, Inc.<br>Sobel NV<br>Pliva Prague |
| C04–074 | Davis, Elnora | MS | Chattem, Inc.<br>Signal Investment and Management<br>The Delaco Company<br>Sidmark Laboratories, Inc.<br>Sobel NV<br>Pam Holdings, Inc. f/k/a Sobel Holdings, Inc.<br>Plivaa D.D. |
| C04–248 | Davis, Geniece M. | IN | Chattem, Inc.<br>The Delaco Company (formerly Thompson Medical Company, Inc.) |
| C04–785 | Dawkins, Leslie (for the estate of Helen Dawkins) | MS | Chattem, Inc. |
| C02–1013 | DeLucia, Mary | CA | Chattem, Inc.<br>Thompson Medical Company, Inc.<br>The Delaco Company<br>Sav–On Drug Stores (a subsidiary of American Drug Stores, Inc.)<br>American Drug Stores, Inc. |
| C03–3115 | Derigo, Thanh | MS | Chattem, Inc. |
| C04–399 | Donald, Bryant (Alford) | MS | Chattem, Inc. |
| C02–1703 | Draper, Grace | CA | Chattem, Inc.<br>Thompson Medical Company, Inc.<br>The Delaco Company |
| C01–1702 | Drayton, Shirley J. | MS | Chattem, Inc. |
| EDAR C04–99 | Dunn, Curtis | AR | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc.<br>Pliva, Inc. f/k/a Sidmak Laboratories, Inc. |
| C04–399 | England, Maggie M. (Alford) | MS | Chattem, Inc. |
| C04–399 | England, Major Aaron (Alford) | MS | Chattem, Inc. |
| C04–381 | Erbes, Jocelyn | MN | Chattem, Inc.<br>Chattem, Inc. Consumer Products Division<br>Chattem Chemicals, Inc.<br>The Delaco Company |

| | | | Thompson Medical Company, Inc. |
|---|---|---|---|
| C04–399 | Erwin, Irene (Alford) | MS | Chattem, Inc. |
| C04–399 | Evans, Harvey W. (Alford) | MS | Chattem, Inc. |
| C03–2468 | Fitzmaurice, Marilyn | AR | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc.<br>Wal–Mart Stores, Inc. |
| C04–399 | Fleming, David (Alford) | MS | Chattem, Inc. |
| C02–2021 | Ford, Judith | NC | Chattem, Inc.<br>The Delaco Company, (Successor by Merger to)<br>Thompson Medical Company, Inc. |
| C02–1518 | Forrest, Gall (for the estate of Charles Forrest) | FL | Chattem, Inc.<br>The Delaco Corporation (as Successor in Interest to)<br>Thompson Medical Company, Inc.<br>Walgreen Co. |
| C04–1110 | Gatlin, Lossie | MN | Chattem, Inc. |
| C04–399 | Gatlin, Nathaniel (Alford) | MS | Chattem, Inc. |
| C03–1013 | Gregory, Janet | NJ | Chattem, Inc.<br>The Delaco Company<br>Sidmak Laboratories, Inc.<br>Sobel NV<br>Signal Investment & Management<br>Pam Holdings, Inc. f/k/a Sobel Holdings, Inc.<br>Plivaa D.D. |
| C01–2154 | Hammond, Ernestine | LA | Chattem, Inc. |
| C04–868 | Hammond, Wanda | DC | Chattem, Inc. |
| C04–399 | Hannah, Linda (Alford) | MS | Chattem, Inc. |
| C03–3555 | Harper, Ollie Mae | MS | Chattem, Inc.<br>Thompson Medical Company, Inc.<br>Sumrall Drug Store, Inc. |
| C04–153 | Harris, Freddie G. | MS | Chattem, Inc.<br>The Delaco Company<br>Thompson Medical Company, Inc. |
| C04–399 | Harvey, Dewitt Jr. (Alford) | MS | Chattem, Inc. |
| C02–1023 | Heroy, Lenise | NY | Chattem, Inc. |
| C03–1101 | Hills, Alverta | MS | Chattem, Inc. (individually and as successor in interest to)<br>Thompson Medical Company, Inc. |
| C03–216 | Hunt, Angela | NJ | Chattem, Inc.<br>Sidmak Laboratories, Inc.<br>The Delaco Company (successor by merger to Thompson Medical Company, Inc.)<br>Thompson Medical Company, Inc. |

| | | | |
|---|---|---|---|
| C03–3093 | Jackson, Rosie (a/k/a Rosa) | LA | Chattem, Inc. |
| C02–345 | Jackson, Vera | LA | Chattem, Inc. |
| C03–3091 | James, Karen | LA | Chattem, Inc. |
| C03–1742 | Johnson, Gloria | LA | Chattem, Inc.<br>Thompson Medical Company, Inc. |
| C04–1176 | Johnson, Mae Willie | MS | Chattem, Inc.<br>The Delaco Co., f/k/a Thompson Medical Co., Inc. |
| C04–896 | Jones, Mollie | DC | Chattem, Inc. |
| C04–399 | Jordan, Albert (Alford) | MS | Chattem, Inc. |
| C03–3874 | Joseph, Brendra | AR | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc.<br>Wal–Mart Stores, Inc. |
| C03–2156 | Keller, Brenda | LA | Chattem, Inc.<br>The Delaco Company<br>Thompson Medical Company, Inc. |
| C04–1363 | Kelly, Sigrett | MS | Chattem, Inc.<br>Sidmak Laboratories, Inc.<br>The Delaco Company |
| C02–2148 | Lacey, Betty | LA | Chattem, Inc. |
| C03–362 | Lampkin, Tony Ray | AL | Chattem, Inc.<br>Sidmak Laboratories, Inc.<br>Sobel NV<br>Pliva D.D. |
| EDAR C04–99 | Lankford, Jackie (Dunn) | AR | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc.<br>Pliva, Inc. f/k/a Sidmak Laboratories, Inc. |
| C03–1128 | Lankford, Tonni | NJ | Chattem, Inc.<br>The Delaco Company<br>Sidmak Laboratories, Inc.<br>Sobel NV<br>Signal Investment & Management<br>Pam Holdings, Inc. f/k/a Sobel Holdings, Inc.<br>Plivaa D.D. |
| C03–1439 | Lea, Angela | TX | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc.<br>Walgreens Company<br>H.E. Butt Grocery Company d/b/a HEB |
| C02–2018 | Lee, Karen | LA | Chattem, Inc.<br>The Delaco Co. (Successor by merger into)<br>Thompson Medical Co., Inc. |
| C04–1357 | Lewis, Sally | FL | Chattem, Inc.<br>The Delaco Company<br>Sidmak Laboratories, Inc.<br>Walgreen Company |

| | | | |
|---|---|---|---|
| C04–399 | Lilly, Robert (Alford) | MS | Chattem, Inc. |
| C03–3809 | Lott, Alisa | MS | Chattem, Inc. |
| C03–3055 | Mack, Willie Mae | MS | Chattem, Inc. |
| C04–399 | Marshall, Odell (Alford) | MS | Chattem, Inc. |
| C04–399 | Mayfield, Mary (Alford) | MS | Chattem, Inc. |
| C03–3455 | McCook, Edith | AL | Chattem, Inc.<br>Delaco Company (f/k/a Thompson Medical Co.) |
| C02–352 | McCray, Justine | LA | Chattem, Inc. |
| C03–215 | McKinley, Tanya | NJ | Chattem, Inc.<br>Sidmak Laboratories, Inc.<br>The Delaco Company (successor by merger to Thompson Medical Company, Inc.)<br>Thompson Medical Company |
| C04–548 | McLemore (Weaver), Eva | MO | Chattem, Inc.<br>Schnuck Markets, Inc. |
| C03–3024 | Miles, Debbie | MS | Chattem, Inc. |
| C03–3480 | Miller, Daffney | AL | Chattem, Inc.<br>Delaco Company (f/k/a Thompson Medical Co.) |
| C03–1745 | Miller, Ida | LA | Chattem, Inc.<br>Delaco Company, (successory by merger to)<br>Thompson Medical Company, Inc. |
| C02–342 | Miller, James Brandon | CA | Chattem, Inc.<br>Thompson Medical Company, Inc. |
| C02–917 | Miller, Veronica Ann | TX | Chattem, Inc.<br>Thompson Medical Company, Inc.<br>Delaco Company (as successor by merger to Thompson Medical Company, Inc.) |
| C04–399 | Mitchell, Catherine (Alford) | MS | Chattem, Inc. |
| C03–2485 | Mitchell, Dorothy | MS | Chattem, Inc.<br>Sidmak Laboratories, Inc.<br>Sobel, N.V.<br>Signal Investment & Management Co.<br>Pam Holdings, Inc. (DE)<br>Pam Holdings, Inc. (NJ)<br>Plivaa D.D. |
| C04–1172 | Monk, Bobbie Genette | MS | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc. |
| C03–2506 | Moody, Carol | TX | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc.<br>H.E. Butt Grocery Company d/b/a HEB |
| | | | Chattem, Inc.<br>Signal Investment & Management |

| | | | |
|---|---|---|---|
| C03–2857 | Moore, Tanya Rae | NB | Pam Holdings, Inc. f/k/a Sobel Holdings, Inc.<br>Plivaa D.D.<br>The Delaco Company<br>Sidmak Laboratories, Inc.<br>Sobel NV |
| C04–399 | Murphy, Billy (Alford) | MS | Chattem, Inc. |
| C02–2589 | Nail, Richard | AL | Chattem, Inc.<br>The Delaco Company (f/k/a Thompson Medical Company, Inc.) |
| C03–3553 | Owens, Lisa Yolanda | MS | Chattem, Inc.<br>Thompson Medical Company, Inc.<br>Medisave d/b/a Super Discount Drugs, Inc. |
| C03–3027 | Owens, Wiletta | MS | Chattem, Inc. |
| C03–2845 | Pagel, Mary Lorraine | FL | Chattem, Inc.<br>The Delaco Company<br>Sidmak Laboratories |
| C02–755 | Park, Jon | CA | Chattem, Inc.<br>Thompson Medical Company, Inc.<br>The Delaco Company |
| C04–991 | Pitt, Viola L. | MO | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc.<br>Pliva, Inc. f/k/a Sidmak Laboratories, Inc. |
| C04–700 | Pringle, Betty F. | DC | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc.<br>Pliva, Inc. f/k/a Sidmak Laboratories Inc. |
| C04–399 | Raby, Mittle (Alford) | MS | Chattem, Inc. |
| C03–3056 | Rainey, Betty | MS | Chattem, Inc. |
| C04–399 | Reddick, Rufus (Alford) | MS | Chattem, Inc. |
| C03–1728 | Reinninger, Billie | LA | Chattem, Inc.<br>Delaco Company (successor by merger to)<br>Thompson Medical Company |
| C04–399 | Riley, Larry (Alford) | MS | Chattem, Inc. |
| C04–399 | Rodgers, Voncille (Alford) | MS | Chattem, Inc. |
| C04–1363 | Rominger, Barbara | MS | Chattem, Inc.<br>Sidmak Laboratories, Inc.<br>The Delaco Company |
| C02–509 | Romo, Cheryl | CA | Chattem, Inc. |
| C03–2317 | Rosebud, Delores | AL | Chattem, Inc.<br>The Delaco Company |
| C03–587 | Rouse, Lori | AR | Chattem, Inc. |
| C04–399 | Rowell, Era (Alford) | MS | Chattem, Inc. |
| C04–399 | Royster, Vinnie (Lucindy Ruthledge) (Alford) | MS | Chattem, Inc. |
| | | | Chattem, Inc. |

| | | | |
|---|---|---|---|
| C04–879 | Russell, Tracy | MO | The Delaco Company f/k/a Thompson Medical Company, Inc.<br>Pliva, Inc. f/k/a Sidmak Laboratories, Inc. |
| C02–1012 | Salazar, Louis | CA | Chattem, Inc.<br>Thompson medical Company, Inc.<br>Sav–On Drug Stores<br>American Drug Stores Inc. a/k/a Albertson's<br>Sidmak Laboratories, Inc. |
| C03–3551 | Sangster, Carolyn | MS | Chattem, Inc.<br>Thompson Medical Company, Inc.<br>Wal–Mart, Inc. d/b/a Wal–Mart Store |
| C04–399 | Sawyer, William (Alford) | MS | Chattem, Inc. |
| C04–092 | Saxon, Annie | SC | Chattem, Inc.<br>Revco Discount Drug Centers, Inc. |
| C03–589 | Schaal, Marilyn | AR | Chattem, Inc. |
| C03–860 | Shandy, Bo Drax | MS | Chattem, Inc.<br>Eckerd Corporation d/b/a Eckerd Drugs |
| C03–1101 | Shealey, Curley | MS | Chattem, Inc.<br>Thompson Medical Company, Inc. |
| C03–3879 | Siemer, Timi | MO | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc.<br>Schnuck Markets, Inc. |
| C01–2144 | Simmons, Deloris | MD | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc.<br>Pliva, Inc. f/k/a Sidmak Laboratories, Inc. |
| C01–1882 | Smith, Almer Glynn | TX | Chattem, Inc. |
| C04–399 | Smith, Bobby (Alford) | MS | Chattem, Inc. |
| 8:04–CV–88–EAJ (Middle District, Tampa Division) | Sosebee, Charlotte | FL | Chattem, Inc.<br>The Delaco Company<br>Sidmark Laboratories, Inc.<br>Sobel NV<br>Signal Investment and Management<br>Pam Holdings, Inc (f/k/a)<br>Sobel Holdings, Inc.<br>Plivaa D.D. |
| C02–910 | Sparks, Jessie | LA | Chattem, Inc. |
| C03–1121 | Sparks, Sue | NJ | Chattem, Inc.<br>The Delaco Company<br>Sidmak Laboratories, Inc.<br>Sobel NV<br>Signal Investment & Management Co.<br>Pam Holdings, Inc. f/k/a Sobel Holdings, Inc. |

Plivaa D.D.

| | | | |
|---|---|---|---|
| C04–399 | Starks, Elaine (Alford) | MS | Chattem, Inc. |
| C03–2492 | Street, Hall | MS | Chattem, Inc. |
| C01–2138 | Strickley, Judith F. | KY | Chattem, Inc. |
| C02–2625 | Tanner, Alma | TX | Chattem, Inc.<br>The Delaco Co. (f/k/a Thompson Medical Company, Inc.)<br>Sidmak Laboratories, Inc.<br>Sobel, NV<br>Signal Investment & Management Co.<br>Pam Holdings, Inc. (DE)<br>Pam Holdings, Ind. (NJ)<br>Plivaa D.D. |
| C04–399 | Taylor, Wille (Alford) | MS | Chattem, Inc. |
| C04–380 | Teixeira, Linda | MN | Chattem, Inc.<br>Chattem, Inc. Consumer Products Division<br>Chattem Chemicals, Inc.<br>The Delaco Company<br>Thompson Medical Company, Inc. |
| C03–3284 | Thomas, Dorothy | MS | Chattem, Inc. |
| C04–396 | Thomas, Dorothyette (for the estate of Linda Marie Jones) | MS | Chattem, Inc.<br>The Delaco Co. (f/k/a)<br><br>Thompson Medical Co., Inc. |
| C04–399 | Thomas, Inell (Alford) | MS | Chattem, Inc. |
| C04–399 | Thomas, Robert (Alford) | MS | Chattem, Inc. |
| C04–134 | Thompson, Brenda | AL | Chattem, Inc.<br>The Delaco Company<br>Sidmark Laboratories, Inc.<br>Sobel NV<br>Signal Investment and Management<br>Pam Holdings, Inc. f/k/a Sobel Holdings, Inc.<br>Plivaa D.D. |
| C01–2162 | Thompson, Karen | LA | Chattem, Inc. |
| C04–1082 | Thompson, Nathaniel W. | MS | Chattem, Inc. |
| C04–399 | Thurmond, Rosie (Alford) | MS | Chattem, Inc. |
| WDAR C04–100 | Tolbert, Larry | AR | Chattem, Inc.<br>The Delaco Company (f/k/a Thompson Medical Company, Inc.)<br>Pliva, Inc. (f/k/a Sidmak Laboratories, Inc.) |
| C03–2506 | Trevino, Zulema | TX | Chattem, Inc.<br>The Delaco Company f/k/a Thompson Medical Company, Inc.<br>H.E. Butt Grocery Company d/b/a HEB |
| C04–399 | Tyson, Della (Alford) | MS | Chattem, Inc. |
| C04–546 | Walker, Benito | MO | Chattem, Inc.<br>Schnuck Markets, Inc. |
| | | | Chattem, Inc. |

| C02–2268 | Warhul, Lillian | GA | The Delaco Corporation, Successor in Interest to Thompson Medical Company, Inc. <br> Thompson Medical Company, Inc. |
|---|---|---|---|
| C04–405 | Waterman–Reynolds, Joyce | AR | Chattem, Inc. <br> Chattem, Inc. Consumer Products Division <br> Chattem Chemicals, Inc. <br><br> Wal–Mart Stores, Inc. <br> The Delaco Company (f/k/a Thompson Medical Company. Inc.) |
| C04–399 | Watson, Myrtle (Lilly Cunningham) (Alford) | MS | Chattem, Inc. |
| C04–840 | Whitehorn, Jonell | MO | Chattem Inc. <br> The Delaco Company f/k/a Thompson medical <br> Sidmak Laboratories, Inc. <br> Schnuck Supermarkets, Inc. (a/k/a Schnucks, Inc., a/k/a Schnuck Holding Company a/k/a Schnucks Food & Drugs) d/b/a Schnucks |
| C04–399 | Whitehurst, Mary (Alford) | MS | Chattem, Inc. |
| C02–537 | Woodward, Ethen | KY | Chattem, Inc. <br> The Delaco Company f/k/a Thompson Medical Company, Inc. <br> Sidmak Laboratories, Inc. <br> Sobel, NV <br> Signal Investment & Management Co. <br> Pam Holdings, Inc. (DE) <br> Plivaa D.D. |
| C03–1737 | Young, Charlotte | LA | Chattem, Inc. <br> Thompson Medical Company, Inc. <br> The Delaco Company |
| C04–399 | Young, Cynthia (Alford) | MS | Chattem, Inc. |
| C04–399 | Young, Reginald (Alford) | MS | Chattem, Inc. |

Exhibit C

*CLASS MEMBERS ELGIBLE TO PARTICIPATE IN SETTLEMENT PROCESS*

| Docket # (if any) | Class Claim # | Name | Resident State |
|---|---|---|---|
| | 899 | Alcom, Kenneth | TX |
| | 438 | Aleem, Saleem | CA |
| C04–413 | 219 | Alewel, Kimberly | MO |
| | 743 | Alexander, Melinda | AL |

| | | | |
|---|---|---|---|
| C02–027 | 360 | Ambrose, Angela | LA |
| | 476 | Ames, Betty | AZ |
| PA | 13 | Anen, George | VA |
| C01–2152 | 21 | Antoine, Dorothy | LA |
| C03–226 | 121 | Anzalone, Margie | OH |
| | 827 | Aragon, Suzanne | UT |
| C03–3098 | 129 | Ashton, Joyce | MD |
| | 952 | Austin, Bertha | AL |
| | 341 | Baduske, William | NJ |
| C04–414 | 217 | Baeseman, Katherine | MO |
| | 1024 | Baker, Shannon | TX |
| | 1023 | Bal, Gurpreet | CA |
| LA | 29 | Bardales, Andres | LA |
| C03–224 | 141 | Bardlett, Michelle | NV |
| | 692 | Barrett, Charlotte | CA |
| | 620 | Baskerville, Ruth | AL |
| C03–859 | 157 | Bass, John Martin | MS |
| C03–3291 | 131 | Baynes, Velma | MS |
| | 891 | Bell, Earlean | TN |
| C04–1140 | 291 | Belt, Judy | MO |
| | 1041 | Bequillard, Aldana | FL |
| | 993 | Billingsley, Mia | AZ |
| | 934 | Bishop, Lynn | TN |
| | 1004 | Bixler, Yvonne | TX |
| NJ | 105 | Blacklidge, Darlene | AZ |
| | 484 | Blakely, Sharon | MO |
| | 877 | Bodal, Victoria | FL |
| | 1014 | Bolda, Lisa | TX |
| | 1035 | Bowe, George | MO |
| | 348 | Braxton, Aaron | CA |
| | 1021 | Breeswine, Garry | NM |
| C03–3125 | 207 | Breite, Shirley | MO |
| C04–412 | 235 | Brice, Lakisher | MO |
| C03–212 | 145 | Brisco, Shonda | TX |
| C04–084 | 285 | Broadway, Estella | MS |
| C04–689 | 470 | Broadway, Judy | TX |

| | | | |
|---|---|---|---|
| NJ | 17 | Brown, Anna | NJ |
| PA | 113 | Brown, Philip | PA |
| | 700 | Brown, Rickey | KS |
| | 1046 | Brown, Vickie | IA |
| C03–3468 | 203 | Bryan, Louise | SC |
| | 445 | Burton, William | CA |
| NJ | 109 | Busby, Angela | OK |
| C02–1729 | 63 | Cage, Gloria | LA |
| LA | 61 | Cain, Kenneth | LA |
| | 640 | Caldwell, Kimmerly | SC |
| | 1036 | Caley, Melinda | MO |
| C04–783 | 461 | Cannion, Jessie | AL |
| | 995 | Carey, Tammi | MI |
| | 911 | Carlson, Starrlett | AL |
| C04–415 | 215 | Carter, Kathy | MO |
| | 602 | Castello, Melvin | CA |
| | 697 | Causey, Virgle | MS |
| C03–476 | 125 | Cervas–Meyer, Katherine | TX |
| | 818 | Christopher, Jose Raul | FL |
| | 936 | Clark, Edward | UT |
| | 577 | Clark, Patricia | MS |
| | 1028 | Clark, Phyllis | FL |
| C01–1540 | 7 | Clark, Shirley | AL |
| | 419 | Clegg, Sharon | IN |
| C04–1142 | 277 | Cocklin, Dan | MS |
| | 722 | Coger, Essie | IL |
| | 996 | Cole, Janet | CA |
| | 954 | Coleman, Alvetre | CA |
| | 939 | Coleman, Earl | CA |
| | 799 | Collazo, Mildred | FL |
| NJ | 149 | Collins, Cherise | NM |
| | 1027 | Collins, Victoria | FL |
| | 888 | Conner, Donna | NC |
| | 997 | Cook, James | FL |
| | 994 | Cooley, Sharde | CA |
| | 981 | Copeland, Harry | MD |

| | 332 | Cordick, William | AZ |
|---|---|---|---|
| | 1047 | Cotey, Stephen Ray | FL |
| C02–091 | 27 | Craft, Wallace | LA |
| | 1003 | Crawford, Beverly | CA |
| C01–1636 | 9 | Crawford, Roy | KS |
| C03–1131 | 169 | Crothers, Judith | PA |
| | 632 | Curtis, Cheryl | IL |
| | 324 | Daranyl, Peter | CA |
| | 948 | Darensbourg, Percy | CA |
| | 1030 | Daunt, Sharon | KY |
| | 661 | David, Sandra | FL |
| C04–074 | 225 | Davis, Elnora | MS |
| | 1029 | Davis, Etrenda | FL |
| C04–248 | 459 | Davis, Genlece | IL |
| C04–785 | 247 | Dawkins, Leslie | AL |
| | 710 | Delgado, Beverly | OK |
| C02–1013 | 53 | DeLucia, Mary | CA |
| | 1037 | Dennis, Joseph | MN |
| | 745 | Dent, Lorann | GA |
| C03–3115 | 433 | Derigo, Thanh | FL |
| | 1040 | Dixon, Leasha | APO, AE |
| | 987 | Dixon, Tasha | CA |
| C02–1703 | 41 | Draper, Grace | CA |
| C01–1702 | 15 | Drayton, Shirley | MS |
| | 973 | Dunivant, Patsy | AL |
| | 448 | Ellenburg, Joyce | MO |
| | 727 | Elliot, Tom | PA |
| NJ | 127 | Esguerra, Gloria | VA |
| | 609 | Etheridge, Minnie | AL |
| | 629 | Etheridge, Sophie | AL |
| | 976 | Evans, Henry | CA |
| | 992 | Evans, Minnie | CA |
| PA | 75 | Evans, Regina | PA |
| | 979 | Evans, Sharon | MI |
| | 836 | Evans, Stephanie | CA |
| | 421 | Ewing, Connie | IL |

| | | | |
|---|---|---|---|
| | 868 | Ewing, Patricia | IL |
| | 873 | Farmer, Mary | AL |
| | 988 | Field, Brent | OR |
| | 951 | Fielder, Thelma | CA |
| | 978 | Finley, Christopher | CA |
| C03–2466 | 432 | Fitzmaurice, Marilyn | AR |
| | 541 | Flowers, Ann | CA |
| C02–2021 | 31 | Ford, Judith | NC |
| C02–1518 | 71 | Forrest, Charles | FL |
| NJ | 83 | Forrest, Patsy | TN |
| | 847 | Fox, Elaine | FL |
| TX | 143 | Frances, Mary | TX |
| | 456 | Freeman, Alexzander | CA |
| | 846 | Gambrel, Edith | IN |
| | 349 | Garrett, Donald | TX |
| | 351 | Gatewood, Helen | CA |
| | 949 | Gearon, James | IL |
| | 985 | Gilmore, Willie | CA |
| | 352 | Glasper, Andrea | CA |
| | 350 | Glasper, Jack Thomas | CA |
| | 343 | Glasper, Robert | CA |
| | 398 | Glasper, Roy Lee | CA |
| | 1020 | Grantz, Patricia | KS |
| | 977 | Grathwohl, Carla | ME |
| | 843 | Green, Bobby | AR |
| C03–1013 | 491 | Gregory, Janet | FL |
| | 659 | Guidry, Cassandra | LA |
| | 887 | Hall, Robin | CA |
| | 397 | Hall, Valerie | CA |
| C01–2154 | 19 | Hammond, Ernestine | LA |
| C04–868 | 276 | Hammond, Wanda | MS |
| | 884 | Hardy, Karlan | TX |
| NV | 3 | Harper, Charles | NV |
| C03–3555 | 427 | Harper, Ollie | MS |
| FL | 289 | Harris, Billie | FL |
| C04–153 | 281 | Harris, Freddie | MS |

| | | | |
|---|---|---|---|
| | 999 | Hash, Robert | VA |
| | 1016 | Hawkins, Brigette | MI |
| | 778 | Henderson, Rodney | CA |
| | 929 | Henley, Suemeko | MS |
| C02–1023 | 59 | Heroy, Lenise | NY |
| | 924 | Hike, Connie | GA |
| PA | 97 | Hill, Lenrea Moss | NC |
| | 1026 | Hill, Ophella | FL |
| | 764 | Hodges, Nancy | NC |
| | 881 | Holloway, Delfhine | AL |
| NJ | 155 | Honeyblue, Danza | NJ |
| | 1009 | Houston, Eddie | CA |
| | 413 | Houston, Robert | CA |
| C03–216 | 139 | Hunt, Angela | IN |
| | 695 | Ivery, Rachel | GA |
| C03–3093 | 425 | Jackson, Rosie | LA |
| C03–3091 | 103 | James, Karen | LA |
| | 950 | Jenkins, Etta | CA |
| | 984 | Johnson, Alice | CA |
| | 926 | Johnson, Dovine | CA |
| | 918 | Johnson, Ed | FL |
| | 774 | Johnson, Fred | MO |
| | 409 | Johnson, Fred C. | FL |
| C03–1742 | 39 | Johnson, Gloria | LA |
| C04–1176 | 279 | Johnson, Mae Willie | MS |
| LA | 67 | Johnson, Noreen | LA |
| | 559 | Johnson, Terry | CA |
| | 766 | Jones, Barbara | FL |
| | 231 | Jones, Linda | MS |
| C04–896 | 262 | Jones, Mollie | VA |
| | 982 | Jones, Yolanda | CA |
| C03–3874 | 431 | Joseph, Brendra | AR |
| | 915 | Kelly, Antoinette | IL |
| | 767 | Kelly, Georgia | IL |
| | 963 | Kelly, Larry | IL |
| | 736 | Kelly, Teresa | OH |

| | | | |
|---|---|---|---|
| | 452 | Kirby, Donald | OH |
| | 786 | Knox, Curtis | CA |
| | 637 | Lance, Paul | OH |
| | 622 | Lanford, Hugh | SC |
| C03–1128 | 153 | Lankford, Tonni Yolinda | TX |
| | 920 | Lano, Mike | CA |
| | 628 | Larson, Stephen | OR |
| C03–1439 | 123 | Lea, Angela | TX |
| | 931 | Leaks, Jeffery | CA |
| | 475 | Leany, Sharon | AZ |
| TX | 115 | Lemon, Sharon | TX |
| | 408 | Lewis, Bryant | MD |
| | 900 | Lewis, Elmer | CA |
| | 946 | Lewis, Patrice | GA |
| C04–1357 | 293 | Lewis, Sally | FL |
| | 1038 | Ley, Diane | MO |
| | 698 | Little, John | MO |
| | 863 | Long, Pamela | CA |
| | 890 | Love, Angela | IL |
| TX | 5 | Lowry, Delbert | TX |
| | 733 | Luttnell, Nancy | TN |
| | 783 | Lyons, Cameron | CA |
| | 842 | Machado, Antoinio | CA |
| C03–3056 | 434 | Mack, Wille Mae | MS |
| | 790 | Mansour, Laurie | OK |
| PA | 47 | Mapp–Grier, Theresa Bernice (Anne Maxwell) | PA |
| | 391 | Marquez, Laura Jane | CA |
| | 908 | Marshall, Douglas | NY |
| | 820 | Martin, Anne | MA |
| | 655 | Martinez, Judy | MN |
| PA | 93 | Mattison, Michael | NE |
| | 1034 | Mayberry, Linda | LA |
| | 794 | Mayweather, Bobby | LA |
| | 758 | McCall, Hermine | LA |
| C03–3455 | 99 | McCook, Edith | AL |
| | 980 | McCormick, Dieshawn | CA |

| | | | |
|---|---|---|---|
| C02–352 | 385 | McCray, Justine | LA |
| | 947 | McCrea, Phyllis | CA |
| | 687 | McCuller, Janice | TX |
| | 957 | McGriff, Andre | FL |
| C03–215 | 133 | McKinley, Tanya | CO |
| | 714 | McKinney, Steve | LA |
| C04–546 | 455 | McLemore (Weaver), Eva | MO |
| | 941 | Menard, Mauro | NY |
| | 825 | Milea, Earnest | TX |
| C03–3480 | 423 | Miller, Daffney | AL |
| C02–342 | 25 | Miller, James Brandon | CA |
| | 394 | Miller, Ora | TX |
| C02–917 | 69 | Miller, Veronica | TX |
| | 399 | Mills, Richard | MI |
| | 974 | Mitchell, Dorothy | MS |
| | 846 | Molina, Mary | CA |
| | 631 | Monroe, Tonsa | LA |
| C03–2506 | 430 | Moody, Carol | TX |
| C03–2857 | 211 | Moore, Tanya | NE |
| | 728 | Morton, George | PA |
| | 691 | Muldrow, Sharon | CA |
| C02–2589 | 89 | Nall, Richard | AL |
| | 717 | Namanny, Ronald | TN |
| | 842 | Nelson, Kenneth | IL |
| | 1000 | Netterville, Melanie | MS |
| | 814 | Nettles, Garyon | CA |
| | 565 | Neville, Edmond | NY |
| | 623 | Neyer, Claudia | IL |
| | 945 | Nolah, Christopher | IL |
| | 650 | Norris, Avis | NY |
| | 755 | O'Quinn, Barbara | IL |
| C03–3553 | 159 | Owens, Lisa | MS |
| C03–3027 | 435 | Owens, Wiletta | CA |
| C03–2846 | 194 | Pagel, Mary | FL |
| | 1039 | Paluch, Dale | MO |
| C02–755 | 55 | Park, Jon | CA |

| | | | |
|---|---|---|---|
| PA | 492 | Parker, Stacy | NV |
| | 956 | Parrish, Amiesha | CA |
| PA | 77 | Pastella, Judith | PA |
| | 1005 | Patin, Augusta | LA |
| | 983 | Patterson, Joseph | MI |
| | 716 | Peer, Galvester | WI |
| | 720 | Pindle, Davont | PA |
| | 753 | Polk, Bertha | MO |
| | 682 | Prescott, Clifford | VA |
| | 1008 | Price, Maurice | CA |
| NY | 95 | Privitera, Kathleen | NY |
| | 1001 | Przystup, Christopher | MI |
| | 707 | Pyclor, Mary | IL |
| | 771 | Quiroga, Ponclan | IN |
| C03–3056 | 182 | Rainey, Betty | MS |
| | 726 | Reed, Christopher | CA |
| | 893 | Reichbart, Marc | FL |
| | 617 | Randa, Evon | PA |
| | 898 | Reynolds, Terry | WA |
| | 908 | Richardson, Donald | TX |
| | 410 | Richmond, Cecelia | IL |
| FL | 283 | Ricketts, Florence | FL |
| | 331 | Rider, Dale | IL |
| | 731 | Roberson, Larry | TX |
| | 897 | Robertson, John | CA |
| CA | 493 | Rodriguez, Manuel | CA |
| | 1017 | Rogers, Maggie | SD |
| C04–1363 | 296 | Rominger, Barbara | MS |
| C02–500 | 369 | Romo, Cheryl | CA |
| | 792 | Rone, Timothy | NC |
| C03–2317 | 119 | Rosebud, Delores | AL |
| C03–587 | 135 | Rouse, Lori | AR |
| | 944 | Rouse, Ronald | DR |
| | 964 | Rudnick, Neal | IA |
| | 393 | Salaml, J.L. | TX |
| C02–1012 | 51 | Salazar, Louis | CA |

| | | | |
|---|---|---|---|
| | 323 | Saller, Caroline | MD |
| NJ | 131 | Sanders, Erika | LA |
| C03–3551 | 161 | Sangster, Carolyn | MS |
| | 913 | Sapp, Shamont | PA |
| C04–092 | 201 | Saxon, Annie | SC |
| | 845 | Scales, Billy | AR |
| C03–589 | 137 | Schaal, Marilyn | AR |
| | 791 | Sell, Lydia | TX |
| | 679 | Senty–Haugen, Arthur | MN |
| | 586 | Serrell, Rene | CA |
| | 789 | Sexton, Carole | AR |
| C03–860 | 165 | Shandy, Bo Drax | TX |
| C03–3879 | 192 | Sierner, Timi | MO |
| | 956 | Singleton, Marnette | AR |
| | 619 | Siravo, Nicholas | PA |
| | 585 | Sloan, Tyrone | CA |
| C01–1882 | 11 | Smith, Almer | TX |
| | 975 | Smith, Carl | CA |
| | 960 | Smith, Gregory | CA |
| | 756 | Smith, Jennifer | IL |
| | 729 | Smith, Phillip | AZ |
| | 642 | Smith, Richard | NY |
| | 678 | Sorina, Barbara | LA |
| | 734 | Sorth, Christopher | MO |
| | 923 | Sosa, Rosemarie | FL |
| FL | 471 | Sosebee, Charlotte | GA |
| C02–910 | 45 | Sparks, Jessie | LA |
| C03–1121 | 163 | Sparks, Sue | AL |
| | | Spaulbing, Kristal | |
| | 1007 | Stallworth, Alma | MI |
| | 986 | Stallworth, Jerome | MI |
| | 938 | Stallworth, Wayne | CA |
| CA | 49 | Stanton, Melinda | CA |
| FL | 196 | Stemen, Joan | FL |
| | 767 | Stephens, Joseph | AR |
| NJ | 151 | Sterling, Vanessa | AL |

| | | | |
|---|---|---|---|
| | 822 | Stevens, Wendelyn | NY |
| | 688 | Stewart, Betty | MS |
| | 937 | Stewart, Thomas | TX |
| | 316 | Stoglin, Gloria | TX |
| | 797 | Stratton, Angrea | AL |
| C01–2138 | 31 | Strickley, Judith | KY |
| | 320 | Stuebner, George | IL |
| | 896 | Swain, Rebecca | NM |
| FL | 269 | Swistack, Edward | FL |
| C02–2625 | 107 | Tanner, Alma | TX |
| | 1019 | Taylor, Rudy | CA |
| | 615 | Taylor–Parrish, Shirley | TN |
| | 701 | Thomas, John | IL |
| C04–134 | 458 | Thompson, Brenda | AL |
| C01–2162 | 23 | Thompson, Karen | LA |
| | 732 | Tidik, Brad | MI |
| C03–2505 | 117 | Trevino, Zulema | TX |
| | 998 | Tuggle, Ebony | MI |
| | 1002 | Tuggle, Jessica | MI |
| | 1015 | Tuggle, Marilyn | MI |
| | 961 | VanHalen, Heiko | OR |
| | 321 | Vascellaro, Salvatore | NY |
| | 584 | Villa–Powell, Tammy | IL |
| C04–546 | 237 | Walker, Benito | MO |
| | 538 | Walters, John | AL |
| C02–2268 | 85 | Warhul, Lillian | GA |
| | 1025 | Washington, Irene | CA |
| | 874 | Washington, Sharene | CA |
| | 598 | Washington, Shirley | DC |
| C04–405 | 1022 | Waterman–Reynolds, Joyce | AR |
| | 965 | Weatherford, James | CA |
| | 723 | Weatherford, Marsha | CA |
| | 628 | Welch, Brenda | MI |
| | 800 | Wells, Kevin | TN |
| | 1010 | Wheatley, Charles | FL |
| C04–840 | 221 | Whitehorn, Jonell | AL |

| | 770 | Whitten, Raymond | CA |
|---|---|---|---|
| | 972 | Wiley, Mose | AR |
| | 562 | Williams, Cheryl | FL |
| | 610 | Wilson, Irma | AL |
| | 910 | Wilson, Roy | FL |
| | 696 | Wofford, LaVerne | KS |
| C02–537 | 33 | Woodward, Ethen | KY |
| | 725 | Yarrell, Dennis | NC |
| C03–1737 | 167 | Young, Charlotte | LA |
| NY | 147 | Zarkin, Cheryl | NY |

### INELGIBLE CLAIM FORMS RECEIVED (DOI prior to 12/21/98)

| DOI | LAST NAME | MDL Docket # |
|---|---|---|
| 10/10/98 | BaCole, Marion Jarmaine | |
| 7/12/996 | Bennett, LaVeda Michelle | |
| 4/3/97 | Brodsky, Jennifer L. | |
| 8/19/94 | Chapman, Oakley M. | C02–798 |
| 1990 | Compton, Thomas Henry | |
| 1997 | Dosunmu, Delores Jenkins | |
| 1993 | Frost, Betty Ann | |
| 7/15/94 | Khan, Penelope Phyllis | |
| 5/98 | Lawrence, Jerry | |
| 6/12/98 | Lewis, Flora Moore | |
| 7/96 | Murrie, Elodia | |
| 1994 | Payll, Sarah R. | |
| 1994 | Rollins, Betty J. | C02–1736 |
| 1996 | Salinas, Peter | |
| 1986 | Schultz, Nerissa Regina | |
| 7/97 | Slaughter, Michael Eugene | |
| 11/19/97 | Slocum, Anthony | C02–555 |
| 1997 | Smith, Linday Winningham | |
| 1/30/98 | Thomas, Wanda J. | |
| 6/97 | Tormey, Joyce Runge | |
| 7/98 | Ulibarri, Peter Louis | |
| 11/4/98 | Walker, Barbara Renee | |

Exhibit D
*OPT–OUTS*

| NAME | DOCKET # |
|------|----------|
| Barrientez, Rose | |
| Bell, Glyna | C04–1137 |
| Bryant, Rose | |
| Geldon, Lisa | MN # 04–2647 |
| George, Amy | C04–993 |
| Glover, John E. | |
| Haux, Rhonda L. | |
| Lester, Susan | |
| Malcolm, Donnie | |
| Robertl, Kathleen | |
| Sherbak, Michael | |
| Swartz, Ellen | |
| Vollmar, John | MN # 04–2648 |
| Williams, Philandew | C03–2059 |
| Young, Jacquelyn | |

**The following people sent opt-out letters, but have dates of injury prior to December 21, 1998**

| DOI | NAME | DOCKET # |
|-----|------|----------|
| 12/97 | Goleman, Peggy | C04–1130 |
| 9/2/95 | Mitchell, Regina | C04–1116 |
| 10/98 | Montgomery, Rebecca | C04–1119 |
| 1/8/91 | Powers, Joy | C04–1122 |
| 4/17/95 | Reeves, Carla | C04–1123 |